## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## NORTHERN DIVISION

MICHELLE WALKER

     Plaintiff,

v.

RETURN TO THE LAND; RETURN TO
THE LAND, OZARKS CHAPTER;
WISDOM WOODS LLC; ERIC ORWOLL;
PETER JULIUS CSERE; GAVIN BAKER;
PETER NEUGEBAUER; and SCOTT
THOMAS HALLOWOOD,

     Defendants.

Case No. 3:26CV151-DPM

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAY 20 2026

TAMMY H. DOWNS, CLERK
By:_____
DEP CLERK

## COMPLAINT

## INTRODUCTION

1.    Plaintiff Michelle Walker brings this action for damages, injunctive relief, and declaratory relief against Defendants Return to the Land, Return to the Land, Ozarks Chapter, Wisdom Woods LLC, Eric Orwoll, Peter Julius Csere, Gavin Baker, Peter Neugebauer, and Scott Thomas Hallowood, to seek redress for violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, the Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982, the Civil Rights Act of 1871, 42 U.S.C. § 1985, and the Arkansas Civil Rights Act of 1993, Ark. Code Ann. § 16-123-101 *et seq.* Defendants discriminated against Plaintiff by refusing to sell her land on the basis of race and religion.

2.    Defendants rejected Ms. Walker's application to purchase property in the Return to the Land ("RTTL") community in Ravenden, Arkansas because the community's founders are

This case assigned to District Judge Marshall
and to Magistrate Judge Kearney

1

explicitly attempting to establish an all-white community and Ms. Walker is of Jewish ancestry, is married to a Black man, and has biracial children.

3.      Defendant RTTL is a white nationalist organization. Its founders believe that white people are genetically superior to other races, advance the view that Jewish people are engaged in a plot to eliminate the white race, and advocate for segregated white communities for the purpose of creating a separate all-white nation state that will help avoid "white genocide."

4.      Defendants founded RTTL and its related organizations for the specific purpose of creating a segregated all-white community in Arkansas. Defendants hoped that the RTTL Arkansas community would be the first of many all-white communities they would establish in the United States, with a long-term objective of creating an all-white nation.

5.      Only white persons with "European ancestry" are allowed to buy land or live at RTTL's Arkansas community. Non-white people and Jewish people, or those with Jewish ancestry, are not permitted to buy land or live at RTTL, and the ban extends to spouses and other members of a person's family.

6.      Plaintiff Michelle Walker is a real estate broker who lives and works in the greater St. Louis area, which is within driving distance of RTTL's Arkansas community. Ms. Walker self-identifies as white. She belongs to a Christian church and believes in the teachings of Jesus. Her ancestry on her mother's side is Jewish. Her husband is Black, and their children are biracial.

7.      In the summer of 2025, Ms. Walker learned that Defendants were offering land for sale in the Ozarks, an area where she occasionally vacationed. The offer caught her attention because the sale price was exceptionally low. Interested in the investment potential of the land and the other possibilities it offered, she decided to apply to purchase land at the RTTL community.

8.      Ms. Walker completed RTTL's application form on its website. The application had Ms. Walker answer a series of questions about her ancestry and religion. As to her ancestry, Ms. Walker noted that her father's side of the family came to the United States in the 1600s; that her mother's side of the family consists of Russian Jewish immigrants; that her husband is of Irish and African descent; and that her children are a mix of the races and nationalities of her and her husband.

9.      In response to the RTTL application question about her religion, Ms. Walker stated that: "I am a Christian. I believe Jesus died for my sins and through believing in him, I will have a heavenly eternal life."

10.     Ms. Walker was surprised to see the ancestry and religion questions on the application, which she understood as clearly violating federal and state fair housing laws prohibiting consideration of race and religion in a land-sale decision. She nevertheless completed the application to purchase land at the RTTL Arkansas community with the hope and expectation that Defendants understood the requirements of the law and would not actually deny her the right to buy the land because she was married to a Black man or because of her Jewish ancestry.

11.     Shortly after completing her application, a member of the RTTL community interviewed Ms. Walker. At the interview, the RTTL member asked her if she belonged to "any other white nationalist organizations."

12.     Approximately one month later, having received no response from Defendants regarding her application, Ms. Walker asked her interviewer when she would learn whether she had been approved. The RTTL interviewer told Ms. Walker that she should not expect her application to be approved.

13. Ms. Walker never received any further communication from Defendants. Ms. Walker's RTTL application portal currently states that her application was not accepted as she was not an ideal fit for RTTL.

14. Defendants' decision to deny Ms. Walker the right to purchase land was based on her religion, ancestry, and the race of her family members, which are incompatible with RTTL's goal of establishing an all-white community. Because Ms. Walker has Jewish ancestry and is married to a Black man, she did not meet Defendants' criteria.

15. Defendants' actions in denying Ms. Walker's application to buy land at the RTTL Arkansas community constitute blatant and brazen violations of long-standing federal and state fair housing laws. Defendants' discrimination has caused Ms. Walker financial and emotional harm, for which she seeks declaratory, compensatory and injunctive relief, and punitive damages.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 1343, and 42 U.S.C. § 1988(a), as the claims at issue arise under the civil rights laws of the United States, including the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, and statutory provisions regarding the protection of civil rights, 42 U.S.C. §§ 1981, 1982, and 1985.

17. Plaintiff's claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201, 2202 and 1343.

18. This Court has supplemental jurisdiction over Ms. Walker's state law claims pursuant to 28 U.S.C. § 1367, because those claims are so related to Ms. Walker's federal law claims that they form part of the same case or controversy.

19.    Venue is proper in this judicial district because Defendants reside in this district, and a substantial part of the events or omissions giving rise to the claims occurred in this district. 28 U.S.C. § 1391(e)(1).

## PARTIES

20.    Michelle Walker is a resident of the State of Missouri. Ms. Walker sought to purchase land that Defendants owned, advertised, and offered for sale. Ms. Walker is of English and Jewish descent. Ms. Walker is married to a Black man and has three biracial children.

21.    Defendant Return to the Land is an unincorporated association formed and managed by, *inter alia*, Defendants Eric Orwoll, Peter Julius Csere, Gavin Baker, Peter Neugebauer, and Scott Thomas Hallowood. At least some members of Return to the Land are domiciled in Arkansas.

22.    Defendant Return to the Land, Ozarks Chapter is a subsidiary association of Defendant Return to the Land. Upon information and belief, Defendant Return to the Land, Ozarks Chapter was formed by and is managed by, *inter alia*, Defendants Orwoll, Csere, Baker, Neugebauer, and Hallowood. At least some members of Return to the Land, Ozarks Chapter are domiciled in Arkansas.

23.    Defendant Wisdom Woods LLC is a corporation headquartered in Arkansas that owns the parcel of land on which RTTL's Arkansas community is located. Wisdom Woods LLC was formed for the purpose of purchasing the land and selling sub-parcels of land to members of Return to the Land, Ozarks Chapter.

24.    Defendant Eric Orwoll is the President and co-founder of Return to the Land. He is also Vice President of Return to the Land, Ozarks Chapter and a member of Wisdom Woods LLC. Orwoll is domiciled in Ravenden, Arkansas.

25.    Defendant Peter Julius Csere is a co-founder and manager of Return to the Land and Return to the Land, Ozarks Chapter. He is also a member and manager of Wisdom Woods LLC. Csere is domiciled in Ravenden, Arkansas.

26.    Defendant Gavin Baker is a co-founder and manager of Return to the Land and Return to the Land, Ozarks Chapter. He is also a member and manager of Wisdom Woods LLC. Baker is domiciled in Ravenden, Arkansas.

27.    Defendant Peter Neugebauer is a co-founder and manager of Return to the Land and Return to the Land, Ozarks Chapter. Neugebauer is domiciled in Ravenden, Arkansas.

28.    Defendant Scott Thomas Hallowood is a co-founder and Vice President of Return to the Land. He is also President of Return to the Land, Ozarks Chapter, and a member of Wisdom Woods LLC. Hallowood is domiciled in Ravenden, Arkansas.

## FACTUAL BACKGROUND

### I.    The White Nationalist Movement in the United States

29.    White nationalism is a political movement founded on the concept that white people are inherently superior to people with any other racial or ethnic heritage. Many white nationalists believe that in order to preserve their white cultural identity, white people need a segregated geographical area, preferential treatment, and special legal protections.

30.    In the United States, white nationalist groups share several core beliefs.

31.    First, they are convinced that a shadowy cabal of elites—usually described as "the Jews"—is conspiring to destroy the white race.

32.    Second, white nationalists emphasize genetic differences between racial groups and portray white people as the superior race.

33.    Third, white nationalists believe that the United States is on the brink of collapse because of immigration and interracial relationships. They frequently speak of a coming "bloodbath" or "race war," where a Jewish-led coalition of minority groups will attempt to eliminate white people.

34.    A subset of white nationalists, known as "white separatists," believe that white Americans should form an independent all-white nation and secede from the United States. White separatists claim that white people and non-white people cannot live peaceably together within the United States. The only possible solution, they say, is to resegregate America and divide it into separate ethnostates.

## II.    Return to the Land

### A.    Return to the Land's Strategic Vision

35.    RTTL is a white separatist organization. Like many white separatists, RTTL's founders believe that Jewish people have taken control of the United States and are working to systematically destroy the white race.

36.    An RTTL recruitment video accuses Jews of conspiring to "turn Europe and North America into a mixed mongrel race of Asians and Negros [sic] ruled over by Jews." RTTL also claims that white men are being turned into "bug-man abominations" who "wouldn't be recognized as [men] in virtually any other age," and that "[t]estosterone has experienced a freefall to the extent that a near majority of men are now practically impotent."

37.    RTTL's founders believe that Republican figures like President Donald Trump and Tucker Carlson are "controlled" by the Jewish elites and other minority groups.

38.    To prevent a "white genocide," RTTL advocates for the creation of an all-white nation within the United States.

7

39.      RTTL's leaders claim that their all-white nation will "lay the groundwork" for a "Hitler 2.0" to seize political power. In one promotional video, RTTL proclaims, "You're going to get Hitler 2.0 when you deserve him . . . . He's not just going to show up to a people that aren't putting in the work themselves." White people will "deserve" this "Hitler 2.0," RTTL teaches, when they begin the process of forming a white nation.

40.      The first step in RTTL's plan involves creating small, all-white neighborhoods.

41.      RTTL will "build these communities and scale them rapidly," so that it can "control local government and state government." It hopes to build "multiple ten-thousand, twenty-thousand, fifty-thousand person settlements" and eventually "cities of thousands of our people." RTTL predicts that it will someday "organize land buys on the scale of thousands of acres."

42.      Once RTTL expands, it intends to "move towards independence" from the United States and build a new white ethnostate "from the ground up." As RTTL advises its supporters, every nation "started with a community, and it grew to a town, and it grew to multiple towns, and it colonized other areas, and expanded its regional influence until it was a nation." RTTL thus urges, "You want a white nation? Build a white town. It can be done, and we're doing it."

43.      By starting with small, decentralized white neighborhoods, RTTL's founders hope to avoid the attention of the "corrupt forces"—i.e., Jewish elites—that it believes are implementing a genocide of white people.

44.      RTTL's founders believe they can secure legal precedent greenlighting RTTL's plans for all-white neighborhoods. Later on, RTTL intends to use these precedents to kickstart hundreds of all-white communities across the United States and eventually form a "freely confederated nation."

**B.    The Origins of RTTL**

45.    Eric Orwoll, RTTL's President, is the group's primary spokesman and the driving force behind its recruitment. Starting in or around 2012, Orwoll developed a small online following by posting on YouTube and Twitter (currently known as X).

46.    Orwoll warned his followers that minority groups are "anti-White" and "just want to genocide Whites, who they perceive as a threat." He denigrated Black Americans as "our most criminal, lowest IQ, least productive demographic." He suggested that ancient Jews made a pact with a powerful "parasitical spirit" so that they could gain an edge over other groups. And he claimed to have seen documents establishing that "Jewish elites talk about us as subhuman and traffic and rape our children."

47.    Orwoll's solution was to form all-white communities. He called on white people to "take your fate into your own hands and either a) start a cult, or b) join a cult. If your cult works out, grow it, then use it to take power."

48.    In or around July 2023, Orwoll and a dozen supporters gathered at Orwoll's Missouri home and developed the plan for RTTL.

49.    As a starting point, RTTL's founders wanted to find a permanent way to ensure that the communities they formed would remain exclusively white. They feared that members of their community would later betray the group by selling land to non-white buyers or marrying outside their race. RTTL wanted their communities to have a "semi-permeable membrane" that would enable the organization to "let in who we want, expel who we want." In that way, RTTL's founders could have complete "control" over who their neighbors were and ensure that "non-whites" could never "buy the house next door."

9

50. Some of RTTL's founders understood that their plan to create an all-white community violated civil rights laws, including the Fair Housing Act. Defendant Csere, however, claimed that he had discovered a way around the Fair Housing Act on the anonymous internet forum 4chan. With the correct corporate structure, Csere insisted, RTTL could freely discriminate based on race.

51. RTTL designated Csere as the "chief architect" of their new community and tasked him with drafting RTTL's governing documents. Aided by ChatGPT, Csere fashioned the corporate structure that RTTL continues to use to this day.

## C.    **RTTL's Corporate Structure**

52. RTTL has two parts: a "private membership association" (the "Association") and a limited liability corporation (the "LLC").

53. The Association is tasked with vetting the people who want to join RTTL and ensuring that they are "of European heritage." RTTL only admits into the Association people who are heterosexual, white, and non-Jewish.

54. The LLC purchases the land for RTTL's all-white communities. RTTL distributes land to its members by selling shares of the LLC, which are tied to a particular plot of land. Only members of RTTL's all-white Association are eligible to buy land from the LLC.

55. RTTL believes that the creation of the Association and LLC is a "key innovation" that enables it to "work around" the Fair Housing Act. RTTL's leaders assert that: (1) RTTL's Association qualifies for the "private club" exception to the Fair Housing Act; and (2) RTTL's LLC "does not engage in the sale or rental of real estate," and therefore is not subject to the Fair Housing Act.

56.     RTTL claims that a private club can manage land according to its own principles and that upon joining the Association, members change their "legal status . . . from that of a Public Person to that of a Private Membership Association individual," waiving application of state or federal civil rights laws.

57.     The "private club" exceptions to the Arkansas Fair Housing Act and federal Fair Housing Act, however, only allow a private club "that, *as an incident to its primary purpose*, provides lodging that it owns or operates *for other than a commercial purpose*," to limit the rental or occupancy of that lodging to its members and to give preference to its members. Ark. Code Ann. § 16-123-307(b) (emphasis added); *see* 42 U.S.C. § 3607(a).

58.     RTTL does not provide lodging in the context of its land sales, and its use of land is not "an incident to its primary purpose": RTTL's central mission is to provide permanent homes for white people. RTTL does not own or operate land for a non-commercial purpose: it runs a for-profit LLC that uses land and land sales to generate revenues for its members.

59.     RTTL also purports to be exempt from the Fair Housing Act because its LLC "does not engage in sales or rental of real estate." However, when an RTTL member moves into one of its communities, RTTL sells them a share of the LLC that is associated with a particular parcel of land, and the LLC "allocate[s]" that land to the share's owner for their "indefinite use." RTTL's bylaws "spell out what the lot partitions are and which shares are associated with which lots of land." The value of the share is tied to the value of the associated land, not the percentage of the LLC.

60.     When someone leaves RTTL, they can sell their land to any other RTTL member who is willing to buy it. If they can't find a buyer, the LLC compensates them for the "fair market value" of the land. The "buy-out value" is the original price the member paid for their land plus

11

the appraised value of any improvements to the member's land, minus any liabilities or debts the owner has to the LLC.

61.    Once a member buys a share in the LLC, the associated land is their property: They have the right to "move into the neighborhood," "develop [their] land," and later sell the land at a price they believe is fair. They have a "legally enforceable claim" to that specific piece of property and the home they build on it. If they die, their heirs will inherit their share in the LLC and the corresponding property (although RTTL can force the heir to sell if they are not white).

62.    RTTL markets its communities as places where white people can become "landowners" at an affordable price. RTTL's website has featured maps of the properties available for purchase in its communities and has directed visitors to "purchase a lot" by applying for RTTL membership. RTTL emphasizes that each member of the RTTL communities "has their own private land."

### D.    The Arkansas Community

63.    In September 2023, Defendants Orwoll, Csere, Baker, Neugebauer, and Hallowood signed the Articles of Association for their new "private membership association," the RTTL Ozarks Chapter. ("RTTL Ozarks"). That same month, they formed Wisdom Woods LLC ("Wisdom Woods").

64.    In October 2023, Wisdom Woods purchased a 160-acre tract of land near Ravenden, Arkansas, and began recruiting members to buy three-acre plots of land. Ravenden, Arkansas is a small, rural town located in the Ozark Mountains of Northeast Arkansas.

65.    RTTL's founders chose Arkansas because they believe that racial segregation is "sort of just normal in Arkansas," and that judges in Arkansas are "on [their] side." Orwoll is originally from California and Csere is originally from Connecticut.

12

66.    RTTL's founders were also drawn to Arkansas because of its history of white-nationalist outposts. In Mountain View, Arkansas, neo-Nazi Billy Roper founded "Ozarkia," a "seedbed ethnostate" for people of "wholly White European ancestry." In Zinc, the Klu Klux Klan had its headquarters, and Klan National Director Thomas Robb was working to recruit white nationalists from across the country to move to the area. In nearby Harrison, the town's proximity to the Klan headquarters led news outlets to label it "the most racist town in America."

67.    RTTL's founders hoped to coordinate with other white-nationalist groups in Arkansas. In September 2023, shortly before RTTL purchased its first property, Peter Csere and an Ozarkia spokesman appeared on a podcast to jointly promote their communities. Csere praised Ozarkia and told listeners that RTTL would use similar race-based criteria to evaluate applicants.

*1.  RTTL's racial and religious eligibility criteria.*

68.    Only white people can join RTTL's Association.

69.    RTTL only accepts members if they, and their immediate family members, are "biologically" white. RTTL does not view Jewish people as white and therefore will not accept people of Jewish descent, even if they are not practicing Jews. RTTL states that it also "do[es] not accept any applicants [of Jewish or Muslim faith], even if they are ethnically European," citing Nazi Germany as a "successful example" of a nation that adopted a similar policy.

70.    RTTL will not accept an applicant who has a non-white spouse or child, even if the applicant is white. RTTL's leaders believe that interracial relationships (which they call "race mixing" relationships) are dangerous. They claim that interracial children have "serious health complications," and white women in interracial relationships will "end[] up abused or worse."

71.    RTTL regularly publicizes its whites-only limitation:

- In May 2025, RTTL's official X channel proclaimed: "We started a Whites only community."

- In July 2025, RTTL President Eric Orwoll told Sky News: "What we've done here is establish a place where we have control over who our neighbors are. And that is just for the sake of preserving our culture . . . White American culture."

- Board Member Scott Thomas Hallowood told Sky News that, "You have to be a [private membership association] member to live here . . . . So you have to be someone of European heritage."

- In August 2025, Orwoll explained to the New York Times that its communities were strictly for white, heterosexual people. He also stated that RTTL could reject an applicant who "doesn't present as white."

- That same month, Orwoll stated on a podcast that "we're an association for people of European heritage, both biologically and culturally."

- In November 2025, Orwoll told CNN that Return to the Land is forming communities of "European heritage," which he said was a "synonym[]" for white.

72.     RTTL uses social media to advertise and publicize its racial criteria and discourage non-white people from applying to purchase land in the community. Its messaging campaign has been successful: few non-white people apply to join the Association. RTTL's blog boasts that it "does a fairly good job of conveying its membership criteria to applicants via social media and its website, so the number of ineligible applicants is low." RTTL's rejection rate is supposedly "around 7%."

14

73.    RTTL has developed an extensive screening process to make sure that only white, non-Jewish people can join RTTL Ozarks. It requires applicants to fill out an application form that asks detailed questions about their ethnicity and religion. It also interviews applicants by video or has them submit pictures or a video to confirm that they appear white.

74.    On RTTL's application form, candidates must describe the "geographical/ethnic origins of [their] family" and "that of [their] spouse and children if different." They must also supply "demographic information," including their gender, sexual orientation, and religion.

75.    The form asks candidates to share their views on several "controversial topics" such as "segregation," "procreation," and "multiculturalism":

| | |
|---|---|
| **I support segregation** * | O Yes  O No  ● Neutral |
| **I support procreation** * | O Yes  O No  ● Neutral |
| **I support multiculturalism** * | O I prefer a community with a variety of different ancestral origins<br>O I prefer a community where everyone shares common continental ancestry<br>● Neutral |

76.    RTTL's original form asked applicants to indicate what "religions [they] would . . . NOT want to tolerate in a community?"

**Which of the following religions would you NOT want to tolerate in a community?** *

- ☐ Christianity
- ☐ Paganism (and similar)
- ☐ Islam
- ☐ Judaism
- ☐ Buddhism
- ☐ Atheism / Nihilism
- ☐ I would tolerate all religions, no preference

77.    RTTL later developed its formal policy on religion, which specifies that it will not accept Jews or Muslims, and it removed this question from the form.

15

78.    After a candidate submits an application, RTTL invites the candidate to schedule a video interview.

79.    RTTL uses the video interview to ask the candidate about their ancestry and to do a "physiognomy check" to verify that the candidate "present[s] as White." RTTL also encourages candidates to provide DNA test results.

80.    RTTL will expel members from its community, and force them to sell their land, if it later discovers they have non-white ancestry. RTTL's founding documents threaten members with a $500,000 fine if RTTL discovers they joined the Association "under false pretenses."

81.    RTTL also asserts the right to "revoke someone's residency rights" if they "decide[] at some point to get married to . . . a Black woman," or otherwise violate RTTL's rules against interracial relationships.

2.    *Sale and rental of land through RTTL's LLC.*

82.    Only members of RTTL's all-white Association can purchase or lease land through its LLC.

83.    Under the LLC's Operating Agreement, all residents of the Arkansas Community must first "be members of the 'Return to the Land: Ozarks Chapter' private membership association, or equivalent affiliated regional subgroup."

84.    RTTL posted notices on its website specifying that RTTL property is for "[Private Membership Association] Members Only," and that buyers must "[j]oin RTTL to become eligible."

| Availability of LLC Membership Interest tied to above lots of land<br><br>* PMA Members Only *<br>Join RTTL to become eligible. | THIS IS NOT A REGISTERED PLAT<br>For Reference Only<br><br>LAND IS USED BY LLC MEMBERS.<br>LOTS ARE ALLOCATED BASED ON MEMBERSHIP PERCENTAGE. |
| --- | --- |

85.     Once a person buys a share of the LLC, and the property associated with the share, they can only sell that share to another member of RTTL's all-white Association.

86.     Similarly, if an RTTL homeowner wants to rent their property, they must pick a tenant who is already a member of the Association or who "meet[s] the criteria to be approved for [Association] membership," i.e., a tenant who is white.

### E.     Expansion of Return to the Land

87.     Since its 2023 founding, RTTL has recruited about forty people to purchase land and live on "homesteads" in the Arkansas community.

88.     Consistent with RTTL's goal of helping white people build wealth, it considerably undervalues the land in its Arkansas community when it sells it to new members. It sells three-acre parcels for around $6,000, or $2,000 per acre, which is well below the market rate for vacant land in the region.

89.     In the summer of 2025, RTTL's founders went on a tour of mainstream media outlets to promote their all-white community. They used this coverage to attract new members and donors. As of May 2026, RTTL has raised more than $200,000, including $105,158 to "get more RTTL chapters kicked off around the country," $94,401 for "legal framework research," $23,758 to build a community center, $12,897 for RTTL's "peer academy," and $15,113 for "family incentives."[1]

90.     In January 2025, RTTL started a second community in Northeast Arkansas ("Ozarks Community II").

---

[1] RTTL uses the funding for its "family incentives" program to award $1,000 to white women who give birth to white children on RTTL property. Its program is modeled after the Nazi Lebensborn program, which sought to increase the Aryan birth rate through similar incentives.

91.     Plans are underway for four other communities: "Ozarks Community III," "Deep South Community I," "Appalachia Community I," and "Appalachia Community II." RTTL is also recruiting members for a new community in Idaho.

92.     RTTL's founders promise that RTTL will be "off to the races" once RTTL establishes that it is possible to form segregated communities.

## III.     Plaintiff Michelle Walker's Attempt to Purchase RTTL Land

93.     In November 2025, Plaintiff Michelle Walker applied for membership in the RTTL Association in order to purchase a plot of land in the RTTL Arkansas community. RTTL denied her application. Ms. Walker is of Jewish ancestry, her husband is Black, and they have three biracial children.

94.     Ms. Walker and her family live in the suburbs of St. Louis, Missouri. Ms. Walker and her family vacation in the Ozarks and are interested in purchasing land in the area. Ms. Walker learned about RTTL from seeing a piece about the community in the news.

95.     Ms. Walker understood from the information she saw and read about the community that individuals could join RTTL's LLC for $25 and that approved members would have the opportunity to purchase land in the RTTL Arkansas community for approximately $2,000 or less an acre.

96.     Ms. Walker was attracted to the land purchase opportunity because of the extremely affordable price. She was interested in the description of the community as promoting land stewardship, self-sufficiency, and rural living. Seeking to take advantage of the land, housing, and investment opportunity, Ms. Walker went to the RTTL website to apply for membership during the first week of November 2025.

18

97. The application asked Ms. Walker to "describe [her] ancestry, and that of your spouse and children if different . . . ." Ms. Walker explained that her father's side of the family is from England, that her mother's side of the family consists of Russian Jewish immigrants, that her husband is of Irish and African descent, and that her children are a mix of her and her husband's ancestry.

98. The application asked Ms. Walker to describe her religious views. Ms. Walker stated that she is a Christian who believes that Jesus died for our sins and that she will have a heavenly eternal life.

99. The application sought Ms. Walker's views on a number of topics that implicate groups afforded protection under the fair housing laws, including asking whether she supports "segregation," "multiculturalism," "gay marriage," and "transgenderism." The application also had Ms. Walker list her sexual orientation.

100. The application asked Ms. Walker to explain her interest in RTTL. She stated that she liked the idea of returning to the land and that she wanted to be part of a community that honors our nation with a focus on nature.

101. After submitting the application, Ms. Walker sought an interview as provided for in the application process. Ms. Walker had significant difficulty obtaining the interview. The RTTL representative did not appear for the first scheduled interview, and the actual interview did not occur until nearly six weeks after Ms. Walker submitted her application.

102. During the interview, Ms. Walker was asked many of the questions that had appeared in the application.

103. Ms. Walker was also asked whether she belonged to any other white nationalist organizations. She responded that she did not.

19

104.    The RTTL interviewer confirmed Ms. Walker's understanding that there was a $25 fee to become a member of the LLC and that approval of membership was required before she could purchase an interest in any land. The interviewer would not answer Ms. Walker's specific questions about the options for purchasing land and the size of plots, responding that all of the specific information was in the membership agreement she would receive if she was accepted.

105.    After the interview, which was done through an audio-only link, Ms. Walker was instructed to submit a video of herself stating "Hi, this is Michelle." Ms. Walker recorded and submitted the video. Ms. Walker followed up with RTTL a few weeks after the interview when she did not receive a decision on her application. She was told that she should not expect to be accepted. Later, Ms. Walker logged into her RTTL portal and read a message stating that her application to join was not accepted as she was not an ideal fit for RTTL.

## INJURY TO PLAINTIFF

106.    Defendants' unlawful and discriminatory conduct, policies, and practices have caused Ms. Walker significant loss and injury, including but not limited to emotional distress, humiliation, embarrassment, and pain and suffering. Ms. Walker has been deprived of her housing and civil rights, including the equal opportunity to obtain and use land and build, use, and enjoy a home. Ms. Walker has suffered economic damage from being denied the investment and income-generating benefits of purchasing a parcel in the RTTL community.

107.    RTTL has engaged in the discriminatory conduct described herein intentionally, maliciously, and with willful, callous, wanton, and reckless disregard for the rights of current and prospective residents.

## CAUSES OF ACTION

### Count I – Violation of the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*

108.    Plaintiff realleges and incorporates by reference all of the allegations set forth above.

109.    Defendants' conduct, as alleged herein, violates multiple provisions of the Fair Housing Act. Specifically, Defendants have engaged in the following discriminatory housing practices:

    i.    Refusing to sell or rent after the making of a bona fide offer, or refusing to negotiate for the sale or rental of, or otherwise making unavailable or denying, a dwelling because of race, color, national origin, or religion, in violation of 42 U.S.C. § 3604(a);

    ii.    Discriminating in the terms, conditions, or privileges of a sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, national origin, or religion, in violation of 42 U.S.C. § 3604(b); and

    iii.    Making, printing, or publishing, or causing to be made, printed, or published a notice, statement or advertisement, with respect to the sale or rental of a dwelling that indicates a preference, limitation, or discrimination based on race, color, national origin, or religion, or intending to make such preference, limitation, or discrimination, in violation of 42 U.S.C. § 3604(c).

110.    Plaintiff is an "aggrieved person" as defined in 42 U.S.C. § 3602(i), and is entitled to relief under 42 U.S.C. § 3613(c).

21

## Count II – Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981

111.    Plaintiff realleges and incorporates by reference all of the allegations set forth above.

112.    In acting as alleged herein, Defendants have injured Plaintiff by impairing her right to make and enforce contracts and her right to the full and equal benefit of the laws for security of property as is enjoyed by white citizens, in violation of 42 U.S.C. § 1981.

113.    Plaintiff is entitled to relief under 42 U.S.C. § 1981.

## Count III – Violation of the Civil Rights Act of 1866, 42 U.S.C. § 1982

114.    Plaintiff realleges and incorporates by reference all of the allegations set forth above.

115.    In acting as alleged herein, Defendants have injured Plaintiff by depriving her of her right to purchase, lease, sell, hold, and convey real property, in violation of 42 U.S.C. § 1982.

116.    Plaintiff is entitled to relief under 42 U.S.C. § 1982.

## Count IV – Violation of the Civil Rights Act of 1871, 42 U.S.C. § 1985
### (against Defendants Orwoll, Csere, Baker, Neugebauer, and Hallowood)

117.    Plaintiff realleges and incorporates by reference all of the allegations set forth above.

118.    In acting as alleged herein, Defendants Orwoll, Csere, Baker, Neugebauer, and Hallowood have conspired or joined together with the express purpose of depriving, either directly or indirectly, a person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws.

22

119.    In acting as alleged herein, Defendants Orwoll, Csere, Baker, Neugebauer, and Hallowood have taken acts in furtherance of their conspiracy.

120.    In acting as alleged herein, Defendants Orwoll, Csere, Baker, Neugebauer, and Hallowood have injured Plaintiff by depriving her of her rights to freely enter contracts and purchase, lease, sell, hold, and convey real property.

121.    Plaintiff is entitled to relief under 42 U.S.C. § 1985.

### Count V – Violation of the Arkansas Fair Housing Act, Ark. Code Ann. § 16-123-201 *et seq.*

122.    Plaintiff realleges and incorporates by reference all of the allegations set forth above.

123.    Defendants' conduct, as alleged herein, violates multiple provisions of the Arkansas Fair Housing Act. Specifically, Defendants have engaged in the following discriminatory conduct:

i.      Refusing to engage in a real estate transaction with Plaintiff because of race, color, religion, or national origin in violation of Ark. Code Ann. § 16-123-204(a)(1);

ii.     Discriminating against Plaintiff in the terms, conditions, or privileges of a real estate transaction or in the furnishing of facilities or services in connection therewith, because of race, color, religion, or national origin in violation of Ark. Code Ann. § 16-123-204(a)(2);

iii.    Refusing to receive from Plaintiff or transmit to Plaintiff a bona fide offer to engage in a real estate transaction because of race, color, religion, or national origin in violation of Ark. Code Ann. § 16-123-204(a)(3);

iv.     Refusing to negotiate for a real estate transaction with Plaintiff because of race, religion, or national origin in violation of Ark. Code Ann. § 16-123-204(a)(4);

v.  Making, printing, or publishing or causing to be made, printed, or published, a notice, statement, or advertisement with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin or an intention to make any such preference, limitation, or discrimination, in violation of Ark. Code Ann. § 16-123-204(a)(6);

vi.  Imposing a condition, restriction, or prohibition, including a right of entry or possibility of reverter, which directly or indirectly limits the use or occupancy of real property on the basis of religion, race, color, or national origin, in violation of Ark. Code Ann. § 16-123-206(a); and

vii.  Inserting in a written instrument relating to real property a provision creating a condition, restriction, or prohibition, including a right of entry or possibility of reverter, which directly or indirectly limits the use or occupancy of real property on the basis of religion, race, color, or national origin, in violation of Ark. Code Ann. § 16-123-206(b).

124.  Plaintiff is entitled to relief under Ark. Code Ann. § 16-123-210.

### Count VI – Violation of the Arkansas Civil Rights Act of 1993, Ark. Code Ann. § 16-123-101 *et seq.*

125.  Plaintiff realleges and incorporates by reference all of the allegations set forth above.

126.  Defendants' conduct, as alleged herein, violates multiple provisions of the Arkansas Civil Rights Act. Specifically, Defendants have engaged in the following discriminatory conduct:

24

i.     Depriving Plaintiff of her right to engage in property transactions without discrimination because of race, religion, or national origin in violation of Ark. Code Ann. § 16-123-107(a)(3); and

ii.    Depriving Plaintiff of her right to engage in credit and other contractual transactions without discrimination because of race, religion, or national origin in violation of Ark. Code Ann. § 16-123-107(a)(4).

127.    Plaintiff is entitled to relief under Ark. Code Ann. § 16-123-107.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court grant judgment in her favor, and against Defendants, as follows:

(1)    Declare that Defendants have violated the provisions of applicable federal and state laws;

(2)    Permanently enjoin Defendants from engaging in the conduct described herein, either directly or through others;

(3)    Order Defendants to take appropriate affirmative actions to ensure that Defendants do not again engage in the type of conduct described herein;

(4)    Award compensatory damages to Plaintiff in an amount that would fully compensate her for the injuries caused by Defendants' conduct alleged herein;

(5)    Award punitive damages to Plaintiff in an amount that would punish Defendants for the willful, wanton, and reckless conduct alleged herein that would effectively deter similar conduct in the future;

(6)    Award Plaintiff her reasonable attorneys' fees and costs; and

(7)    Order such other relief as the Court deems just and equitable.

Dated: May 20, 2026

Respectfully submitted,

/s/ Kendall Lewellen
Kendall Lewellen (Ark. Bar No. 2016193)
Abigail Herzfeld (Ark. Bar No. 2024219)
Legal Aid of Arkansas
Fair Housing Project
320 Executive Court, Suite 201
Little Rock, AR 72205
(870) 972-9224
klewellen@arlegalaid.org
aherzfeld@arlegalaid.org

/s/ Jason Bailey
Jason Bailey (Ark. Bar No. 2015228)
Justyce Yuille*
NAACP Legal Defense and
Educational Fund, Inc.
700 14th Street. NW, Suite 600
Washington, DC 20005
(202) 682-1300
jbailey@naacpldf.org
jyuille@naacpldf.org
*Pro hac vice application to be filed

/s/ John Relman
John Relman*
Reed Colfax*
Edward Olds*
Miriam Pierson*
RELMAN COLFAX PLLC
1225 19th Street, NW, Suite 600
Washington, DC 20036
(202) 728-1888 (phone)
jrelman@relmanlaw.com
rcolfax@relmanlaw.com
tolds@relmanlaw.com
mpierson@relmanlaw.com
*Pro hac vice application to be filed