# Wisdom Woods LLC

**Confidential: For Authorized Individuals Only. Do Not Share This Document.**

# Operating Agreement

---

**LLC Effective Date:** September 20, 2023

**LLC Filing #:** 811458277

**State of LLC Registration:** Arkansas

**Primary Office Address:** 480 Browns Creek Rd, Ravenden AR 72459-8025

# Table of Contents

## Operating Agreement


- Article I: Management and Voting
- Article II: Member Interests
- Article III: Membership Transfer Restrictions
- Article IV: Buy/Sell Agreement
- Article V: Startup and Compliance Strategy
- Article VI: Contributions, Budgets, and Common Elements
- Article VII: Allocation of Assets
- Article VIII: Regulation of Assets
- Article IX: Profit and Loss Distribution
- Article X: Code of Conduct
- Article XI: Dispute Resolution and Mediation
- Article XII: Book Access and Audits
- Article XIII: Force Majeure
- Article XIV: Dissolution
- Article XV: Governing Law
- Article XVI: Miscellaneous Provisions


# Article I: Management and Voting

1. **Management:**
   A. Management of the LLC shall be vested in a Board of Managers consisting of four positions: President, Vice President, Treasurer, and Secretary. Each manager shall serve a term of two years.
   B. The initial managers, their positions, and term dates shall be set forth in an Organizing Resolution prepared and signed by the organizing members.

C. Any subsequent changes to the Board shall be made by Administrative Resolution issued and signed by the Board, in accordance with this Operating Agreement.

2. **Board Elections:**

   A. Elections shall be held no later than sixty (60) days before the expiration of the current Board's term and shall be managed by the sitting Board. If no candidate achieves a simple majority, a runoff election shall be held, with the current Board remaining in office until the election is concluded.
   B. Candidates for the Board must maintain fraternal organization membership as specified by the Board.
   C. Elected managers who are not LLC members shall sign the Operating Agreement and undergo a criminal background check at the LLC's expense.
   D. All LLC members may vote in Board elections. A simple majority of membership interest is required for a candidate to win.

3. **Manager Removal:**

   A. The Board may remove a manager by a three-fourths (3/4) vote of the Board, provided that such removal is also approved by a simple majority (more than fifty percent) of total voting membership interest, with a quorum of sixty percent (60%) of total voting membership interest. Board members who are also LLC members may vote in the membership component of this vote.
   B. Members may remove a manager by a vote of ninety percent (90%) of non-Board voting membership interest. All Board members' membership interest shall be excluded from both the vote and the quorum for this purpose. No single member may veto such a removal; if a sole dissenting member holds sufficient interest to block the vote, approval of the remaining non-Board membership interest shall suffice.
   C. In any case of removal or resignation, the Board shall appoint a replacement to serve the remainder of the departing manager's term.

4. **Authorized Representative:** Authorized representatives for financial account management and signing contracts will be appointed via administrative resolution.

5. **Legal Representation:** Either the president or the vice president may authorize any legal action on behalf of the LLC, including but not limited to litigation, retention of counsel, settlements, and grants of power of attorney.

6. **Checks and Payments, Bank Transactions:**

   A. The Board of Managers shall designate one or more managers with authority to open and manage bank accounts, online banking, and payment accounts, and to communicate with financial institutions on behalf of the LLC. The Board shall notify such institutions by signed resolution. The Board of Managers may appoint additional individuals to carry out these duties by Administrative Resolution.
   B. The designated individuals may conduct financial and operational transactions on behalf of the LLC, including but not limited to payments, invoicing, vendor orders, contractor engagement, equipment rental, and insurance.

7. **Loan Limitations:** The Board of Managers shall not incur any debt or financing that would cause the LLC's total liabilities to exceed 25% of its total assets, or result in negative equity.

8. **Disposition of Major Assets:** The sale, transfer, or disposition of any major asset requires the president's signature, the signature of the individual appointed by Administrative Resolution, and approval by 95% of membership interest. No single member may veto such a transaction; if a sole dissenting member holds more than 5% of membership interest, approval of the remaining membership interest shall suffice.
9. **Disposition of Other Assets:** The sale, transfer, or disposition of any titled personal property of the LLC (such as vehicles or equipment) requires the signature of the president or vice president and approval by a two-thirds vote of the Board of Managers. Any manager may dispose of, sell, or otherwise administer non-titled assets on behalf of the LLC.
10. **Voting Rights:** All member voting rights are proportionate to their percentage of total membership interest.
11. **Electronic Signature:** All members agree to conduct LLC business electronically and to use electronic signatures for documents, proxies, and other official matters.
12. **Vote Requirements:** A 2/3 vote of the Board of Managers is required for the following:
    A. Amending the Operating Agreement to reflect a legitimate transfer of membership interest conducted in accordance with this Agreement.
    B. Amending the Operating Agreement to correct minor errors or make routine administrative updates (such as changes to contact information or registered agent details).
    C. Issuing membership interest and admitting new members, in accordance with Articles III and IV.
    D. Any other business the Board deems significant enough to require a formal vote
13. **Quorum Requirements:**
    A. Quorum for Board of Managers Votes
        i. A quorum requires the presence of all Managers (100%). No business shall be conducted without a full quorum, except in the following circumstances:
            (a) Any two Managers may authorize an extra-budgetary expenditure of less than $1,000 when an immediate necessity arises.
            (b) Expulsion of a Manager — A quorum of three Managers shall suffice when voting on the expulsion of a Manager.
    B. Quorum for Membership Votes
        i. A quorum for any membership vote requires the presence, in person or by proxy, of members representing at least sixty percent (60%) of total voting membership interest, unless otherwise specified herein.
        ii. The following actions require a quorum of ninety-five percent (95%) of total voting membership interest. No single member may veto such actions; if a sole dissenting member holds more than 5% of membership interest, approval of the remaining membership interest shall suffice.
            (a) Disposition of major assets
            (b) Any action that would significantly alter members' beneficial use of LLC assets
            (c) Change of management status
            (d) Dissolution

(e) Amending this Agreement in any way that alters the approval requirements for items (a) through (d) above

14. **Amendment of Operating Agreement:**

    A. **Voting Rule:** Amending or restating the Operating Agreement or Articles of Organization requires an affirmative or abstaining vote of three-fourths (3/4) of total membership interest, except for matters addressed elsewhere in this Article.

    B. **Affiliation Considerations:** When amending or restating the Operating Agreement or other governing documents, the Board of Managers should consider whether such amendments may affect the LLC's affiliations, memberships, or certifications with other organizations, and take appropriate steps as outlined or authorized in Article V.

15. **No-Contact Clause:** If a voting member fails to respond to a vote request within fifteen (15) days and has not assigned a proxy, their vote shall be treated as an abstention.

16. **Voting by Proxy:** A proxy must be submitted in writing to the Secretary prior to the meeting by the member or their power of attorney. Proxies are valid for a maximum of twenty-four (24) months. Revocations must be communicated to the Secretary before taking effect. The Secretary shall disclose to the membership the existence of any active proxies, including the identity of the proxy holder, prior to any vote in which a proxy is exercised. All membership votes shall be non-anonymous, and the Secretary shall publish a record of each member's vote following the conclusion of the vote.

17. **Board Responsibilities:**

    A. Board members shall fulfill the duties outlined below, ensure all LLC activities demonstrate financial prudence, and perform any other duties reasonably expected of their position.

       i. **President:** The President serves as chief executive officer, presides over all meetings of the members and the Board, and ensures that all Board and member resolutions are carried into effect.
       ii. **Vice-President:** The Vice President assumes all powers and duties of the President during the President's absence, disability, or at the President's request. The Vice President shall also perform any additional duties prescribed by the Board. The Vice President shall ensure all regular meetings occur as scheduled.
       iii. **Secretary:** The Secretary shall record all votes and meeting minutes, notify members as required, maintain a current roster of members and their contact information, safeguard all LLC documents and records, and perform any additional duties prescribed by the Board.
       iv. **Treasurer:** The Treasurer shall maintain custody of LLC funds, keep complete and accurate financial records, deposit and disburse funds as required, and report on the LLC's financial condition as requested by the Board. Financial prudence includes reasonable flexibility in adhering to the budget to preserve its original function and intent.

    B. **SMART Proposals:**

       i. The Board shall not consider any proposal unless it is presented with sufficient detail to qualify as a "SMART proposal" based on the presence, but not the evaluation, of such details.
       ii. A "SMART proposal" is one that is sufficiently detailed to be considered Specific, Measurable, Achievable, Relevant, and Time-Bound.

18. **Conflict of Interest:** Managers shall disclose any conflict of interest related to their management decisions and shall not make any management decision primarily for personal benefit.
19. **Authorization of Approved Amendments:** All members agree to be bound by any amendments or restatements of this Operating Agreement or the Articles of Organization that are adopted in accordance with the voting requirements herein, without the need for additional signatures.
20. **Accounting and Tax Regulations:**
    - A. The Treasurer and Secretary shall ensure compliance with all accounting regulations herein.
    - B. The LLC shall maintain records of all membership interest transfers, including membership percentages, capital contributions, asset allocations, and the manner in which transfers affect capital accounts, inside basis, and other relevant financial data.
    - C. The LLC shall either maintain records of each member's outside basis or provide sufficient data to enable members to track their own outside basis.
    - D. **Partial Year Tax Liability:** When membership interest is transferred, tax liabilities shall be pro-rated based on the number of days each member held the interest during that tax year, per US Treasury Regulation 1.706-1(c)(2).
    - E. **Foreign Partners:** Members who are not U.S. citizens are wholly liable for any taxes, fines, or penalties resulting from their membership. They must provide an ITIN or a taxation method compliant with federal law. Because fines imposed on the LLC due to a foreign partner's tax issues may result in losses difficult to quantify, the foreign partner agrees to pay liquidated damages equal to any such fines or penalties, plus a $200 administrative fee.
21. **Scope of Activities:**
    - A. The LLC exists solely as a private expense-sharing arrangement among its members for the purposes of forming a private association, helping its members raise their families, and preserving the cultural values of its members. The LLC is not intended to conduct business with the general public.
    - B. No member or manager shall use the LLC's name to conduct personal business, nor shall the LLC engage in any commercial activity beyond its purpose as a private expense-sharing arrangement.
    - C. The LLC is prohibited from engaging in the real estate business or making real estate offerings to the public, except in connection with any dissolution of the LLC and the resultant sale of LLC property. Neither the LLC nor its members or managers shall market, sell, or offer membership interests as real estate transactions.

# Article II: Member Interests

1. **Purpose and Basic Criteria:**
    - A. Membership interest is defined and regulated by this Article and at the discretion of the Board of Managers.
    - B. Members shall not acquire membership interest for purposes of profit, investment, or similar financial expectations, and outside of any consideration of the fraternal, cultural, social, and educational goals of membership.

C. Membership interests are transferable as described in this Agreement.
D. The Board of Managers may adjust membership interest percentages to correct rounding errors or fractional discrepancies.

2. **Calculation of Membership Interest:**

   A. **Two-Stage Calculation:**

      i. **Stage 1 (Pre-Acquisition):** Before the Board declares Stage 2, membership interest shall be calculated as each Member's capital contribution divided by total capital contributions.
      ii. **Stage 2 (Post-Acquisition):** Upon the Board's declaration that the LLC has acquired its primary asset(s) and the conditions described in Article V have been met, membership interest shall be calculated as the percentage of allocable LLC assets designated for each Member's private use, divided by the total allocable assets.
      iii. The Board shall declare Stage 2 as described in and authorized under Article V.
      iv. Stage 2 may be reversed by the Board if the LLC disposes of its primary asset(s) and has not yet acquired replacement asset(s), reverting the calculation to Stage 1 until a new Stage 2 declaration is made.

   B. **Other Factors.** Distributions, allocations of income or loss, capital contributions, and changes in the tax basis of LLC assets do not, by themselves, alter percentage of membership interest in Stage 2. In Stage 1, membership interest is recalculated upon each capital contribution per § 2(A)(i).

3. **Standard Allocation Unit.** The "Standard Allocation Unit" (SAU) is the minimum allocation of LLC assets required for a Member to receive rights to improve allocated LLC assets. The Board is authorized to set the specific size and details of the SAU, and this definition is subject to the standard voting requirement to amend this Agreement as set forth in Article I, Section 14.A. References to the SAU throughout this Agreement shall be interpreted in accordance with the definition set in accordance with this authorization.

4. **Specific Asset Allocation Rights:**

   A. Members whose asset allocation equals or exceeds the Standard Allocation Unit have the right to make improvements to the assets allocated to them, unless restricted per this Operating Agreement or by the Board.
   B. Members whose asset allocation is less than the Standard Allocation Unit share a common allocation with other similarly situated Members. Such Members may enjoy beneficial use of the shared allocation but may not make permanent improvements to it.
   C. The Board may, at its discretion, sell membership interest that receives shared allocations at fair market value in order to consolidate membership interest into units equal to or greater than the Standard Allocation Unit.

5. **Voting Rights:** All Members have voting rights proportional to their membership interest percentage. Voting rights are limited to those matters described in Article I and elsewhere herein.

6. **Manager Voting Rights:** An LLC member who is appointed as a Manager is permitted the voting rights afforded to the Board for management decisions as described in Article I.

7. **Dilution of Membership Interest:**

A. **Authorization to Dilute Membership Interest.** The Board may dilute Membership Interest of all Members who joined the LLC during Stage 1 (see Section 2.A.i of this Article) by accepting capital contributions from a new Member, in compliance with the appropriate membership interest transfer procedures in Articles III and IV, and for the purposes of funding the PDB.

B. **Limits on Membership Issuance.**

i. The Board is prohibited from diluting Membership Interest any more than what is necessary to obtain the exact amount of funding required by the PDB (Project Development Budget) and all AOBs and SBs thereafter.

ii. Allocation Protection.

(a) The Board is prohibited from diluting Membership Interest in a way that reduces the proportion of LLC assets previously allocated to existing Members.

(b) Exception for Sub-SAU Allocations: Allocations that do not equal a whole-number multiple (1, 2, 3, or 4) of the Standard Allocation Unit may be reduced as part of the dilution process.

(c) Consent Required for Whole-SAU Allocations: Members whose allocation equals a whole-number multiple of the Standard Allocation Unit and who have the right to make improvements to their allocated assets shall not have that allocation reduced without their written consent, except as otherwise provided for in this Agreement.

8. **Maximum Allocation:**

A. No Member may hold an asset allocation exceeding four (4) times the Standard Allocation Unit.
B. If a Member's allocation exceeds this maximum, the Board must initiate a forced buy-out of the excess allocation at fair market value, reducing the Member's allocation to exactly four (4) times the Standard Allocation Unit.
C. The forced buy-out shall be conducted in accordance with the procedures set forth in Article III.

## Article III: Membership Transfer Restrictions

1. **Board Oversight:**

A. All transfers of membership interest must be approved by the Board and governed by a standard Purchase Agreement provided by the Board.

B. **Default Penalty Limitations and Residual Economic Interest.**

i. Management must not approve a Purchase Agreement that results in a penalty of more than forty-nine percent (49%) of the total payments made by the Buyer to the Seller prior to default, if the Buyer defaults on the payment or specific performance terms of the Purchase Agreement. The Purchase Agreement may set a penalty rate lower than this maximum.
ii. Upon default, only the membership interest that is the subject of the defaulted Purchase Agreement shall revert in its entirety to the Seller, who shall regain full ownership and all associated rights. The Defaulting Buyer shall lose all voting rights, rights of beneficial use and enjoyment, distribution rights, and any other rights or benefits of membership associated with that interest. Any other membership interest held by the Defaulting Buyer that is not

subject to the defaulted Purchase Agreement shall not be affected, unless it is subject to a collateral agreement or cross-default provision as permitted and described elsewhere in this Agreement.

iii. The Defaulting Buyer shall retain a Residual Economic Interest in the membership interest, which is an assignee-type interest limited solely to the right to receive a payout upon resale of the membership interest, as described herein. This Residual Economic Interest does not confer membership, voting, beneficial use and enjoyment, distribution, or any other rights.

iv. The Residual Economic Interest Payout shall be calculated as follows: one (1) minus the penalty percentage stated in the Purchase Agreement (not to exceed 49%), multiplied by the quotient of the Defaulting Buyer's total payments to the Seller prior to default divided by the original total purchase price, multiplied by the new sale price. For example, if the penalty is 20%, the payout equals 0.80 × (Payments Made ÷ Original Purchase Price) × New Sale Price.

v. The Seller shall have payment priority: upon resale of the membership interest, one hundred percent (100%) of payments from the new buyer shall be directed to the Seller until the Seller has been fully compensated for the outstanding balance. Only after the Seller is fully paid shall any remaining payments be directed to the holder of the Residual Economic Interest.

vi. The Residual Economic Interest shall expire seven (7) years from the date the Seller notified the Defaulting Buyer of the default. The interest shall also terminate upon full payout to the holder, or upon the holder's voluntary written release, whichever occurs first.

vii. The Residual Economic Interest may be transferred by the holder only with the written consent of both the Seller and LLC Management, and only to an individual or entity who has been approved by the Board of Managers as eligible for LLC membership. Such a transfer does not confer membership upon the transferee.

viii. Management shall determine, in good faith, the application of this section to any specific default situation, and any disputes shall be resolved in accordance with Article XI.

C. The Board shall not approve any Purchase Agreement containing a usurious interest rate. When making this determination, the Board shall consider annual real inflation rates of a standard basket of goods.

D. The Board shall maintain a record of all easements, notes, contracts, shared infrastructure agreements, obligations, and other encumbrances that must transfer with a membership interest, for inclusion in the Purchase Agreement.

2. **New member approval:**

A. All new members must be approved by a two-thirds (2/3) vote of the Board.

B. The Board shall apply specific and exclusive eligibility criteria; membership in the LLC is not open to the general public

C. Individuals or legal entities who become assignees due to matters of litigation, death, or dissolution of an entity, will not receive any rights of LLC members unless approved by the management, and may be obligated to transfer their interest or assignee status and withdraw from the LLC. This clause does not apply to holders of a Residual Economic Interest as described in Section 1.B of this Article, whose rights are governed exclusively by that section.

D. The Board has authority to establish additional requirements for new Members, which must be approved by the membership in accordance with Article I, Section 14.A.

E. No creditor may obtain a member's interest in the LLC, except where: (1) the creditor is a member

of the fraternal organization affiliated with the LLC and its members, (2) the loan agreement was signed by the creditor, the member, a representative of the Board, and all related parties, and (3) the member's interest was pledged as collateral under a Purchase Agreement.

F. Upon default under such an agreement, the creditor may seize the member's interest but shall not acquire any rights of beneficial use and enjoyment, voting, or other rights afforded to members under this Agreement. The creditor's sole right shall be to sell the interest to an individual or entity approved by the Board, within a timeframe specified by the Board, unless the creditor undergoes and completes the standard membership approval process described herein.

G. Charging orders seeking to attach distributions, guaranteed payments, membership interest, or to assign a court or creditor as assignee are expressly prohibited, except as specifically permitted above.

H. The creditor restrictions in this section supersede any other provisions of this Agreement assigning rights to membership interest, and their enforcement is at the sole discretion of the Board.

I. **Background Check Requirement.** All Members must undergo a criminal background check as a condition of membership. This requirement applies to all new Members and to existing Members who have not yet completed one. The procedural details, timing, cost allocation, and fee schedule for background checks conducted during a membership interest transfer are governed by Article IV, Section 1.F through 1.H.

J. **Trust Membership Guidelines.** The Board is authorized to adopt, by Administrative Resolution or Board policy, guidelines, requirements, and procedures governing the eligibility and admission of trusts as Members of the LLC. Such guidelines may address matters including, but not limited to, the types of trusts eligible for membership, trustee qualifications, beneficiary disclosure requirements, and ongoing compliance obligations. This subsection constitutes a delegation of authority to the Board and shall not be construed as self-executing or as conferring any right of membership upon a trust absent the adoption and satisfaction of such guidelines.

3. **Forced transfer with mandated owner financing:**

A. A member may be expelled only by a three-fourths (3/4) vote of the Board and in accordance with this Agreement.

B. In the event of a forced buy-out, the LLC may require owner financing via monthly or quarterly payments on terms that are reasonable and consistent with this Agreement.

C. **Value Determination:** The forced buy-out value shall be calculated as the member's inside basis, adjusted for inflation and depreciation, plus the documented cost basis of any improvements to the member's allocated assets, minus any damages to those assets and any liabilities or debts owed by the member to the LLC or encumbering the allocated assets. The Board may apply a lack-of-marketability discount at its discretion.

D. **LLC Right of First Refusal.** Before any voluntary transfer of membership interest to a third party, the selling Member must first offer the interest to the LLC at a price equal to the Member's aggregate capital contributions, adjusted for inflation, plus the documented cost basis of any improvements to the Member's allocated assets, minus any damages to those assets and any liabilities or debts owed by the Member to the LLC or encumbering the allocated assets. Please note that the valuation method in this subsection differs from the forced buy-out valuation in Section 3.C. The LLC shall have thirty (30) days from receipt of written notice to exercise this right. If the LLC declines or fails to respond within the thirty-day period, the Member may proceed to sell the interest to a Board-approved buyer at a price set by the parties to the transaction, subject

to all other transfer restrictions in this Agreement.

4. **Marriage and Death of a Member**

   A. If a member who is an individual dies or a court of competent jurisdiction judges the member to be incompetent to manage his or her person or property, the member's executor, administrator, guardian, conservator, or other legal representative will not receive the rights and benefits of the member's interest, such as voting rights and rights of beneficial use and enjoyment. The estate or legal representative shall have only the rights of an assignee under A.C.A. § 4-32-707.

   B. **Transfer On Death of Membership Interest:**

      i. Members who wish to designate a beneficiary for their membership interest upon death shall submit written notice to the Board. The Board shall record this designation and honor it provided it complies with this Agreement and Arkansas law.
      ii. Transferees must be approved by Management in order to receive normal member benefits as explained elsewhere in this Operating Agreement; otherwise their only rights shall be those of an assignee — i.e., the right to receive distributions allocable to the interest, but no voting, beneficial use and enjoyment, or management rights (A.C.A. § 4-32-704(a)(2)–(3)).
      iii. An assignee may become a member only with the consent of Management (A.C.A. § 4-32-706(a)). Management reserves the right to force an expulsion, and reimbursement of fair market value as described herein, in the case that the Transferee is ineligible to be approved as an LLC member.

   C. **Marital property agreements:**

      i. A "distribution agreement" as used in this Section means a written agreement specifying how the Member's LLC interest shall be distributed in the event of divorce or dissolution of the Member's marriage. A distribution agreement must be:

         (a) In writing;
         (b) Signed by both the Member and the Member's spouse;
         (c) Acknowledged in accordance with A.C.A. § 9-11-301; and
         (d) Delivered to Management for inclusion in the LLC's permanent records and the Marital Property Agreements Register described in subsection (vi) below.

      ii. Management shall follow the instructions in a valid distribution agreement so long as it complies with this Operating Agreement and Arkansas state law. (See A.C.A. §§ 9-11-301 through 9-11-305; § 9-12-315(b)(4).)

      iii. In the absence of a valid distribution agreement, an existing and valid prenuptial or postnuptial agreement between the married couple will be used; and in the absence of that, a divorce decree or judgment of dissolution. (See A.C.A. §§ 9-11-401 through 9-11-413 (Arkansas Premarital Agreement Act); § 9-12-315(b)(4) (property excluded by valid agreement).)

      iv. In all cases involving divorce or dissolution of a Member's marriage, the LLC shall comply with valid court orders regarding the disposition of the Member's LLC interest. However, any transfer of membership interest pursuant to a divorce decree shall be subject to the transfer restrictions in this Article, including Management approval requirements. A non-member spouse who did not sign this Operating Agreement and all other required LLC documents and who receives an LLC interest by court order shall have only the rights of an assignee

under A.C.A. § 4-32-704(a)(2)–(3) until approved as a member by Management. A non-member spouse who signed this Operating Agreement and all other required LLC documents and who receives an LLC interest by court order shall receive full membership rights, subject to the standard eligibility criteria of this Agreement. (See A.C.A. § 9-12-315.)

v. **Marital Property Protection Requirement.** As a condition of membership, each Member who is married or who marries after admission shall, within ninety (90) days of the earlier of (a) admission to the LLC or (b) marriage, satisfy **one** of the following:

(a) Provide Management with a valid distribution agreement as defined in subsection (i) above, OR a valid prenuptial or postnuptial agreement that designates the Member's LLC interest as separate property, executed in compliance with A.C.A. §§ 9-11-401 through 9-11-413 (Premarital Agreement Act) or A.C.A. §§ 9-11-301 through 9-11-305 (Marriage Contracts Generally) as applicable; or

(b) Have the Member's spouse sign this Operating Agreement and all other required LLC documents, which constitutes acknowledgment of the transfer restrictions and assignee-status provisions under Article XVI, Section 8.

If the Member's spouse has signed this Operating Agreement and all other required LLC documents, no separate written acknowledgment under this subsection is required.

If the Member's spouse has not signed this Operating Agreement and all other required LLC documents, and the Member has not provided a distribution agreement or prenuptial/postnuptial agreement, the Member shall provide Management with a written acknowledgment signed by the Member's spouse that the LLC interest is subject to the transfer restrictions in this Operating Agreement and that the spouse's rights in the event of divorce or death shall be limited to those of an assignee under A.C.A. § 4-32-704(a)(2)–(3).

Failure to comply within the specified period shall be reported to Management, which may take such action as it deems appropriate under this Operating Agreement, including but not limited to requiring the Member to appear before Management to discuss compliance.

vi. Management shall maintain a Marital Property Agreement Register containing copies of all distribution agreements, prenuptial agreements, postnuptial agreements, and spousal acknowledgments filed by Members under this Section. Where any such agreement affects real property held by the LLC, Management should consider whether recording the agreement with the county recorder's office is advisable under A.C.A. § 9-11-303. (See A.C.A. §§ 9-11-303, 9-11-304.)

D. **Surviving Spouse's Rights in Member's LLC Interest.**

i. **Spouse who signed this Operating Agreement and all other required LLC documents.** If the surviving spouse signed this Operating Agreement and all other required LLC documents, all rights and benefits of the deceased Member's interest — including voting rights, rights of beneficial use and enjoyment, and all other member benefits — shall transfer directly to the surviving spouse upon the Member's death. No separate membership approval is required. Management shall update the LLC's records to reflect the transfer within thirty (30) days of receiving notice of the Member's death.

ii. **Spouse who did not sign this Operating Agreement and all other required LLC**

**documents.** If the surviving spouse did not sign this Operating Agreement and all other required LLC documents, or if the surviving spouse elects to take against the will of the deceased Member under A.C.A. § 28-39-401, or claims dower or curtesy in the Member's LLC interest under A.C.A. §§ 28-39-301 through 28-39-309, the surviving spouse's rights in the Member's LLC interest shall be limited to the rights of an assignee under A.C.A. § 4-32-707 and this Operating Agreement. The surviving spouse shall have no voting rights, rights of beneficial use and enjoyment, or other member benefits, unless approved by Management; this approval may be sought at any point in advance.

iii. **Forced buy-out.** Management may, at its discretion, force a buy-out of a surviving spouse's assignee interest to any party authorized and approved by Management, at fair market value as determined under Section 3.C of this Article. This right does not apply to a surviving spouse who signed this Operating Agreement and all other required LLC documents — such a spouse is exempt from a forced buy-out that is undertaken solely on account of being a surviving spouse of a Member.

5. **Business organization as member, dissolution and subsequent assignability of interest -**

   A. If a member that is a corporation, partnership, LLC, trust, or other entity is dissolved, terminated, or undergoes a forced change of ownership, its successor or legal representative shall not acquire any rights or powers of a member under this Agreement.
   B. The Board shall appoint a temporary assignee to hold the interest until it is transferred to a new member approved by the Board. The Board may, by a three-fourths (3/4) vote, compel the sale of the interest at a price determined in accordance with this Article.
   C. A business entity member may avoid this process by submitting written notice to the Board designating a successor to assume ownership upon dissolution, termination, or forced change of ownership. The designated successor must be approved by the Board in accordance with the standard membership approval process described in Article III, Section 2 and Article IV, Section 1. If the designated successor is not approved, the successor shall have only the rights of an assignee under A.C.A. § 4-32-707 until approved as a member by Management, or until the interest is transferred to a Board-approved buyer.

6. **Expulsion and Damages for Misrepresentation.**

   A. A member who materially misrepresented their eligibility to join the LLC, under the criteria of the Board or as expressed herein, may be expelled via forced buy-out at the Board's discretion.

   B. A member who misrepresented or failed to disclose any current or prior employment, contracts, compensation, representation, or affiliation with any government entity (federal, state, or local) or any organization deemed incompatible with the LLC's values by the Board may be expelled via forced buy-out and shall pay liquidated damages in an amount determined by the Board, as such violations may result in losses difficult to quantify.

   C. Where a member holds interest through a business entity, damages may be levied against both the entity and the individual representative.

   D. Enforcement shall follow Art. X procedures.

7. **ITAR Country Restrictions.**

   A. No individual who is a citizen or resident of a country subject to the International Traffic in Arms

Regulations (22 CFR § 126.1) shall serve on the Board of Managers or hold any interest in the LLC.

B. Members shall promptly notify the Board of Managers of any change in citizenship or residency that may affect the LLC's compliance with applicable law.

## Article IV: Buy/Sell Agreement

1. **Transfer of Membership Interest:** All transfers of membership interest must comply with the procedures set forth in this Agreement. The Board may declare invalid any transfer that does not comply.

   A. **Invitation and Application:** Applicants must receive an invitation from the Board to apply. The Board shall not solicit or recruit prospective members. Any person seeking to obtain membership interest ("Applicant") must complete an application form provided by the LLC.

   B. **Purchase Agreement.** The Board shall provide a Purchase Agreement for all parties to review and sign. The Secretary shall approve all Purchase Agreements to ensure they follow a standard form and contain all necessary information.

   C. **On-site Meeting:** The Applicant must visit and meet other members before being eligible for approval. The Board may waive this requirement at its discretion, including where travel would present an exceptional hardship, in which case the Applicant may instead meet with a Board member or authorized representative at another location.

   D. **Review of Applicant by Members:** The application must be sent to all Members for review.

   E. **Formal Approval by Board:** All transfers of membership interest require Board approval in accordance with Article III, Section 2.A. Before approving any transfer, the Board shall verify that:

      i. The applicant or transferee satisfies any additional requirements set by the LLC;
      ii. For existing members acquiring additional interest, the member is in good standing with the LLC and the transfer will not cause the member to exceed any maximum ownership percentage established in this Agreement.

   F. **Background Check:** Board approval is contingent upon favorable results from a criminal background check of the Applicant and, if applicable, their spouse. The background check shall be conducted by the Board after receipt of the Membership Transfer Fee, at the expense of the LLC or its authorized transfer agent.

   G. **Membership Transfer Fee:** Upon contingent approval by the Board, the Applicant shall pay a fee to the LLC or its authorized transfer agent per the following schedule:

| Transfer Type | Fee |
|---|---|
| From one member to new single Applicant | $280 |
| From one member to new Applicant couple | $380 |
| From multiple members to new single Applicant | $300 |
| From multiple members to new Applicant couple | $400 |

| Transfer Type | Fee |
|---|---|
| From single member or single-member couple to existing single Member | $150 |
| From single member or single-member couple to existing Member couple | $175 |
| From multiple members to existing single Member | $200 |
| From multiple members to existing Member couple | $225 |
| Exigent circumstances | Additional fee at Board discretion. Must be stated in Purchase Agreement. |
| Background check already on file | Reduction by $80 if single, $160 if couple. Cannot apply to existing-member fees. |

H. **Background Check Results:**

i. If the background check returns concerning results, the Board shall conduct a second vote. If the Applicant is rejected, the Membership Transfer Fee is non-refundable; however, any funds paid toward the purchase of membership interest shall be returned to the Applicant by the seller.

ii. If the background check returns no results beyond what the Applicant previously disclosed, approval shall be deemed final and the Purchase Agreement may proceed.

I. **Finalization of Transfer:** Upon execution of the Purchase Agreement, the Board is authorized to update its internal records and issue an amended Operating Agreement reflecting the new ownership.

2. **Foreign Members:** Applicants or members who are not U.S. citizens shall:

A. Pay the applicable Membership Transfer Fee plus an additional $100 administrative fee for determination of their tax filing requirements;

B. Pay an annual fee of $50 to cover additional tax filing requirements;

C. Be responsible for any additional liabilities arising from their specific legal or tax situation.

3. **Business Entity Members:**

A. Business entity members shall pay the applicable Membership Transfer Fee plus an additional $100 administrative fee. The entity's authorized representative shall be subject to the required background check.

B. Eligibility requirements for business entity members shall be as established by the Board via Administrative Resolution.

4. **Installment Payment Terms for Membership Interest**

A. The following provisions govern any transfer of membership interest where payment is made in installments. These provisions supplement, and do not replace, other transfer regulations in this Agreement.

i. The Board shall ensure that all installment terms in the Purchase Agreement are fair, reasonable, and consistent with this Agreement.

ii. Upon execution of the Purchase Agreement, the full membership interest shall be transferred to the buyer and recorded in the LLC's member records and accounting. All taxation and

capital accounting records shall treat the buyer as the full owner of the interest. Capital contributions may be recorded in Accounts Receivable if the buyer is making payments directly to the LLC.

iii. If the buyer defaults on the payment terms, the Board shall transfer the membership interest back to the seller, subject to the default penalty limitations and Residual Economic Interest provisions in this Agreement. If the Purchase Agreement provides an alternative method to cure default, that method shall be followed provided it is consistent with this Agreement.

5. **Involuntary Buy-Out:** When a member is compelled to sell all or part of their membership interest pursuant to this Agreement, the following provisions apply:

   A. The Board is authorized to execute the transfer with or without the seller's cooperation. If the seller refuses to sign the necessary transfer documents, the Board shall prepare documents requiring only the signatures of a Board member and the buyer.
   B. If the seller refuses to provide payment information, payment shall be made by check via USPS certified mail to the seller's last known address on file with the LLC.
   C. If the seller refuses to accept payment, the LLC may hold the funds in escrow until the seller agrees to receive them.
   D. Upon completion of the transfer, the Board is authorized to update its internal records and issue an amended Operating Agreement reflecting the new ownership.

6. **Map and Plat Compliance:** The Board has the authority to establish rules and requirements governing the use of maps and plats by the LLC, including disclaimers, permitted uses, and restrictions on content. All maps and plats used by the LLC shall comply with such rules and with Section 7 of this Article.

7. **Subdivision compliance:** The LLC shall not (1) subdivide any real estate it may own to sell individual lots, whether via tenancy-in-common or otherwise, or (2) record any interior features of such real estate on any plat filed with the county land authority.

8. **Transfer of Private Assets:** The transfer of private assets, improvements, appurtenances, and movable assets in connection with a transfer of membership interest shall be governed by Article VII.

# Article V: Startup and Compliance Strategy

1. **Initial Formation:** The LLC is authorized to pass Organizing and Developing Resolutions as necessary to plan its early stages of activity. Such resolutions must be passed by its Members, with the standard quorum and decision rule required for significant amendments and restatements of the Operating Agreement.

2. **Compliance Strategy:**

   A. The LLC is authorized to draft and carry out strategies regarding compliance of the LLC for the purposes of certifications, memberships, and other benefits. The approval, amendment, and restatement of such strategies must be approved by the Membership in accordance with Article I, Section 14.A.

   B. **SEC Compliance Strategy**

i. Members agree that the primary motive of forming this LLC is for it to serve as an expense-sharing agreement (ESA) for the benefit of its members.
ii. Members certify that this LLC was formed cooperatively, with no profit motive, and its membership interest does not fit the criteria to be considered a security as defined by the United States Securities and Exchange Commission.
iii. The Board has the authority to select and carry out an SEC compliance strategy should legal counsel recommend it or should the SEC require it.

# Article VI: Contributions, Budgets, and Common Elements.

1. **Capital Contributions.**

   A. Capital contributions shall be requested from members following the approval of budgets as described herein. Unrequested contributions are prohibited; the Treasurer shall record any such payments as taxable donations or return them.

   B. Failure to make a mandatory capital contribution shall result in penalties determined by the Board, no earlier than ninety (90) days from the first missed payment. Revocation or restriction of a member's beneficial use of allocated assets, or expulsion, shall not occur earlier than one hundred eighty (180) days after the initial penalty, and thus no earlier than two hundred seventy (270) days from the missed payment.

   C. A member in default may negotiate a payment plan with the Board to cure the default, subject to Board approval.

   D. Members shall have no right to return of capital except through the sale of membership interest as permitted herein.

   E. **Assignee Contributions:** An assignee who has not become a member remains liable for all contribution obligations of the assignor until the interest is transferred, regardless of whether the assignee receives any other rights or benefits. This obligation applies equally to all assignees, whether natural persons, business entities, or any other legal entity. Inclusion of such entity types does not imply that assignment to such entities is permitted under this Agreement.

   F. **Alternative Forms of Contribution.** At the Board's discretion, members may provide capital contributions in the form of sweat equity, equipment, or other assets. The Board shall approve (or deny) all non-cash contributions, determine their fair market value, and ensure their necessity and economic viability. The Board shall act promptly if such contributions are not provided as promised.

2. **Budgets.** The LLC is authorized to establish and administer the following budgets. All budgets require mandatory contributions from members unless otherwise specified.

   A. **Initial Formation Budget ("IFB").** Covers expenses related to LLC formation, pre-purchase administrative costs, and asset search. The IFB shall be approved as an appendix to the Organizing Resolution signed by all initial members and ratified by subsequent members. The IFB remains in effect until the Initial Development Budget is passed. Contributions shall be covered by each initial member's deposit to the LLC.

B. **Initial Development Budget ("IDB")** Covers acquisition of various assets, initial improvement expenses necessary to begin the allocation of assets to members, and ongoing administrative costs. Requires three-fourths (3/4) approval by a sixty percent (60%) quorum of membership interest. Remains in effect from major asset purchase until budgeted improvement is complete. Contributions shall be included in the funds members contribute toward the acquisition of assets.

C. **Project Development Budget ("PDB")** Covers development of common elements and ongoing administrative costs during the development of the project. The PDB encompasses the IDB. Requires three-fourths (3/4) approval by a sixty percent (60%) quorum of membership interest. Remains in effect from asset acquisition until planned projects are completed or funds are exhausted. Members who purchased their interest before the PDB was approved are not required to contribute beyond amounts already contributed toward the major asset purchase. The remaining funding shall come from contributions by new members admitted after the PDB is passed, subject to the share dilution provisions described herein.

D. **Annual Operating Budget ("AOB")** Covers maintenance of LLC assets and ongoing administrative costs. Requires a two-thirds (2/3) vote of a sixty percent (60%) quorum of membership interest. Takes effect upon completion or exhaustion of the PDB and continues until dissolution. The AOB shall not include elective projects unrelated to maintenance or administration; such items shall be proposed as a separate Special Budget. The Board has full authority over payment details, including surcharges and late fees, and may impose a surcharge on members who do not enroll in automatic payment.

E. **Special Budgets ("SB")** Covers any purpose not classifiable under the above budget types. Period and purpose shall be as specified in the proposal. Approval requirements:

   i. Legal defense or emergency repairs to common elements or payment of fines: simple majority of a sixty percent (60%) quorum.

   ii. Elective projects: unanimous approval of a one hundred percent (100%) quorum. This threshold exists to prevent scope creep and the unfair burden on members who did not agree to fund projects outside the original scope.

   iii. Exception: The Board may approve an elective project Special Budget without unanimous approval if funded solely by consenting members, provided such contributions are not recorded as capital contributions and do not affect membership interest percentages.

F. **Low Cash Reserve Fail-safe:**

   i. **Stage 2:** If the LLC is in Stage 2 as defined in Article II and liquid cash reserves fall below $5,000 for more than thirty (30) days, an Automatic Mandatory Contribution of $3,000 shall be triggered, with each member contributing according to their membership interest percentage, due within thirty (30) days.
   ii. **Stage 1:** If the LLC is in Stage 1 as defined in Article II and liquid cash reserves fall below $600 for more than thirty (30) days, an Automatic Mandatory Contribution of $1,000 shall be triggered under the same terms.
   iii. **Recurrence:** This event may recur no more than once every thirty (30) days if reserves remain or fall back below $5,000.
   iv. **Automatic Board Election.** If this event is triggered more than three (3) times in one calendar year, a full Board election must be held within sixty (60) days of the third trigger,

and the leadership of the LLC's affiliated fraternal organization must be notified.

3. **Shared Assets.** The Board may establish, develop, and administer assets designated for the shared use and benefit of all members, and may adopt and enforce rules governing their use, including monetary penalties for noncompliance and suspension of access for default on assessments or violation of published rules. Any amendment to such rules shall require approval of the Membership in accordance with Article I, Section 14.A.

## Article VII: Allocation of Assets

1. The LLC has the authority to allocate the beneficial use of its assets to its members and to regulate the distribution, enjoyment, and transfer thereof.
2. Such allocations can be amended or restated only by approval of the Membership in accordance with Article I, Section 14.A.

## Article VIII: Regulation of Assets

1. The LLC is authorized to issue and maintain regulations in regards to the use of its assets by its members.
2. Such regulations can be amended or restated only by approval of the Membership in accordance with Article I, Section 14.A.
3. The Board may issue an "Emergency rule" as an amendment to such regulations which shall override them. Such a rule must not significantly change the ability of the Members to benefit from LLC assets as described in its regulations, and must not endure for a period of longer than 180 days, and must not be enacted more than once in one calendar year, either verbatim or in a substantially equivalent form.

## Article IX: Profit and Loss Distribution

1. **Profit and Loss Allocation:**

   A. Profits and losses shall be allocated to members in proportion to their respective membership interest. These allocations are for tax and accounting purposes only; no member shall have the right to demand or receive cash distributions.

   B. The allocation of losses shall not create any personal liability for members with respect to the LLC's obligations or debts. This provision does not override any obligatory contributions specified elsewhere in this Agreement.

   C. **Cash Distributions:** The LLC operates as an expense-sharing arrangement and is not formed for business purposes. Any net income shall be used exclusively for maintenance of LLC assets, shared member benefits, or administrative and legal costs of the LLC. No cash distributions shall be made to members, and forced distributions to members, creditors, assignees, or any other party are strictly prohibited.

   D. **Tax Compliance**

      i. The Board shall ensure timely filing of all required federal, state, and local tax returns and issuance of all required tax documents to members.

ii. Tax filings shall be prepared by a licensed tax professional or, with Board approval, a qualified Board member.

iii. The LLC may deduct any advertising, promotion, or related expenses to the extent permitted by applicable tax law.

## Article X: Code of Conduct

The Board may establish and enforce a Code of Conduct. Any amendment or restatement of the Code of Conduct shall require approval of the Membership in accordance with Article I, Section 14.A.

## Article XI: Dispute Resolution and Mediation

1. **Informal Resolution:** Any dispute arising out of or relating to this Agreement, the LLC's activities, or the relationship between members shall first be addressed through informal negotiation, except for Code of Conduct enforcement by the Board.
2. **Mediation:** If informal resolution is not achieved within sixty (60) days, the dispute shall be submitted to mediation conducted by a neutral mediator mutually agreed upon by the parties, under the rules of the American Arbitration Association.
3. **Arbitration:** If mediation does not result in a signed settlement within the timeframe established at the outset of mediation, the dispute shall proceed to binding arbitration under the rules of the American Arbitration Association.
4. **Waiver of Litigation and Jury Trial:** Members waive their right to litigation and jury trial in favor of the mediation and arbitration process described herein, to the fullest extent permitted by law.
5. **Class Action Waiver:** All disputes arising out of or relating to this Agreement, the LLC's activities, or the relationship between members shall be resolved on an individual basis only. No member may bring, join, or participate in any class action, collective action, or representative proceeding against the LLC, its managers, or other members. This waiver applies to all claims, whether in arbitration, mediation, or any other forum. This waiver is a material term of the arbitration agreement in this Article; if a court or arbitrator of competent jurisdiction deems this waiver unenforceable, the agreement to arbitrate in Section 3 shall be void as to the affected claim.
6. **Confidentiality:** All communications and proceedings related to mediation and arbitration shall be confidential and shall not be used as evidence in any subsequent proceeding, except as required by law and only after consulting with the Board.
7. **Disruption of Communication.** If disputing parties disrupt LLC communications or meetings with discussion of their dispute, the Board may exclude either or both parties from such communications or take other reasonable measures to preserve the functioning of the LLC.
8. **Continuation of Operations:** During any dispute resolution process, the LLC's operations shall continue unaffected to the extent possible.
9. **LLC's Right to Litigation.** Nothing in this Article waives the LLC's right to pursue legal action against any party as the Board deems necessary.

10. **No Public Airing of Disputes.** Members shall not publicly discuss serious inter-member disputes in official LLC member communication channels outside the dispute resolution process established herein. Violations may result in enforcement action per Art. X.

## Article XII: Book Access and Audits

1. **Access to Records:**
   A. The LLC shall maintain accurate and complete records of all financial transactions, activities, and decisions.
   B. These records shall be accessible to members in good standing for review.
   C. On or before March 15th of each year, the Board shall approve and present to the members a signed profit and loss statement and balance sheet for the previous fiscal year.
2. **Electronic Access:** All LLC records shall be maintained and accessible electronically. Members in good standing shall be granted access.
3. **Member Responsibilities:** Members shall maintain the confidentiality of their access credentials and shall not share credentials or LLC records with any unauthorized individual. Records shall not be disclosed to non-members unless required by law and only after consulting with the Board.
4. **Audits:**
   A. The Board may conduct periodic audits of the LLC's financial records, performed by independent auditors or a committee of members designated by the Board. The frequency of audits shall be determined by the Board.
   B. Audit results and recommendations shall be documented in written reports and made available to all members in good standing.
   C. Audit reports and any financial information obtained through audits shall be treated as confidential and shall not be disclosed to non-members unless required by law and only after consulting with the Board.
5. **Record Retention:** The LLC shall retain all records for a minimum of ten (10) years, or as otherwise required by law.
6. **Document Conveyance:** To the extent Arkansas law permits, all LLC documents required to be delivered to members shall be delivered electronically within thirty (30) days.

## Article XIII: Force Majeure

1. The Board has the authority to create regulations and policies in response to force majeure situations and conditions.
2. Such regulations and policies can be amended or restated only by approval of the Membership in accordance with Article I, Section 14.A.

# Article XIV: Dissolution

1. **Voluntary Dissolution:** The LLC may be dissolved voluntarily in accordance with Article I, Section 13.B.ii. No single member may veto dissolution; if a sole dissenting member holds more than 5% of membership interest, approval of the remaining membership interest shall suffice.

2. **Involuntary Dissolution:** The LLC may be dissolved involuntarily under circumstances permitted by law, including but not limited to court order or bankruptcy. A member's withdrawal from the LLC shall not trigger dissolution.

3. **Winding-Up Process:** Upon dissolution, the LLC shall cease all activities except those necessary for the winding-up process, which shall be managed by the Board.

4. **Distribution of Assets:**

   A. After settling all debts and liabilities, assets allocated to specific members shall be distributed, to the extent allowable by applicable laws and regulations, in a manner that preserves each member's beneficial use and enjoyment of those assets.
   B. If direct distribution of allocated assets is not possible due to regulatory or legal restrictions, the liquidation process shall follow applicable state and federal law. Any cash distribution resulting from liquidation shall account for both improvements made by the member and any diminishment in value caused by or reasonably attributable to the member.
   C. Shared or common assets may be sold, transferred to a successor entity formed by the members, or otherwise distributed as determined by the Board to be most fair and feasible.
   D. Remaining assets not allocated to specific members shall be distributed in proportion to each member's capital contributions and ownership interest, and preserving any need for long-term beneficial use and enjoyment. Distributions may be made in cash or in kind as determined by the Board, and shall be documented and reported to all members.
   E. After all debts and liabilities have been settled and each member has received distributions equal to their aggregate capital contributions and the documented cost basis of improvements to their allocated assets, any remaining surplus shall be donated to the LLC's affiliated fraternal organization or, if that organization no longer exists, to a nonprofit organization selected by the Board that is consistent with the values of the members.

5. **Taxes and Filing:** The Board shall file all required final tax returns and dissolution documents with applicable state and federal authorities.

6. **Termination of Agreement:** Dissolution shall terminate this Agreement, except for provisions that by their nature survive termination, including but not limited to confidentiality and indemnification clauses.

7. **Record Retention:** Prior to dissolution, the Board shall contract with an individual or entity to retain all records related to the dissolution for a minimum of ten (10) years, or as otherwise required by law. All members shall have access to such records upon request.

# Article XV: Governing Law

This Agreement shall be governed by and construed under the laws of the State of Arkansas.

# Article XVI: Miscellaneous Provisions

1. **Definitions.** For the entirety of this agreement, the following shall apply regarding terms used:
   A. "Membership interest," "ownership interest," "share," and similar terms are interchangeable throughout this Agreement and shall not be construed to alter the LLC's nature as a limited liability company.
   B. "Board," "Management," "Board of Managers," and similar terms all refer to the manager(s) appointed by the LLC.
   C. "Business Entity Member" means a person who holds membership interest through an LLC or other business entity rather than as a natural person.
2. **Severability:** If any provision of this Agreement is held invalid or unenforceable by a court of competent jurisdiction, the remainder of this Agreement shall remain in full force and effect. The members agree to replace any such provision with a valid and enforceable provision that achieves, to the extent possible, the original intent.
3. **Counsel and Construction:** All signing parties confirm they have had the opportunity to consult legal counsel and that all parties are considered the drafting party, such that this Agreement shall not be construed against any party. This Agreement shall be construed to provide the maximum confidentiality, autonomy, and authority to the LLC as is lawful.
4. **Repealer:** This Agreement supersedes all prior operating agreements, bylaws, resolutions, and other governance documents of the LLC, whether written or oral, that are inconsistent herewith.
5. **Counterparts:** This Agreement may be executed in counterparts, each of which is an original and all of which together constitute one instrument.
6. **Confidentiality.**
   A. Members shall not disclose non-public information relating to the LLC — including its finances, governance, member lists, contact information, and internal communications — to any non-member or third party without the prior written consent of the Board, except: (1) to the member's legal, tax, or financial advisors who agree to maintain confidentiality; (2) as required by law, after promptly notifying the Board; or (3) as otherwise expressly permitted by this Agreement.
   B. This obligation survives termination of membership for five (5) years. Breach may result in enforcement action per Art. X, including liquidated damages and injunctive relief.
7. **Validity of Signatures.** A signature on this Agreement or any document executed pursuant to it shall be valid and binding regardless of the form in which it is made, including but not limited to a legal name, pseudonym, alias, initials, mark, or symbol, provided the signatory intended thereby to authenticate the document and to be bound by its terms. A signature by mark shall be witnessed by at least one disinterested person. Electronic signatures shall be valid to the extent permitted by the Uniform Electronic Transactions Act (A.C.A. §§ 25-32-101 et seq.).
8. **Non-Member Spouse or Domestic Partner Acknowledgment.** Where a non-member spouse or domestic partner of a Member signs this Agreement or any amendment hereto, the spouse's or domestic partner's signature constitutes an acknowledgment that:
   A. The spouse or domestic partner has had the opportunity to review this Agreement and to consult independent legal counsel;

B. The spouse or domestic partner agrees to be bound by the provisions of this Agreement to the extent applicable to non-members, including but not limited to the confidentiality obligations of Section 6 of this Article, the transfer restrictions of Article III, and the dispute resolution procedures of Article XI;

C. In the event the spouse or domestic partner becomes an assignee of a membership interest — whether by divorce, death, court order, or any other means — the spouse or domestic partner accepts that their rights shall be limited to those of an assignee under A.C.A. § 4-32-704(a)(2)–(3) and this Agreement, and that the spouse or domestic partner shall have no voting, beneficial use and enjoyment, or management rights unless separately approved as a member by Management; provided, however, that this subsection is subject to Article III, Section 4.D, which grants a surviving spouse or domestic partner who has signed this Operating Agreement and all other required LLC documents the right to receive full membership rights upon the Member's death without separate approval;

D. This acknowledgment survives the dissolution of the marriage or domestic partnership between the spouse or domestic partner and the Member; and

E. The spouse's or domestic partner's signature does not confer membership or any rights of a member in the LLC. Nothing in this Section creates any rights in the spouse or domestic partner beyond those expressly stated herein; however, the spouse's or domestic partner's signature on this Agreement is a prerequisite for the automatic transfer of membership rights under Article III, Section 4.D(i).

F. For purposes of this Section, "domestic partner" means an individual who shares a primary residence with a Member and is in a committed relationship with that Member, regardless of whether the relationship is recognized as a marriage under applicable law. The LLC's use of this term does not constitute recognition of any particular legal status.

9. **Waiver of Associational Standing.** Each Member, as a condition of membership, waives the right to authorize any third-party organization to assert claims against the LLC, its managers, or other members on the Member's behalf through associational standing or any similar legal theory. This waiver extends to any organization that would rely on the Member's individual injury as the basis for standing to sue. This waiver does not affect the Member's individual right to bring claims through the dispute resolution procedures established in Article XI.