**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**

| | |
|---|---|
| MICHELLE WALKER<br>Plaintiff,<br>v.<br>RETURN TO THE LAND; RETURN TO THE LAND, OZARKS CHAPTER; WISDOM WOODS LLC; ERIC ORWOLL; PETER JULIUS CSERE; GAVIN BAKER; PETER NEUGEBAUER; and SCOTT THOMAS HALLOWOOD,<br>Defendants. | Case No. 3:26-cv-151-DPM |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**

## INTRODUCTION

In 2023, Defendants proudly launched their "flagship" all-white neighborhood in Northeastern Arkansas, which they named Return to the Land Ozarks (the "RTTL Community").[1] Defendants explicitly allow only people of "European ancestry"—a term they define to exclude Jews—to buy land in their community.[2] The RTTL Community is the first of what Defendants expect will be thousands of white cities across the globe.[3] Defendants believe these cities will someday form the basis for an independent white nation.[4]

---

[1] Compl. ¶¶ 63–64; *see also* Return to the Land (RTTL) Website Advertisements, Pierson Decl. Exhibit A.

[2] Compl. ¶¶ 5, 53, 73; *see also* Sky News, *Inside 'Return to the Land': The Group Making a Whites-Only Community in Arkansas* ("Sky News Documentary"), at 7:28–:36, YouTube (July 22, 2025), https://www.youtube.com/watch?v=kBYBwILYTpM ("You have to be a PMA member to live here [in the RTTL Community] . . . . So you have to be someone of European heritage.").

[3] Compl. ¶ 41; *see also* Eric Orwoll (@Aarvoll), *What Oranians Can Teach Us* ("Orania YouTube Video"), at 17:30–:41, YouTube (Jan. 14, 2025), https://www.youtube.com/watch?v=ytr1xF_iKcU ("We wouldn't just build a three-thousand person town. We could have multiple ten-thousand, twenty-thousand, fifty-thousand person settlements."); Social Media Posts on Race-Based Admissions, Pierson Decl. Exhibit B, at 17 ("We're going to have dozens, then hundreds, then thousands of safe all White communities around the world.").

[4] Compl. ¶¶ 38–44; Eric Orwoll (@Aarvoll), X Video at 16:49–:59, (Feb. 21, 2025), https://x.com/Aarvoll_/status/1892962397427519887 ("You want a white nation? Build a white town. It can be

Understanding that our nation's civil rights laws prohibit housing discrimination, Defendants claim to have found a "workaround of the letter of the law."[5] Their scheme involves two entities: a private membership association called "Return to the Land" ("RTTL" or "the PMA")[6] and a limited liability corporation called Wisdom Woods, LLC ("Wisdom Woods" or "the LLC"). Defendants employ RTTL to screen potential residents and reject anyone who is or has family members who are non-white or Jewish. The remaining "pool of vetted prospective members" has the opportunity to purchase parcels of land owned by Wisdom Woods.[7] Wisdom Woods refuses to do business with anyone who is not a member of the all-white RTTL PMA. Both RTTL and Wisdom Woods are managed by the same individuals: Eric Orwoll, Peter Csere, and Scott Thomas Hallowood (the "Individual Defendants").[8]

In their motion to dismiss, Defendants argue that their use of two entities insulates the land-owning LLC (Wisdom Woods) and its managers (the Individual Defendants) from civil rights liability. That premise is contrary to everything Congress intended when it prohibited housing discrimination. The Fair Housing Act "provide[s], within constitutional limitations, for

---

done, and we're doing it. ReturntotheLand.org. You can join our PMA."); Orania YouTube Video, *supra* note 3, at 31:15–:40 ("The intentional community path is the path that is the beginning of sovereignty . . . . There's no limit to how far we can get down that path . . . . We have to move towards independence through our own effort."); Scott Thomas (@scottth86), X (Dec. 2, 2025), https://x.com/scottth86/status/1995906169907372462 ("Our lawyers now handle most of the fine-tuning of the legal framework, which finally allows us to focus on . . . building an independent, parallel society.").

[5] Compl. ¶ 50; The Stew Peters Network, *FIGHTING the GREAT REPLACEMENT: 'Return to the Land' Building Parallel Communities* ("Stew Peters Interview"), at 8:50–:54, Rumble (Mar. 27, 2024), https://rumble.com/v4lx865-fighting-the-great-replacement-return-to-the-land-building-parallel-communi.html ("So basically we had to look for a workaround of the letter of the law."); *see also* Social Media Posts Describing Legal Structure, Pierson Decl. Exhibit C.

[6] Return to the Land's internal documents refer to two separate PMA entities: Return to the Land and Return to the Land Ozarks Chapter. Ms. Walker has filed suit against both entities. Defendants claim that Return to the Land Ozarks Chapter is now defunct, although they do not offer any evidence on this point. The Court need not decide this issue, however, as neither entity has moved to dismiss Ms. Walker's claims against it. For the purposes of this motion, Ms. Walker refers to both entities as Return to the Land or RTTL.

[7] American Renaissance (@realAmRen), *Eric Orwoll: 'Reclaiming America One Neighborhood at a Time'* ("AmRen Speech"), at 16:49–:58, X (Apr. 17, 2026), https://x.com/realAmRen/status/2045191383107944819 ("[RTTL has] one private association across the country that gives us a pool of vetted prospective members.").

[8] The two other individual Defendants, Gavin Baker and Peter Neugebauer, have not been served and do not join the Motion to Dismiss. RTTL also does not join the Motion to Dismiss.

fair housing throughout the United States," 2 U.S.C. § 3601, while the Civil Rights Act of 1866 provides "'broad and sweeping protection'" against discrimination in the "[a]cquisition, enjoyment, and alienation of property," *Lynch v. Household Fin. Corp.*, 405 U.S. 538, 543 (1972) (quoting *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969)). Because civil rights statutes are "remedial and in aid of the preservation of human liberty and human rights," Congress intended that they be "liberally and beneficently construed." Cong. Globe, 42d Cong., 1st Sess., app. 68 (1871).

Courts regularly hold that a housing provider is liable for the acts of its agents, as Wisdom Woods and its owners are for the acts of RTTL. That proposition is particularly clear here, where the same people operate Wisdom Woods, the land-owning LLC, and RTTL, which vets prospective buyers for Wisdom Woods. There is no "workaround" that permits Defendants to create a whites-only neighborhood. Defendants' discrimination against non-whites and Jews violates the fair housing laws to a degree this country has rarely seen in the last sixty years.

In their motion, Defendants endeavor to obscure the racial and religious exclusion that has been central to their recruitment efforts for years. They assert that the RTTL Community is merely "an intentional community where [RTTL members] could live together, homestead, and raise their children," and that it "does not have any restrictions based on race or religion." Mot. Dismiss at 4, 7. That idyllic description for the Court bears no relationship to how Defendants touted their neighborhoods to the public: as "legal, Whites only communities for our people."[9]

RTTL rebuffed Michelle Walker's efforts to buy land because she is of Jewish ancestry, has a Black husband, and has biracial children. As a result, Ms. Walker never had the opportunity to negotiate for a land purchase in the RTTL Community. Defendants created RTTL as an

---

[9] Social Media Posts on Race-Based Admissions, Pierson Decl. Ex. B, at 18; *see also* sources cited *infra* notes 15–18, 36–41.

absolute, impenetrable barrier to non-white and Jewish applicants. Their use of RTTL to implement their discriminatory scheme makes all of them liable under the fair housing laws. Ms. Walker has standing to sue all Defendants because they all participated in creating and enforcing the discriminatory policies that excluded her from purchasing a lot.

In sum, Defendants explicitly discriminate on the basis of race and religion in the sale of RTTL lots to create a whites-only community. Establishing a two-step, two-entity process for purchasing lots does not protect them from the requirements of the Fair Housing Act, Sections 1981 and 1982 of the Civil Rights Act of 1866, and Section 1985 of the Ku Klux Clan Act.

## FACTUAL BACKGROUND

### I. Defendants' All-White Community in Arkansas

In the fall of 2023, Defendants decided to open a segregated neighborhood that excludes non-white people and Jews.[10] They created RTTL and Wisdom Woods and purchased a 160-acre tract of land near Ravenden, Arkansas.[11] They immediately began recruiting white people to purchase three-acre lots for approximately $2,000 an acre.[12] Today, the RTTL Community has around forty residents, all of whom are white.[13]

---

[10] Compl. ¶¶ 45–51, 63–64; *see also* sources cited *infra* notes 15–18.

[11] Compl. ¶¶ 63–64; *see also* Original Wisdom Woods, LLC Operating Agreement, Pierson Decl. Exhibit D, at 35; Original RTTL PMA Articles of Association, Pierson Decl. Exhibit E, at 9.

[12] Compl. ¶¶ 64, 88; *see also* RTTL Website Advertisements, Pierson Decl. Ex. A, at 1 ("3 acre minimum at $2,200 an acre. ~30 acres remaining."); Full Haus, *Podcast Episode 168: Essential Community*, at 1:08:03–:14 (Sept. 21, 2023), https://www.full-haus.com/index.php/2023/09/21/latest-show-essential-community ("[R]ight now, somebody is putting in $10,000 and getting five acres of land in this sort of LLC-owned property. It's a great deal for a lot of young guys who don't have a whole lot of savings."); Social Media Posts Promoting Land Sales, Pierson Decl. Exhibit F, at 1 ("3.09 acres for $6300 . . . .").

[13] Compl. ¶¶ 68, 87; *see also* Social Media Posts on Race-Based Admissions, Pierson Decl. Ex. B, at 4 ("[W]e're all White."); *id.* at 6 ("[T]here aren't any non-Whites involved. Any of us would be fine providing DNA tests to prove it."); Sky News Documentary, *supra* note 2, at 5:04–:07 ("Around 40 people live here.").

To ensure the RTTL Community remains segregated, RTTL screens applicants to determine their racial background.[14] It only accepts applicants if (1) they are of predominately European heritage,[15] (2) their spouses and children are white,[16] and (3) they are not Jewish.[17] Defendants believe that individuals with Jewish ancestry are not white, and it will not admit them, regardless of whether they believe in or practice Judaism.[18]

Anyone who wants to join RTTL must fill out a form on the RTTL website, which asks about the applicant's ethnic ancestry and religious beliefs, among other things.[19] Applicants then complete an interview during which they are asked further questions about their race and religion.[20] To confirm that candidates appear white, RTTL requires them to submit a photo or

---

[14] Compl. ¶¶ 73–79; *see also* AmRen Speech, *supra* note 7, at 16:03–:16 ("To join our LLC that owns that land, you have to be part of our private association, Return to the Land. The PMA does the selective screening and admissions.").

[15] Compl. ¶¶ 5, 68–69, 71; *see also* Eric Orwoll (@Aarvoll_), *Unedited CNN Interview* ("CNN Interview"), at 23:18–:23, X (Nov. 17, 2025), https://x.com/Aarvoll_/status/1990558738454097993 ("We are an association for people of European ancestry and heritage."); Social Media Posts on Race-Based Admissions, Pierson Decl. Ex. B, at 2, 12.

[16] Compl. ¶ 70; *see also* Jesse Lee Patterson (@jlptalk), *JLP Interviews 'Return to the Land' Leader - Whites-Only Community in Arkansas* ("JLP Interview"), at 37:27–:38, YouTube (Aug. 5, 2025), https://www.youtube.com/watch?v=17Br-soP2Gw ("We accept whole family units into the PMA, not just individuals. So if you're married, if your spouse doesn't have European heritage, they don't exactly fit into a European heritage association."); Social Media Posts on Race-Based Admissions, Pierson Decl. Ex. B, at 7, 15 (announcing that "no one involved [in RTTL] has a non-White spouse" and asking "[m]en with non-White wives" to "please stop applying to RTTL").

[17] Compl. ¶ 69; *see also* Return to the Land, *RTTL and Religion: Positive Aryan Theology?*, Substack (Apr. 29, 2025), https://substack.com/home/post/p-162510911 ("We do not accept any applicants who follow [Talmudic Judaism or Islam], even if they are ethnically European."); Ivain Tures (@IvainTures), *Inside "Return to the Land" - America's New White-Only Town* ("Ivain Tures Interview"), at 53:26–:31, YouTube (Nov. 8, 2025) (Mr. Tures: "You don't allow Jews or gays, right? Is that accurate?" Mr. Orwoll: "Yeah.").

[18] Compl. ¶ 69; *see also* Social Media Posts on Race-Based Admissions, Pierson Decl. Ex. B, at 3, 11, 13; Eric Orwoll (@Aarvoll_), X (July 29, 2026), https://x.com/Aarvoll_/status/2082522697108484252 ("Jews are Asian, and we're a European heritage association. We're getting sued by a Jew right now for not admitting her.").

[19] Compl. ¶¶ 73–77; *see also* Application Form, Walker Decl. Exhibit 1.

[20] Compl. ¶¶ 78–79, 102; *see also* The Backlash (@RealBacklash), *Episode 58 – Return to the Land or Die in the City: Aarvol's Plan to Rebuild the West @ericorwoll* ("Backlash Episode 58"), at 20:30–:43. YouTube (July 21, 2025), https://www.youtube.com/watch?v=0eqgZGTqYXg ("To join the PMA, it takes an interview, a video interview or a phone interview. We do like to do a physiognomy check and make sure that, you know, everything passes the sniff test.").

video showing their face.[21] The RTTL Board reviews the questionnaires and interview notes and decides which candidates to admit.[22] If accepted into RTTL, an applicant can then visit the RTTL Community, learn about the specific available lots, and apply to purchase a lot.[23] Defendants emphasize that only RTTL members are eligible to buy or lease property in the RTTL Community.[24]

---

[21] Compl. ¶¶ 73, 79; *see also* Rhetorically Defective (@RhetoricallyDefective), *AnF #24 – Talking to Eric Aarvoll*, at 58:51–59:29, YouTube (Dec. 21, 2025), https://www.youtube.com/watch?v=3QPmcxZsP8A ("We do look at people's pictures, and so if we're not convinced just looking at a picture, we will ask for supplementary information. And we tend to be relatively on the safe side in these admission decisions. So if there's any ambiguity, we want to clear that up."); JLP Interview, *supra* note 16, at 6:03–:09 ("We interview people. We preferably do video interviews. Otherwise, they send pictures.").

[22] *See* RTTL Original Articles of Association, Pierson Decl. Ex. E, at 7 ("To join, Members must . . . be accepted by a majority vote of the Board of Trustees or their delegates . . . ."); JLP Interview, *supra* note 16, at 7:18–:23 ("[O]ur Board of Managers votes on those admissions decisions."); Nick Johnson (@NickJohnson), *No Blacks, No Gays: A 'White Only' Community Has Been Built In Arkansas*, at 20:41–:56, YouTube (Oct. 1, 2025), https://www.youtube.com/watch?v=tEOUWSgZPbk ("[T]he Board votes on whether you should be admitted into the association."); No White Guilt (@NoWhiteGuilt), *Aarvoll Building White Communities*, at 28:17–:23, YouTube (May 7, 2025), https://www.youtube.com/watch?v=kJI6P2 pzwXc ("We have a board of managers and so most of these admissions decisions are made by the board."); Chris PT (@ChrisPT89), *Return to the Land Featuring Pete Csere* ("Chris PT Interview"), at 29:29–:36, YouTube (Aug. 7, 2025), https://www.youtube.com/watch?v=_b3oqaTCVe8 ("We interview you for a little, for 15 or 20 minutes, and get some information. And then the Board votes on each applicant.").

[23] Compl. ¶ 104; *see also* Rhetorically Defective Interview, *supra* note 21, at 55:33–:56:06 ("There's . . . two levels of vetting. Joining the PMA—you go to the website, you take an interview, fill out a questionnaire. And then ultimately you'll be processed into our chats, where you can then organize a trip out here, or to other communities, or to regional meetups. And then that in-person vetting starts to take place and that's how you'd get to the next level of vetting, which is being approved to buy into one of these companies that own land."); Nick Johnson Interviwe, *supra* note 22, at 20:56–21:12 ("Once you're a [RTTL] member, you can come down and visit. And before you can actually buy into the company here or any other RTTL affiliate company that might exist in the future, you have to meet with us and, you know, for a couple days, stay down here, get to know us."); *see also* Social Media Posts Promoting Land Sales, Pierson Decl. Exhibit F (directing prospective residents to apply through the RTTL website).

[24] Compl. ¶¶ 82–86; *see also* Stew Peters Interview, *supra note* 5, at 8:25–:35 ("Any specific piece of land that we buy, it is a prerequisite to buy into it that you're a member of [the RTTL] association."); Return to the Land (@returntotheland), *Return to the Land-Ozarks Project Update, Land Buying LLCs* ("RTTL Ozarks Project Update"), at 5:22–6:23, Odysee (Sept. 17, 2023), https://odysee.com/@returntotheland:a/9910fc19-233a-4ce8-8fa1-11e1aa9a6741:0 ("So we've decided on founding an LLC that has membership requirements stemming from a previous private members association . . . . [The PMA] feeds members into an LLC that then legally designates how we divide up particular parcels of land."); RTTL Website Advertisements, Pierson Decl. Ex. A, at 2–5 ("These lots are tied to membership interest in our LLC. You can purchase a share of membership interest in the LLC to become a landowner/homesteader via the LLC . . . Only PMA members may apply to purchase membership interest in the LLC . . . . *PMA Members Only* Join RTTL to become eligible."); Nick Johnson Interview, *supra* note 22, at 5:52–:59 ("[P]eople can buy shares in the company if they're part of our association, Return to the Land."); About RTTL Webpage, Pierson Decl. Exhibit G ("All LLC members must first join the PMA; that is a condition of the share transfer restrictions in the LLC Operating Agreement."); AmRen Speech, *supra* note 7, at 16:03–:20 ("To join our LLC that owns that land, you have to be part of our private association, Return to the Land. The PMA does the selective screening and admissions.").

Wisdom Woods owns the RTTL Community. Each share of Wisdom Woods is linked to a particular three-acre parcel in the RTTL Community.[25] The purchase of a share in the LLC represents the purchase of the parcel associated with that share. Share owners have the right to live on their individual parcel, develop it, rent or sell it to RTTL members at a price the individual owner believes is fair, and transfer it to heirs.[26] As Mr. Orwoll describes, a share of the LLC is "as good as owning a deed to the land."[27]

Defendants' use of the LLC to allocate property is not particularly novel: millions of Americans own their homes through housing cooperatives that have a similar legal structure. Defendants stand apart, however, because they use their housing cooperative to control the racial composition of their neighborhood.

Wisdom Woods' governing documents specify that only members of the all-white RTTL association can own shares in the LLC.[28] The Wisdom Woods Board has the right to veto any

---

[25] Compl. ¶¶ 54, 59; *see also* Nick Johnson Interview, *supra* note 22, at 6:20–:31 ("So one share is tied to a particular piece of this land and they'll have the right to homestead that three acres—we have three acre lots here."); *see also* Original LLC Agreement, Pierson Decl. Ex. D, at 17 ("The LLC shall allocate land to each member, for their private use. The land and any developments on it shall be considered a private element."); About RTTL Webpage, Pierson Decl. Ex. G ("The LLC . . . owns a large parcel of land, with each person owning a share of the LLC which confers them land rights via its LLC Operating Agreement.").

[26] Compl. ¶¶ 59–61; *see also* About RTTL Webpage, Pierson Decl. Ex. G ("After purchasing a share of membership interest, the LLC will allocate you a piece of land for indefinite use as per its operating agreement. Then you can move into the neighborhood and develop your land. If you change your mind or your life plans, you can later sell this share to another approved buyer."); Original LLC Agreement, Pierson Decl. Ex. D, at 5 ("Class A and B members have rights to reside on their allocated land and other community benefits."); AmRen Speech, *supra* note 7, at 18:19–:38 ("You can sell your share to another member of the PMA. You can ask whatever price you want, it's a market within that PMA . . . . If you made improvements to your lot on the land, well then that'll likely be reflected in the share price.").

[27] Compl ¶¶ 61–62; *see also* AmRen Speech, *supra* note 7, at 16:20–:40 ("[The LLC] bylaws also spell out who has use rights to which aspect of the company property. So which particular lot of land on the 160 acres do you have the right to homestead. And for practical purposes, it's as good as owning a deed to the land, because we can develop however we choose, totally unrestricted."); *See also* Rising Right (@Rising_Right), I*nterviewing Eric Aarvoll, Whites Only Community Leader [RRP Ep 2]*, at 47:35–:43, YouTube (Oct. 12, 2025), https://www.youtube.com/watch?v=vgoqIt9SmiU ("We are indirectly landowners and then our internal bylaws spell out who has rights to what section of the land.").

[28] Compl. ¶ 83; *see also* Original LLC Agreement, Pierson Decl. Ex. D, at 8 ("Any new members [of Wisdom Woods] must previously be members of the 'Return to the Land: Ozarks Chapter private membership association, or equivalent affiliated regional subgroup."); Original RTTL Articles of Association, Pierson Decl. Ex. E, at 8 (listing the opportunity to be "selected to join RTTL group land buy LLCs" as one of the "benefits" of PMA membership);

sale or transfer of shares.[29] If a resident wants to lease or sell their land, they can only advertise the property to members of RTTL.[30] Wisdom Woods will evict residents who violate these rules or otherwise transgress RTTL's racial codes. For instance, if a resident marries a Black person, Wisdom Woods will force them to sell their property.[31] Similarly, if a non-white person inherited a share in Wisdom Woods, the LLC requires them to sell the share to a white RTTL member.[32]

Defendants believe they have created a permanent, legally enforceable way to preserve a whites-only community—comparable to a racially restrictive covenant.[33] Defendants claim that they are not subject to civil rights laws because they use the RTTL association, rather than the LLC, to do an initial screening of prospective buyers.[34]

---

Undated LLC Agreement, Orwoll Decl. Exhibit A, ECF No. 20-4, at 8–9 ("No creditor may obtain a member's interest in the LLC, except where: (1) the creditor is a member of the fraternal organization affiliated with the LLC and its members . . . ."); *see also* Leonarda Jonie (@LeonardaisFunny), *Jewish Woman Sues Whites-Only Group*, at 1:07:47–1:08:11, YouTube (June 1, 2026), https://www.youtube.com/live/nmjy6zTVPVI (explaining that RTTL transitioning from an unincorporated association to a 501(c)(8) fraternal benefits organization).

[29] Compl. ¶¶ 85–86; *See* Original LLC Agreement, Pierson Decl. Ex. D, at 8, 10 ("Any new members must be approved by the board of managers with a 2/3 vote, or they are prohibited from becoming a member."); Undated LLC Agreement, Orwoll Decl. Ex. A, at 13 ("All transfers of membership interest must be approved by the Board . . . .").

[30] Compl. ¶ 60; *see also* AmRen Speech, *supra* note 7, at 18:19–:26 ("You can sell your share to another member of the PMA . . . . It's a market within that PMA."); Backlash Episode 58, *supra* note 20, at 21:58–22:18 ("[RTTL Community residents who are ejected] can still sell their share . . . . PMA Members have the first right to purchase that share, and then if no one in the PMA can be found, the LLC itself ends up as a last resort . . . having the obligation to buy that person out.").

[31] Ivain Tures Interview, *supra* note 17, at 1:04:58–1:05:25 (explaining that if a resident "was to mix with a different race," she would be "kicked out of the association" and forced to sell her share in Wisdom Woods); The Backlash, *Episode 72 – LIVE IN STUDIO W/ Aarvoll & J.F. Garipey*, at 1:00:25–:53, YouTube (Sept. 8, 2025), https://www.youtube.com/watch?v=w3kwghqD0gc ("[W]e can revoke someone's residency rights if they no longer qualify for the association—say someone decides at some point to get married to like a Black woman. Or something else goes on in their life where they no longer match our values. Well, then, they would be kicked out of the PMA, and because they're no longer a member of the PMA, they wouldn't have a right to live on the LLC. It is just for, you know, PMA members.")

[32] Original LLC Agreement, Pierson Decl. Ex. D, at 9 (empowering LLC Board to force heir to sell property); Backlash Episode 58, *supra* note 20, at 21:58–22:18 (describing procedures for forced sales).

[33] *See* The Keith Woods Podcast, *Intentional Communities w. Eric Orwoll*, at 12:45–13:29, Listen Notes (Feb. 4, 2025), https://www.listennotes.com/podcasts/the-keith-woods/intentional-communities-w-W6G4mAfnbet (Mr. Orwoll explaining LLC structure and stating that it "gets around this prohibition in the Fair Housing Act against restrictive covenants").

[34] *Id.* at 11:47–12:27 ("[I]n the Fair Housing Act, obviously you're not allowed to restrict who you sell to in real estate transactions. But there is an exception where if land is managed by a PMA, which itself is exclusive along racial or ethnic lines, that PMA can manage the land according to its own principles. So there's basically cutout

## II. Defendants' Promotion of the RTTL Community

Defendants promote the RTTL Community on social media and the RTTL website and blog. They have also allowed numerous media outlets and podcast hosts to interview them and tour the property. In these public statements, they consistently describe RTTL as an all-white neighborhood:

- In May 2025, the RTTL X account claimed that it was "building legal, Whites only communities for our people" and had "started a Whites only community."[35]
- Also in May 2025, Mr. Orwoll stated that the RTTL Community was the nation's first "full-time residence white intentional community," and touted the fact that RTTL was "doing it openly" and had "a place where you can sign up to join us."[36]
- In June 2025, Mr. Orwoll complained on X that "[o]rganized Jewry is coming after me for having a White neighborhood."[37]
- In July 2025, Mr. Hallowood told Sky News that "you have to be a PMA member to live here [in the RTTL Community] . . . . So you have to be someone of European heritage."[38]
- In June 2026, Mr. Orwoll proclaimed that "we're going to have dozens, then hundreds, then thousands of safe all White communities around the world."[39]

---

under the Fair Housing Act for actual free association in residential developments, you just have to be under this kind of framework."); *see also* Social Media Posts Describing Legal Structure, Pierson Decl. Ex. C.

[35] Social Media Posts on Race-Based Admissions, Pierson Decl. Ex. B, at 5; Sky News Documentary, *supra* note 2, at 0:47–:48.

[36] Eric Orwoll (@Aarvoll_), X Video, at 16:58–17:14 (May 13, 2025), https://x.com/Aarvoll_/status/1900274729602474252.

[37] Social Media Posts on Race-Based Admissions, Pierson Decl. Ex. B, at 10.

[38] Sky News Documentary, *supra* note 2, at 7:28–:36.

[39] *See* Social Media Posts on Race-Based Admissions, Pierson Decl. Ex. B, at 17.

Further examples abound.[40] Over the last three years, Defendants have regularly shared and quoted articles that described RTTL as "whites only" and stated that "no blacks, no Jews, [and] no gays" were allowed to buy land in the community.[41]

Defendants promoted RTTL as "whites only" specifically to encourage white people to purchase land in the RTTL Community. They have also solicited buyers by posting color-coded maps with lots that are available for purchase,[42] speaking publicly about opportunities to buy or lease land,[43] and "advertis[ing] available stakes [in Community 1] to [RTTL] members via [RTTL's] official channels."[44]

### III. Ms. Walker's attempt to purchase land in the RTTL Community.

Plaintiff Michelle Walker is a real estate agent in St. Louis, Missouri. Her father's ancestors were British immigrants who came to the United States in the 1600s, and her mother's ancestors were Russian Jewish immigrants who came to the United States in the early 1900s. Ms. Walker is a Christian. Her husband is Black, and they have three biracial children.[45]

In the summer of 2025, Ms. Walker saw a piece about RTTL on a local television channel. The story reported that RTTL was selling land in rural Arkansas. Ms. Walker was drawn to RTTL because it offered the opportunity to buy land at an affordable price—$2,000 or less per

---

[40] *See, e.g.*, *id.* at 1–17; Compl. ¶ 71 (citing several additional examples).

[41] *See, e.g.*, Social Media Posts Promoting Land Sales, Pierson Decl. Ex. F, at 16–17.

[42] *See, e.g.*, Website Advertisements, Pierson Decl. Ex. A, at 2–5; Social Media Posts on Land Sales, Pierson Decl. Ex. F, at 3.

[43] *See* Social Media Posts Promoting Land Sales, Pierson Decl. Ex. F, at 4, 9–12; *see also* sources cited *infra* notes 60–63.

[44] *See* Return to the Land, *Forming a New RTTL Neighborhood* ("Neighborhood Structure Substack"), Substack, archived at https://web.archive.org/web/20250626042917/https://rttl.substack.com/p/forming-a-new-rttl-neighborhood.

[45] Compl. ¶ 6; Walker Decl ¶¶ 2–4.

acre. Ms. Walker had vacationed in the Ozark Mountains, and she had experience investing in real estate, so she knew that land in the region usually commands a considerably higher price.[46]

In November 2025, Ms. Walker went to the RTTL website, ReturntotheLand.org, to fill out an application form to begin the process for purchasing a parcel in the RTTL Community. Because Defendants had indicated the land was available to RTTL members only, Ms. Walker applied to RTTL.[47] She was surprised by many of the questions on the form, which struck her as improper for a real estate application. The form required her to describe the "geographic/ethnic origins" of her family, and her views on "controversial issues" like "segregation" and "multiculturalism." In response to the question about her family ancestry, Ms. Walker wrote:

> My dad's side of the family have been here from England in the 1600's. My distant great grandfather was the first Lord Baltimore of Maryland. My mom's side of the family were Russian Jewish immigrants, arriving to the US in the early 1900's. My husband is of Irish and African des[c]ent. My children are a mix of all of the above.

In response to questions about her political views, she indicated that she opposes segregation and "prefer[s] a community with a variety of different ancestral origins."[48]

Upon submitting the form, Ms. Walker was able to schedule an interview with RTTL. Ms. Walker had significant difficulty obtaining the interview. The RTTL representative did not appear for the first scheduled interview, and the actual interview did not occur until nearly six weeks after Ms. Walker submitted her application. Eventually, the interview took place on December 23, 2025 via Jitsi Meet, a video conferencing platform.[49]

Based on Defendants' representations, Ms. Walker understood the interview as the next, required step toward membership in RTTL, which was a prerequisite to purchasing a parcel in

---

[46] Compl ¶¶ 7, 94–95; Walker Decl. ¶¶ 5–6.

[47] Compl. ¶¶ 95–96; Walker Decl. ¶¶ 5, 7.

[48] Compl. ¶¶ 97–100; Walker Decl. ¶¶ 8–14; Application Form, Walker Decl. Ex. 1.

[49] Compl. ¶ 101; Walker Decl. ¶¶ 16–17; Messages with RTTL Representative, Walker Decl. Exhibit 2, at 1–2.

the RTTL Community.[50] During the interview, the RTTL representative asked Ms. Walker several questions about her ethnic origins. Ms. Walker explained that her father's ancestors were English settlers, and that her mother's ancestors were Russian Jewish immigrants. She told the RTTL representative that her husband is Black and her children are biracial. The RTTL representative asked Ms. Walker if she belonged to any other white nationalist groups, and Ms. Walker replied that she did not.[51]

When Ms. Walker asked the RTTL representative about the details of purchasing the parcel in the RTTL Community, the representative explained that before Ms. Walker could purchase any land, she would need to be admitted to RTTL, pay a $25 membership fee, and sign RTTL's contract. She advised Ms. Walker that only upon being accepted into RTTL would she have an opportunity to view the available parcels and purchase a lot at the advertised price.[52]

The video tool on Jitsi Meet did not work during the interview, so Ms. Walker and the RTTL representative were unable to see one another. At the close of the interview, the RTTL representative told Ms. Walker to send a short video that showed her face. Ms. Walker sent a six-second clip, in which she stated, "Hello Elizabeth, this is Michelle Walker. We just had our interview. Just wanted to say Merry Christmas." A photo of Ms. Walker's multiracial family is visible in the background of the video clip.[53]

With the interview complete and the video submitted, Ms. Walker understood that her application was ready for review by RTTL. At the time, Mr. Orwoll, Mr. Csere, and Mr.

---

[50] Compl. ¶¶ 95–96; Walker Decl. ¶¶ 5, 7–8, 24.

[51] Compl. ¶¶ 102–03; Walker Decl. ¶ 18.

[52] Compl. ¶ 104; Walker Decl. ¶ 19.

[53] Compl. ¶ 105; Walker Decl. ¶ 20; Messages with RTTL Representative, Walker Decl. Ex. 2, at 3.

Hallowood were all serving on the RTTL's Board,[54] which made decisions as to who would be admitted into RTTL—and who would thereby be able to purchase land from Wisdom Woods.[55]

Ms. Walker heard nothing from RTTL for a month, and on January 20, 2026, she messaged the RTTL representative to ask when she might "expect [an] approval." The RTTL representative responded, "I wouldn't say to expect an approval. But if you were approved, then you probably would have received [an email]."[56] In March, the application portal on the RTTL website updated to say that Ms. Walker's application had been denied.[57]

Having been rejected from membership in RTTL, Ms. Walker knew she was ineligible to purchase land in the RTTL Community.[58] While her application was pending, Ms. Walker had read articles about RTTL and watched interviews of its founders. Every statement by the RTTL founders confirmed that only RTTL members were eligible to buy land in the RTTL Community. Ms. Walker also learned through her research that the RTTL Community does not accept applicants who are Jewish or who are in interracial relationships.[59]

[54] Compl. ¶¶ 24–28; *see* Return to the Land (@RTTL_Official), X (Nov. 16, 2025), (identifying Mr. Orwoll, Mr. Csere, and Mr. Hallowood as "[o]ur board members"), https://x.com/RTTL_Official/status/1990156295186567422; Return to the Land, *RTTL Podcast #1*, at 4:26–:46, Rumble (May 3, 2026), https://rumble.com/v79b6wq-rttl-podcast-1.html (Mr. Hallowood explaining that Mr. Orwoll is "President of the Return to the Land organization" and "the Vice President of Community 1," while Mr. Hallowood is "Vice President of the Return to Land Association" and "the President of Community 1"); RTTL Ozarks Project Update, *supra* note 24, at 5:44–6:10 (Mr. Orwoll: "I and a few of the others will be . . . the Board of Directors of that private members association and we will admit people based on whether they're compatible with the overall ethos and values, aesthetics of the project as a whole.").

[55] *See* sources cited *supra* note 22.

[56] Compl. ¶ 105; Walker Decl. ¶ 21; Messages with RTTL Representative, Walker Decl. Ex. 2, at 5.

[57] Compl. ¶¶ 13, 105; Walker Decl. ¶ 23; Application Form, Walker Decl. Ex. 1, at 12.

[58] Compl. ¶ 104; Walker Decl. ¶¶ 24, 26.

[59] Walker Decl. ¶¶ 24, 26.

## IV. RTTL Community parcels remained available after Ms. Walker submitted her application.

When Ms. Walker applied to RTTL, land in the RTTL Community was available for purchase.[60] In December 2025, while Ms. Walker's application was pending, Mr. Orwoll stated that a RTTL Community resident with "five shares" of the LLC was selling his property and that "it doesn't look like he's asking too much."[61] In January 2026, Mr. Orwoll told a podcaster that new families were moving into the RTTL Community.[62] Over the next few months, RTTL opened at least one new all-white neighborhood in Northeastern Arkansas, near the original RTTL Community, and began selling lots there.[63] Ms. Walker could not pursue these land-buying opportunities, because RTTL rejected her application.

## LEGAL STANDARD

When evaluating a motion to dismiss that asserts a "factual" rather than a "facial" challenge to subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) "a district

---

[60] Compl. ¶¶ 20, 94–95; *see also* Nick Johnson Interview, *supra* note 22, at 43:40–:47 (Mr. Orwoll explaining, in a November 2025 interview, that members of the RTTL Community were reselling their shares); Eric Orwoll (@Aarvoll_), X Video, at 13:28–:39 (Oct 2, 2025), https://x.com/Aarvoll_/status/1973511804379865275 ("We have one community here now in the Ozarks in Arkansas, and it's very affordable, like there are places right now you could come and develop and live cheaply . . . .").

[61] Rhetorically Defective Interview, *supra* note 21, at 1:00:41–1:01:16 ("Our shares are associated each with three acres on the land that you have the right to hold . . . . There are a few available, actually, because people come down, they think they want to develop, and life gets in their way or they change their mind, whatever. So occasionally shares are available. And right now, somebody who owned five shares is deciding to sell, and he put some decent work into it and it doesn't look like he's asking too much."); *see also* Ivain Tures Interview, *supra* note 17, at 22:18–:31 (Mr. Orwoll explaining that the community has forty residents, but is "growing" and the land could "host up to fifty households").

[62] I,Hypocrite (@lporiginalg), *The Progress Report feat. Jared Taylor & Eric Orwoll (YCSP 421)* ("Progress Report Interview"), at 2:22–:30, YouTube (Jan. 14, 2026), https://www.youtube.com/watch?v=kxN2MYGPBoY ("There's been a lot of progress also on the ground here in the first community. A lot of building, a new family moved down.").

[63] Mainstream Dissident (@maindissident), *Eric Orwoll (Aarvoll) Interview: Inside Return to the Land, Navigating the Legal Landscape* ("Mainstream Dissident Interview"), at 11:46–:58, YouTube (May 19, 2026), https://www.youtube.com/watch?v=kB9x-tIPjFg ("There's another community in the U.S. currently established, already being built. There are other communities that are being started in the near future, people are organizing them."); Rhetorically Defective Interview, *supra* note 21, at 53:52–:59 ("There are multiple communities now in development besides this one here. Land has been purchased elsewhere."); Progress Report Interview, *supra* note 62, at 2:03–:12 ("There now are officially other Return to the Land communities. We're not going to share the locations of the others except with members who are interested.").

court may look outside the pleadings to affidavits or other documents." *Moss v. United States*, 895 F.3d 1091, 1097 (8th Cir. 2018). The Court determines, based on the record before it, whether the Plaintiff has shown by a preponderance of the evidence that she has standing to sue. *Id.* If the evidentiary record is incomplete, the Court has "wide discretion" to order further discovery or schedule an evidentiary hearing. *Johnson v. United States*, 534 F.3d 958, 964 (8th Cir. 2008) (quotation marks omitted); *see, e.g.*, *Patterson v. United States*, No. 16-CV-03041, 2018 WL 388916, at *2 (D.S.D. Jan. 11, 2018) (ordering additional discovery).

When jurisdiction and merits are intertwined, the Court can also deny the 12(b)(1) motion as premature and decide the issue after summary judgment briefing or after trial. *See, e.g.*, *Malinowski v. United States*, No. 4:25-cv-00486-LPR, 2026 WL 1750072, at *28 (E.D. Ark. June 17, 2026) (denying Rule 12(b)(1) motion as premature where "additional discovery will only help clarify what truly transpired in this case, and such information will be simultaneously relevant to the jurisdictional issues and to the merits issues").[64]

**ARGUMENT**

Defendants' Motion presents two overarching arguments: (1) Ms. Walker does not have standing to sue Defendants because RTTL and Wisdom Woods are separate entities, Ms. Walker only dealt with RTTL, and RTTL is not involved in the sale of Wisdom Woods parcels; and (2) Ms. Walker has failed to plead some of the requisite elements of her claims. Neither argument has any basis in fact or law.

Wisdom Woods and the Individual Defendants rely on RTTL—which they created, operate, and control—to exclude Black or Jewish home seekers from purchasing land in the

[64] The Article III issue here is inextricably intertwined with the merits. To decide the Motion, this Court will need to determine Defendants' respective roles in the all-white neighborhood scheme—an issue that goes to the heart of the merits dispute. To conserve judicial resources, the Court could deny the Motion as premature and resolve the jurisdictional and merit issues at the summary judgment stage.

RTTL Community. Just as land sellers cannot escape liability by directing a real estate agent to reject Black and Jewish potential buyers, Wisdom Woods and the Individual Defendants cannot escape liability by using RTTL for their discriminatory screening. Further, and detailed as below, Ms. Walker has made specific and detailed allegations supporting every required element for each of her claims.

## I. Ms. Walker has Article III standing to sue Defendants, because each Defendant directly caused her injuries.

To demonstrate Article III standing, a plaintiff must establish: "(1) that [she] suffered an injury-in-fact, (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury likely will be redressed by a favorable decision." *Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000) (quotation marks omitted).

### A. Ms. Walker has suffered an injury-in-fact

Ms. Walker has been injured. As alleged in the complaint and supported by evidence, Ms. Walker attempted to purchase a lot in the RTTL Community but was denied the opportunity due to Defendants' discriminatory conduct. *See* Compl. ¶¶ 12–15, 106. The loss of a housing opportunity is a cognizable injury under the Fair Housing Act and Sections 1981 and 1982. So too is the loss of the opportunity to even learn basic information about housing that is available. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 364 (1982); *Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 297 (7th Cir. 2000) (explaining that Black housing discrimination testers have "cognizable injury" where landlord "show[ed] [them] fewer apartments, and quot[ed] them higher rents and/or later dates of availability . . . notwithstanding the fact that testers were not bona fide apartment seekers."). Furthermore, Ms. Walker suffered dignitary and emotional harms resulting from knowing she was denied housing because of Defendants' animus towards Ms. Walker and her family. *See* Compl. ¶¶ 15, 106; Walker Decl. ¶ 25; *Tallarico v. Trans*

*World Airlines, Inc.*, 881 F.2d 566, 570 (8th Cir. 1989) ("[D]amages for mental distress are allowed under 42 U.S.C. § 1982 and the Fair Housing Act.").

B. The Individual Defendants and Wisdom Woods directly caused Ms. Walker's injuries

Defendants caused Ms. Walker's injuries in several ways: (1) by participating in the RTTL admissions process; (2) by utilizing RTTL to screen prospective applicants on the basis of race and religion; (3) by ratifying RTTL's decisions; and (4) by publicizing and enforcing Wisdom Woods's discriminatory policies.

*1. The Individual Defendants participated in RTTL's admissions process*

To start, Ms. Walker has standing to sue the Individual Defendants because they created and implemented RTTL's discriminatory screening process. Mr. Orwoll, Mr. Csere, and Mr. Hallowood are all founders of RTTL and, as RTTL Board members, were decisionmakers on RTTL applications when Ms. Walker applied.[65] Based on their own description of the RTTL application and decision-making process, the Individual Defendants participated in RTTL's decision to reject Ms. Walker. That rejection precluded Ms. Walker from seeking to purchase a parcel in the RTTL Community and constitutes, at a minimum, "refus[ing] to negotiate for the sale[,] . . . or otherwise mak[ing] unavailable or den[ying], a dwelling." 42 U.S.C. § 3604(a).

*2. Wisdom Woods is vicariously liable for its agents' conduct.*

Wisdom Woods is vicariously liable for the conduct of its agents who collectively determine who may purchase shares and the accompanying parcels from the LLC. Federal courts have long recognized that a defendant is responsible for the discriminatory conduct of its agents taken in the scope of the agent's authority. *See Meyer*, 537 U.S. 280, 285 (2003) (Fair Housing Act); *Green v. Dillard's, Inc.*, 483 F.3d 533, 540 (8th Cir. 2007) (Section 1981). The principal

[65] Compl. ¶¶ 24–25, 28; *see* sources cited *supra* notes 22, 54.

(Wisdom Woods) is vicariously liable if its agents (RTTL and the Individual Defendants) are acting pursuant to their "actual authority" or "apparent authority." *Miles v. Century 21 Real Est. LLC*, No. 4:05-CV-1088 GTE, 2007 WL 92795, at *3–13 (E.D. Ark. Jan. 11, 2007); *Horner v. Warren*, No. 3:23-CV-108-DPM, 2026 WL 1992819, at *4 (E.D. Ark. July 9, 2026). Wisdom Woods is liable under both theories.

**Actual Authority:** An entity is an agent if (1) it has "the authority to act" for the principal; and (2) it is "subject to the principal's control." *Miles*, 2007 WL 92795, at *4 (quotation omitted); *see also S. Pac. Transp. Co. v. Cont'l Shippers Ass'n, Inc.,* 642 F.2d 236, 238 (8th Cir. 1981). If this agency relationship exists, Wisdom Woods is liable for RTTL's conduct taken pursuant to its "actual authority." RTTL acts with "actual authority" if its decisions have "legal consequences" for Wisdom Woods and it "reasonably believe[d]" that Wisdom Woods intended RTTL to act as it did. Restatement (Third) of Agency §§ 2.01, 3.01.

These requirements are met here. First, Wisdom Woods expressly authorized RTTL to manage the first step of its application, the discriminatory screening process. *See* sources cited *supra* note 24. Second, Wisdom Woods controlled RTTL through its managing members, who are the same people who serve RTTL's Board and make decisions on RTTL applications.[66] Next, RTTL's decision to deny Ms. Walker's application had legal consequences for Wisdom Woods, because the Wisdom Woods Operating Agreement prohibits its members from selling or renting land to anyone who is not an RTTL member.[67] Finally, when RTTL denied Ms. Walker's application, it reasonably believed that it was acting as Wisdom Woods intended by following Wisdom Woods's instruction to exclude anyone with Jewish ancestry, a Black spouse, or biracial

---

[66] *See* sources cited *supra* notes 22, 54.

[67] *See* sources cited *supra* notes 24, 28.

children.[68] And RTTL was of course aware that it was acting in accord with Wisdom Woods's intentions, as the people operating Wisdom Woods are the same people who are operating RTTL.

Defendants argue that RTTL and Wisdom Woods are "completely separate," "independent," "distinct," and "unrelated" entities, and that Wisdom Woods is therefore not liable for RTTL's conduct. Mot. Dismiss at 4, 11, 16, 20. This is false. RTTL and Wisdom Woods are as closely linked as two entities can be. They were founded at the same time and are managed by the same individuals. Mr. Orwoll is President of RTTL and Vice President of Wisdom Woods, Mr. Hallowood is Vice President of RTTL and President of Wisdom Woods, and Mr. Csere serves on the Board of both entities.[69] RTTL assists Wisdom Woods with every aspect of the RTTL Community project: it screens applicants to determine their racial heritage before they apply to the LLC; promotes the community on RTTL's official social media pages[70]; advertises lots that are available for purchase[71]; and recruits investors, donors, and volunteers for community projects.[72] Ms. Walker has standing to sue Wisdom Woods for using RTTL to advance its scheme.

**Apparent Agency:** Wisdom Woods is also liable because RTTL was acting as its apparent agent when it rejected Ms. Walker. To establish "apparent agency," Ms. Walker must show that (1) Wisdom Woods "held out" RTTL as its agent; and (2) Ms. Walker's "justifiable reliance upon [that] representation led to [her] injury." *Miles*, 2007 WL 92795, at *9; *see also* Restatement (Third) of Agency §§ 2.03, 3.03.

---

[68] *See* sources cited *supra* notes 15–18.

[69] *See* sources cited *supra* notes 22, 54.

[70] *See* Return to the Land (@RTTL_Official), X, https://x.com/RTTL_Official; Return to the Land (@Return_to_the_Land), Rumble, https://rumble.com/user/Return_to_the_Land.

[71] *See* sources cited *supra* notes 42–44, 60–63.

[72] *See* RTTL, *RTTL Ozarks Community Center*, GiveSendGo, https://www.givesendgo.com/rttl_ozarks. RTTL, *RTTL Ozarks Family Incentives*, GiveSendGo, https://www.givesendgo.com/rttl_ozarks_family.

Both requirements are met. Wisdom Woods "held out" RTTL as its agent when it directed prospective buyers to apply to RTTL through the RTTL website as an initial step for purchasing land through the LLC.[73] Outside of the present motion, Defendants treat RTTL and Wisdom Woods as interconnected pieces of the RTTL organization. Mr. Hallowood has described RTTL's corporate structure as "an LLC wrapped up in a Private Membership Association."[74] Defendants use the name "Return to the Land" to encompass not just RTTL, but also Wisdom Woods and the property it owns. For instance, they refer to the Wisdom Woods property as "Return to the Land Ozarks – Arkansas" the "first Return to the Land Neighborhood," RTTL's "flagship community in Arkansas," or the "RTTL Settlement."[75] RTTL has certified Wisdom Woods as an official "RTTL Land Association,"[76] and the Wisdom Woods Operating agreement recognizes the PMA as an affiliated organization.[77] Ms. Walker justifiably relied on Defendants' representations that the RTTL Community was a part of RTTL, and that she was required to join RTTL in order to buy land.[78] Her reliance led to the injury—being prevented from purchasing land—that she seeks to remedy through this lawsuit.

---

[73] *See* sources cited *infra* notes 87–88.

[74] *See* Social Media Posts Describing Legal Structure, Pierson Decl. Ex. C, at 4.

[75] *See, e.g.*, RTTL Website Advertisements, Pierson Decl. Ex. A, at 2–5 (calling Wisdom Woods "our LLC" and referring to the Wisdom Woods property as "Return to the Land Ozarks," or "Return to the Land Ozarks – Community 1"); Neighborhood Instruction Substack, *supra* note 44 ("An RTTL Land Association is an LLC . . . that owns a piece of land and allocates parts of the land to its members for their use and development. We may also refer to this as a private neighborhood or an RTTL Community. . . .'"); Nick Johnson Interview, *supra* note 22, at 2:24–:29 ("This is our first community with Return to the Land'), *id.* at 20:59–21:12 (referring to Wisdom Woods as an "RTTL affiliate company"), CNN Interview, *supra* note 15, at 0:43–1:15 (Mr. Orwoll agreeing that the RTTL Community is part of Return to the Land); Social Media Posts on Race-Based Admissions, Pierson Decl. Ex. B, at 14 (referring to the RTTL Community as RTTL's "White neighborhood in Arkansas"); Mainstream Dissident Interview, *supra* note 63, at 11:18–:27 (referring to the RTTL Community as RTTL's "flagship intentional community in Arkansas"); Return to the Land (@RTTL_Official), X (Aug. 18, 2025), https://x.com/RTTL_Official/status/1957567882776502508 (referring to the RTTL Community as the "RTTL Settlement").

[76] *See* Neighborhood Instruction Substack, *supra* note 44.

[77] *See* sources cited *supra* note 28.

[78] *See* Walker Decl. ¶¶ 5, 7–8, 19, 26.

*3. Wisdom Woods ratified the PMA's decisions.*

Wisdom Woods is also directly liable for RTTL's discriminatory admissions process because it knew of and ratified RTTL's decisions. When a corporation is aware of a discriminatory housing practice by its agent or a third party, it has an obligation to "take prompt action" to end that practice. 24 C.F.R. § 100.7(a)(ii)–(iii); *see also* Restatement (Third) of Agency § 4.01 (explaining that a corporation can be held directly liable if it ratifies the discriminatory conduct of another entity). Again, it is indisputable (1) that RTTL was rejecting applicants because of their race and religion and (2) that Wisdom Woods's managing members were involved in this process. Rather than "tak[ing] prompt action" to end this practice, Wisdom Woods ratified those decisions by excluding non-RTTL members from the RTTL Community. It is therefore directly liable for RTTL's decisions. *See* Restatement (Third) of Agency § 4.01.

*4. Ms. Walker has standing to challenge Defendants' discriminatory statements and advertising.*

Defendants' are additionally liable for establishing, enforcing, and promoting their discriminatory housing policies. Wisdom Woods operates a whites-only community. For nearly three years, Defendants promoted Wisdom Woods as an all-white neighborhood that excludes Black people and Jews.[79] Defendants told residents of the RTTL Community they could not sell to non-white or Jewish buyers.[80] They emphasized that the RTTL Community was only open to members of the all-white PMA in media interviews and podcast appearances.[81] These policies are also reflected in Wisdom Woods's governing documents. *See* Original LLC Agreement, Pierson Decl. Ex. D, at 8 ("Any new members [of Wisdom Woods] must previously be members of the 'Return to the Land: Ozarks Chapter' private membership association, or equivalent

[79] *See* Compl. ¶¶ 63–89; *see also* discussion and sources cited *supra* pages 8–10.

[80] Compl. ¶¶ 82–86; *see also* discussion and sources cited *supra* pages 8–10.

[81] Copmpl. ¶¶ 68–72; *see also* discussion and sources cited *supra* pages 8–10.

affiliated regional subgroup"); Undated LLC Agreement, Orwoll Decl. Ex. A, at 2, 8–9 (providing that all Wisdom Woods Board members, and all new members of the LLC, must be part of the "fraternal organization affiliated with the LLC", i.e., RTTL).

Ms. Walker has seen these discriminatory statements. She first learned about the RTTL Community after Defendants went on a "media tour" to promote their "all-white community," and she saw one of the resulting news pieces.[82] From the coverage, she learned that Defendants only sold land to members of the all-white RTTL PMA.[83] When applying to RTTL, she was questioned about her race, religion, and membership in "white nationalist groups."[84] After applying, she did further research and saw videos and social media posts from Defendants about their plan to exclude Jewish people and people in interracial relationships from the RTTL Community.[85] Viewing these statements caused Ms. Walker emotional harm and deterred her from taking further steps to purchase land.[86]

C. Ms. Walker was not obliged to directly contact Wisdom Woods members, which would plainly have been futile, before filing suit

Defendants contend that Ms. Walker does not have standing to sue Wisdom Woods and the Individual Defendants because she did not apply directly to Wisdom Woods to purchase the parcel. This argument has at least four fatal flaws.

First, every indication from Defendants is that the RTTL application process is the exclusive route to purchase land in the RTTL Community. Defendants have stated that land in the RTTL Community is for "RTTL members only" and applying to RTTL is "step one" for

---

[82] Compl. ¶¶ 7, 89, 94–95; Walker Decl. ¶ 5.
[83] Compl. ¶¶ 94–95, 104; Walker Decl. ¶¶ 5, 24.
[84] Compl. ¶¶ 11, 97–103; Walker Decl. ¶¶ 9–13, 18; Application Form, Walker Decl. Ex. 1.
[85] Walker Decl. ¶ 18.
[86] Compl. ¶¶ 15, 106; Walker Decl. ¶¶ 25–26.

prospective buyers.[87] When people ask about moving into the RTTL Community, Defendants refer them to the application form on the RTTL website.[88] Mr. Csere has even likened the PMA application to a "preapproval stage" for the RTTL Community.[89] Defendants cannot now say that Ms. Walker "fill[ed] out an application with the wrong entity" when she applied to RTTL. Mot. Dismiss at 10.

Second, even if an alternative path to ownership exists, Defendants are still liable for maintaining a discriminatory application process—particularly where that process is the primary, and from all outward appearance, the exclusive path to land ownership. In such a scenario, Defendants would be using segregated application tracks. White buyers could join RTTL and easily access tours of the RTTL Community and information about available lots. Other buyers would need to find some other unadvertised mechanism to buy land. Defendants may not deter non-white and Jewish buyers by subjecting them to a more burdensome application process.

Third, if an alternative path to ownership existed, it would have been futile for Ms. Walker to pursue it. *See McClain v. Am. Econ. Ins. Co.*, 424 F.3d 728, 734 (8th Cir. 2005) (applying futile gesture doctrine to Fair Housing Act claims); *Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447, 1450 (4th Cir. 1990) (applying futile gesture doctrine to 42 U.S.C. §§ 1981–82 claims). Every statement and indication from Defendants is that they do not sell to

---

[87] *See* Social Media Posts Promoting Land Sales, Pierson Decl. Ex. F, at 9 ("If you're interested in relocating to the Ozarks and building homes with us, first step is to join the PMA. More info at ReturnToTheLand.org."); Nick Johnson interview, *supra* note 22, at 20:38 ("Step one is joining the PMA. You can do that on our website ReturntotheLand.org); Chris PT Interview, *supra* note 22, at 29:07–30:04, ("The first step is, if somebody wants to get involved with Return to the Land, the first step is just to apply to become a member . . . . The only place to apply is on our website . . . . And beyond that in terms of actually being able to . . . join an existing RTTL community, . . . we don't really want a whole bunch of information out there to the public about exactly how everything works. But suffice it to say, the first step is to join the organization. Once you're in the organization, then there are other options that open up.").

[88] *See* Social Media Posts Promoting Land Sales, Pierson Decl. Ex. F, at 4, 9–12

[89] *See* Peter Csere (@petercsere), *Ozark Group Land Buys: NEXT STEPS*, at 7:44–8:01, Odysee (June 16, 2024), https://odysee.com/@petercsere:b/ozarks-group-land-buys-next-steps:2 ("The main benefit of being in this PMA would be that you . . . have undergone the first preapproval stage to participate in one of the group land buys, or rather to buy into one of the LLCs that own land.").

people with Jewish heritage or non-white family member, and Wisdom Woods's governing documents confirm that RTTL membership is necessary to purchase land in the community. Ms. Walker was aware of this policy when she applied to RTTL.

Finally, contrary to Defendants' assertion, Ms. Walker does not need to show "direct contact" with each of the Defendants she is suing. A plaintiff can sue a defendant who causes her injuries, even if she never directly speaks with them directly. For instance, she can sue a principal for the discriminatory actions of its agents, even if she had no direct contact with the principal. *See Meyer*, 537 U.S. at 285.

* * * * *

For all these reasons, Defendants have caused Ms. Walker's injuries. Ms. Walker has Article III standing to assert her claims against them.

## II. Ms. Walker has adequately pleaded each of the claims asserted in the Complaint.

Ms. Walker's Complaint alleges that Defendants violated three federal statutes: (1) the federal Fair Housing Act, 42 U.S.C. § 3604 *et seq.* (Count I); (2) the Civil Rights Act of 1866, 42 U.S.C. §§ 1981–82 (Counts II–III); and (3) the Civil Rights Act of 1871, 42 U.S.C. § 1985 (Count IV). Defendants challenge Ms. Walker's Article III standing to assert each of her federal law claims.[90] In substance, however, their arguments bear on whether Ms. Walker has adequately pleaded the statutory elements of each claim, not whether the Court has subject matter jurisdiction to hear the dispute. Defendants' arguments fail as to each claim.

### A. Fair Housing Act Claims

Count I of Ms. Walker's Complaint alleges violations of Sections 3604(a), (b), and (c) of the Fair Housing Act. Ms. Walker has adequately pleaded each of these claims.

[90] Ms. Walker also asserts state law claims, which are not directly addressed in Defendants' motion. The motion to dismiss states in a footnote that the state law claims are "duplicative" of Ms. Walker's federal claims and should be dismissed, but does not further explain this argument. Mot. Dismiss at 18 n.2.

***Section 3604(a).*** Under Section 3604(a), it is unlawful to, on the basis of race or religion, (1) "refuse to sell or rent [a dwelling] after the making of a bona fide offer," (2) "refuse to negotiate for the sale or rental of [a dwelling]," or (3) "otherwise make unavailable or deny access to [a dwelling]." 42 U.S.C. § 3604(a). A defendant violates Section 3604(a) if, for instance, they prevent a person from inspecting a property or preclude her from negotiating to buy the property because of her race or religion. 24 C.F.R. § 100.70(a), (c)(1).

Defendants' attempt to create a whites-only community is a textbook Section 3604(a) violation. Wisdom Woods requires all prospective buyers to seek admission through RTTL, and RTTL only admits white people without Jewish ancestry. Compl. ¶¶ 53–54, 62, 69–70, 82–83, Until RTTL admits them, buyers cannot visit the RTTL Community, inspect available properties, negotiate terms, or purchase or lease the land. *Id.* ¶ 104. Wisdom Woods also prohibits residents from selling or transferring their shares, and the land allocated to those shares, to anyone outside the all-white RTTL. *Id.* ¶¶ 85–86.

Defendants submit that Section 3604(a) requires Ms. Walker to show that she made a "bona fide offer" to buy or rent a specific property. They are incorrect. Even absent a "bona fide offer," Ms. Walker states a Section 3604(a) claim if she alleges Defendants "refuse[d] to negotiate for the sale or rental of" or "otherwise den[ied] [her] access to" a dwelling. *See Kyles,* 222 F.3d at 300 n.7 (explaining the bona fide offer requirement does not apply to these portions of 3604(a)). Ms. Walker is not required to show that she made any kind of offer to lease or purchase a specific property. *See, e.g.*, *United States v. Badgett*, 976 F.2d 1176, 1178–80 (8th Cir. 1992) (allowing Section 3604(a) claim to proceed where plaintiff "inquire[d] about renting" an apartment but did not visit the apartment or apply).

Defendants also suggest that Section 3604(a) requires Ms. Walker to have access to certain details about the RTTL Community, such as the legal name of the LLC that owned the community, the size and location of the specific parcels that were available for sale, or the nature of the homes on those properties. This knowledge is not a prerequisite to a Section 3604(a) claim, and Defendants cite to no authority suggesting it is. If a victim of housing discrimination had to make such showings, property owners could simply refuse to share specifics with non-white buyers, then ask the Court to dismiss the buyer's claim for "lack of knowledge." Section 3604(a) does not require Ms. Walker to know all the relevant details about the property before she attempts to visit it or negotiate to buy it.

Defendants assert that Ms. Walker has not adequately alleged that land was sold or rented in the RTTL Community after she applied. But the Complaint alleges that Defendants were advertising and selling properties in the RTTL Community when Ms. Walker applied. Compl. ¶¶ 7, 88–90, 95, 106. The public record further confirms that Defendants sold or rented land in the RTTL Community before and for months after Ms. Walker applied. *See* sources cited *supra* notes 60–63. Ms. Walker has sufficiently pleaded all elements of her Section 3604(a) claim.

***Section 3604(b).*** Under Section 3604(b), it is unlawful to discriminate "in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith," because of race or religion. A defendant violates Section 3604(b) if, on the basis of a protected class, they force buyers or renters to go through a more onerous process to buy or rent land, such as by refusing to show them available properties. *See, e.g.*, *Village of Bellwood v. Dwivedi*, 895 F.2d 1521, 1529 (7th Cir. 1990) (broker discouraged Black customers buying homes in a particular area); *United States v. Hylton*, 590 F. App'x 13, 17 (2d Cir. 2014) (landlord refused to negotiate with tenants). That is precisely what Defendants have done here.

They discriminate in the "provision of services" connected with the sale or rental of property, because they only allow white people to tour the RTTL Community, learn about available parcels, and negotiate to purchase those parcels. *See* Compl. ¶¶ 54, 82–86, 104, 109.

***Section 3604(c).*** Under Section 3604(c), it is unlawful to "[1] make, print, or publish, or cause to be made, printed, or published [2] any notice, statement, or advertisement, [3] with respect to the sale or rental of a dwelling [4] that indicates any preference, limitation, or discrimination based on race, color, [or] religion . . . or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. § 3604(c). This Section broadly encompasses any discriminatory "notices" and "statements" that a defendant "cause[s] to be made, printed, or published." *Id*. It covers not only advertisements, but also instructions to third parties like brokers or sellers, statements to the news media, and notices on application forms. *See* 24 C.F.R. § 100.75(c)(2) (statements to "agents, brokers, employees, [and] prospective sellers or renters"); *Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 432 F. Supp. 3d 46, 68–69 (D. Conn. 2019) (statements made "in interviews with local press"); *United States v. Rupp*, No. 4:19-CV-02644, 2021 WL 2187912, at *6 (E.D. Mo. May 28, 2021) (notice on application form).

Ms. Walker has pleaded that Defendants made numerous statements that violate Section 3604(c). As described above in Section II.B.4, Defendants have long promoted the RTTL Community as an all-white neighborhood that excludes Black people and Jews. *See* Compl. ¶¶ 63–89. Ms. Walker saw these types of discriminatory statements prior to applying to RTTL. *Id.* ¶¶ 94–95, 104. During the application process, RTTL and its representative made additional statements suggesting a preference against non-white people and Jews. *Id.* ¶¶ 11, 97–99, 102–103. And while Ms. Walker's application was pending, she saw further videos and social media

posts about Defendants' plan to exclude Jewish people and people in interracial relationships from the RTTL Community. Walker Decl. ¶ 24.

B. Section 1981 and 1982 Claims

Ms. Walker further alleges that Defendants violated the Civil Rights Act of 1866, which protects her right to "make and enforce contracts," 42 U.S.C. § 1981, and purchase or rent both "real and personal property, 42 U.S.C. § 1982, "without any impairment due to private or public racial discrimination." *Daniels v. Dillard's, Inc.*, 373 F.3d 885, 887 (8th Cir. 2004). Ms. Walker has adequately pleaded both claims.

***Section 1981.*** Section 1981 prohibits interference with a person's right to "make and enforce contracts" because of their race. 42 U.S.C. § 1981(a). Congress has "extended the statute's protection to all phases and incidents of the contractual relationship," including "the contracting process." *Green*, 483 F.3d at 538 (quotation marks omitted). To plead a Section 1981 claim, the Plaintiff must allege: "(1) membership in a protected class, (2) discriminatory intent on the part of the defendant, and (3) interference by the defendant with an activity protected under the statute." *Id.*

Defendants contest the third element on the ground that Ms. Walker did not make a "tangible attempt to contract." Their argument is flawed. Ms. Walker took tangible steps to form two separate types of contractual relationships. First, she attempted to contract with RTTL by submitting an application and completing an interview. Compl. ¶¶ 93–105. If admitted to the PMA, she would have signed the membership contract, paid the $25 fee, and gained the benefits of PMA membership, such as the right to purchase land in the RTTL Community. Compl. ¶¶ 95, 104. Instead, RTTL turned her away because of her Jewish ancestry, her Black husband, and their biracial children. Defendants therefore interfered with her effort to form a contract.

In addition, Ms. Walker made a "tangible attempt" to contract with Wisdom Woods members to purchase their shares of the LLC and the land allocated to those shares. She completed the mandatory first step for all prospective buyers—applying to RTTL. Compl. ¶¶ 83–86; *see also* sources cited *supra* note 87. During her RTTL interview, she reiterated her interest in buying land in the RTTL Community. Compl. ¶ 104. Ms. Walker would have done more, but Defendants "thwarted" her efforts by rejecting her from RTTL. *See Green*, 438 F.3d at 534–35, 539 (shoppers unable to take possession of watch due to locked display case). Defendants cannot avoid liability by turning Ms. Walker away at an early stage of the application process. *See Watson v. Fraternal Order of Eagles*, 915 F.2d 235, 243 (6th Cir. 1990) (rejecting idea that "commercial establishments could avoid [Section 1981] liability merely by refusing minorities entrance to the establishment before they had the chance to order").

***Section 1982.*** Section 1982 guarantees all citizens the equal right to "inherit, purchase, lease, sell, hold, and convey real and personal property," no matter their race. 42 U.S.C. § 1982; *see also Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617–18 (1987) (holding that Section 1982 prohibits discrimination based on a person's Jewish ancestry). Section 1982 provides "broad and sweeping" protection against interference with these rights, including by persons who are not party to the ultimate land transaction. *Sullivan*, 396 U.S. at 237.[91] A defendant violates Section 1982, for instance, by steering minority renters away from particular neighborhoods, *see,*

[91] The facts of *Sullivan* are relevant here. In *Sullivan*, residents of a neighborhood who wanted to use community facilities were required to purchase a "membership share" in a nonprofit corporation. *Sullivan*, 396 U.S. at 234–35. The corporation attempted to prevent a resident from renting his home to Black tenants by barring him from assigning his corporate shares to the tenants. *Id.* at 235. Without the shares, the tenants would be unable to access community facilities, like the playground or pool. *Id.* at 234. The Court found that the corporation had violated Section 1982 by interfering with the leasing of real property or the transfer of personal property. *Id.* at 236–37. Similarly, Wisdom Woods uses share-sale restrictions to exclude non-white people from the RTTL Community. It prohibits its members from selling or transferring LLC shares, which come with the right to use specific parcels of land, to non-white buyers.

*e.g.*, *Dwivedi*, 895 F.2d at 1529, or refusing to negotiate with certain buyers, *see, e.g.*, *Wilson v. Souchet*, 168 F. Supp. 2d 860, 864–65 (N.D. Ill. 2001).

The Individual Defendants and Wisdom Woods interfered with Ms. Walker's efforts to purchase personal property (the Wisdom Woods shares) and real property (land in the RTTL Community). Compl. ¶¶ 54, 59, 61–62. They used RTTL to exclude prospective buyers who were Jewish or non-white, and they refused to negotiate with anyone whom RTTL rejected. *Id.* ¶¶ 54, 82–83.

Defendants suggest that Section 1982 also requires a "tangible attempt to contract." It does not—although if it did, Ms. Walker would meet this requirement as described above. Section 1981's "tangible attempt" rule arises from that section's "focus on protecting a contractual relationship." *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 470 (8th Cir. 2009). Section 1982 does not reference contracts. Many of the rights it protects—such as the rights to inherit, hold, and convey property—do not require contracts at all. Although some out-of-circuit courts have applied the "tangible attempt" rule to Section 1982, they do so only for Section 1982 claims alleging interference with a plaintiff's attempt to contract with a retail store to purchase personal property. *See Garrett v. Tandy Corp.*, 295 F.3d 94, 99, 103 (1st Cir. 2002); *Williams v. Dillard's Dep't Stores, Inc.*, 211 F. App'x 327, 329 (5th Cir. 2006). That is not the kind of interference Ms. Walker alleges here.

C. <u>Section 1985 Claim</u>

Finally, Ms. Walker alleges that the Individual Defendants conspired to deny her the equal protection of the laws in violation of 42 U.S.C. § 1985. Defendants argue that this claim should be dismissed because Ms. Walker does not adequately allege an underlying violation of civil rights laws that Defendants conspired to aid or commit. Mot. Dismiss at 21. For all the

reasons articulated above, Ms. Walker has adequately pleaded that Defendants violated multiple federal civil rights laws. The Individual Defendants led each of these conspiracies.

## CONCLUSION

Defendants seek to create an all-white community. In a transparent attempt to avoid application of the fair housing laws, they use a simple two-entity corporate structure to exclude non-white and Jewish people from purchasing or renting land in the community. They have failed. The fair housing laws are designed to "provide, within constitutional limitations, for fair housing throughout the United States," 42 U.S.C. § 3601. The laws do not countenance a neighborhood where Black and Jewish families are unwelcome. Defendants have not, merely by establishing two entities—one that screens applicants seeking to purchase land and one to own the land—evaded "a policy [of fair housing] that Congress considered to be of the highest priority." *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 211 (1972). Neither the veneer of separation nor the fiction of two entities allows Defendants to sidestep the federal civil rights laws. The Court should deny the Motion to Dismiss.

Dated: September 4, 2026

Respectfully Submitted,

/s/ Miriam Pierson
John Relman*
Reed Colfax*
Edward Olds*
Miriam Pierson*
RELMAN COLFAX PLLC
1225 19th Street, NW, Suite 600
Washington, DC 20036
(202) 728-1888 (phone)
jrelman@relmanlaw.com
rcolfax@relmanlaw.com
tolds@relmanlaw.com
mpierson@relmanlaw.com
* *Admitted pro hac vice*

Kendall Lewellen (Ark. Bar No. 2016193)
Abigail Herzfeld (Ark. Bar No. 2024219)
Legal Aid of Arkansas
Fair Housing Project
320 Executive Court, Suite 201
Little Rock, AR 72205
(870) 972-9224
klewellen@arlegalaid.org
aherzfeld@arlegalaid.org

***Attorneys for Plaintiff***

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 4th day of September 2026, a copy of the foregoing Plaintiff's Response to Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction was served by electronic mail on the following counsel of record:

Jonathan Gross
Law Office of Jonathan Gross
2833 Smith Ave., Suite 331
Baltimore, MD 21209
jonathangross@gmail.com

/s /Miriam Pierson
*Attorney for Plaintiff*