# EXHIBIT D

Public Version
Personal information redacted

# [redacted], LLC

**RTTL Ozarks Chapter: Arkansas**

**158 acre homestead project in [redacted] Arkansas**

## LLC Operating Agreement

**FEIN:** [redacted]
**NAICS code:** [redacted]
**LLC Effective Date:** September 20, 2023
**Business email:** [redacted]
**Address:** [redacted]
**Business Phone:** [redacted]

**Registered agent:**
[redacted]

### Article I: Management and Voting

1. **Management Power:** The management of [redacted] LLC shall be vested in the board of managers, consisting of a president, vice president, treasurer, and secretary.
2. **Initial Managers:** The board shall consist of four members who will be appointed for a management period of two years each. The initial managers of the LLC and their positions are as follows:
   1. [redacted] president) ☑
   2. [redacted] vice president) ☑
   3. [redacted] treasurer) ☑
   4. [redacted] (secretary) ☑
3. **Board Elections:** 60 days before the end of the board's term, elections shall be held. Class A and B members may vote, with a simple majority being necessary for a candidate to win. If no candidate in a given race achieves a simple majority, a run-off election will be held.
4. **Manager Removal:** The board may remove a manager with a 3/4 majority vote, and may replace the manager for the remainder of that term with someone of their choosing. The Class A and B members may remove a manager with a vote of unanimity of their total interest minus a possible 5% dissenting votes, and in this case, the board will also replace that manager with someone of the board's choosing for the duration of the term. Class C members may not participate in any management decisions (unless one is appointed as a manager) and may not officially vote on any matter relating to the LLC. If a manager resigns during his term, the board may replace him with a manager of their choosing for

the remainder of the term.

5. **Authorized Representative:** Either the president or vice president's signature shall be required to sign all manner of legally binding contracts public and private, title deeds, sale contracts, or any other official document.

6. **Legal Representation:** Either the president or the vice president's signature are necessary to take legal action on behalf of the LLC including filing lawsuits and other legal claims, defending against legal actions, retaining an attorney, settling cases, granting legal power of attorney, and any other legal representation that may be necessary for the smooth operation of the LLC.

7. **Checks and Payments, Bank Transactions:** Either the president or treasurer may sign checks or make online transfers from the LLC's bank account, and may request and receive payment for services, request invoices, make promises of payments, place orders with vendors and suppliers, hire contractors and contract jobs, rent equipment, take out insurance policies, etc. Either the president or treasurer may open bank accounts and payment processor accounts for the LLC.
8. **Loan Limitations:** The Board of Managers are prohibited from taking out loans or other forms of financing that cause the LLC to have negative equity, or that result in total liabilities that are valued at more than 25% of the value of the LLC's assets.
9. **Sale of real estate:** For the sale of real estate, the president's signature is required, and it must be authorized by the totality of Class A and B shareholders minus a possible maximum of 5% of dissent of their total interest.
10. **Sale of Moveable Assets:** For the sale of vehicles or other titled and valuable equipment, the president or vice president's signature is required, and it must be authorized by a 2/3 vote of the board of managers. For any non-titled or less valuable assets, any manager is authorized to dispose of, sell, or otherwise administer on behalf of the LLC.
11. **Voting Rights:** Class A and Class B members shall have voting rights, with voting power proportionate to their respective share size. Class C members shall not have voting rights.
12. **Electronic Signatures:** All members shall be required to maintain and use an electronic signature for remote document signatures, proxies, and other official LLC business.
13. **Vote Requirements:** A 2/3 vote of the board of managers shall be required for the following:
    13.1 - Amend/restate a written operating agreement for the purposes of changing membership after a legitimate transfer of membership interest following the Operating Agreement
    13.2 - Amend/restate a written operating agreement for the purpose of

changing the board of managers list after a legitimate election of new board members, or a removal and change of board member(s) following the Operating Agreement.
13.3 - Amend/restate a written operating agreement for the purpose of adding an operating budget and detailing the required contributions, after a legitimate ratification of that budget following the Operating Agreement.
13.4 - Amend/restate a written operating agreement for the purpose of correcting a minor error, and making minor, inconsequential changes in the course of normal business such as changing contact information for members, the LLC, the registered agent, etc. 13.5 - Issue an interest in the limited liability company to any person and admit such person as a member, provided the Operating Agreement was followed in the issuing of the interest.
13.6 - Authorize any transaction, agreement or action on behalf of the limited liability company that is unrelated to its purpose as set forth in the articles of organization, that otherwise contravenes the operating agreement or that is not within the usual course of the business of the limited liability company
13.7 - Determine, modify, compromise or release the amount and character of the contributions which a member shall make, or shall promise to make, as the consideration for the issuance of an interest in the limited liability company

14. **Future Authorization Without Signature:** All members hereby authorize all future amendments and restatements of the LLC Operating Agreement and Articles of Organization provided the changes follow the above regulations, and therefore will not need to re-sign such amendments and restatements unless the changes are outside the scope of the above regulations.

15. **Change of Management Status or Dissolution:** An affirmative or abstention vote from all Class A and Class B member interests minus a possible 5% of dissenting votes shall be required for the following:
12.1 - Change the status of the limited liability company from one in which management is vested in the members to one in which management is vested in one or more managers, or vice versa
12.2 - Dissolution of the LLC (See the relevant article in this Operating Agreement.)

16. **Amendment:** An affirmative or abstention vote from 3/4 of all Class A and B member interests shall be required to amend or restate the operating agreement or articles of organization for any reason other than that mentioned in the previous clauses in this article.
17. **Member Class Voting Rights:** To decide any matter connected with the business or affairs of the limited liability company, including those listed in the previous clauses of this article, the Class C members shall have no vote, and the Class A and B shares shall each have a vote that is

equal in power to their ownership interest divided by the total of all Class A and B interests. (e.g. if total Class A + B interest is 60%, a 10% Class A owner shall have approximately 16.67% of the total vote.)

18. **Board Responsibilities**: The board members shall fulfill the following duties, shall ensure all activities of the LLC are exercised in a way that demonstrates financial prudence, as well as any other duties considered to be reasonable and within the realm of such a position:

- ☑ The President shall be the chief executive officer of the corporation and shall preside at all meetings of the members and of the board to ensure that all orders and resolutions of the board, or resolutions of the members as permitted elsewhere in this Operating Agreement, are carried into effect.
- ☑ The Vice-President shall have all the powers and functions of the President during the President's absence or disability, or otherwise at his request, as the second executive, and shall perform such duties as the board shall prescribe.
- ☑ The Secretary shall record all votes and minutes of all proceedings, perform notifications to members, keep in safe custody the seal and letterhead of the LLC and administer them as necessary, maintain a full list of members and their contact details, maintain all the Association documents and records in a proper and safe manner, and perform other such duties as may be prescribed by the board.
- ☑ The Treasurer shall have custody of the LLC funds, maintain complete and accurate accounts of receipts and disbursements in the LLC books using GAAP and double-entry accounting software, deposit and disburse funds as required, render an account or the financial condition of the LLC at board meetings as requested, provide financial statements, reports, information, transaction details, etc as requested by the board. The treasurer shall refrain from using single-entry accounting records, and shall ensure that the LLC exercises financial prudence. Financial prudence includes reasonable leeway in following the budget, for purposes of preserving the function and original intention of the budget.

18. **No Contact Clause:** If a member with voting power does not respond to requests for a vote within 15 days, and has not legitimately assigned a proxy, his vote may be considered an abstention vote for the purposes of allowing a measure to pass.
19. **Voting by Proxy:** Proxies for voting in absence must be communicated to the Secretary before the start of a meeting in order to be valid, and must be written by the member or their power of attorney. Proxy notifications are valid for a maximum period of 11 months. Proxy revocations must be communicated to the Secretary before being considered valid.
20. **Scope of Activities:** To maintain its status as a pro forma corporation serving its members as a private club organization, the LLC shall not carry out business activities to serve the general public. In addition, the LLC is required to maintain its status as a pro forma corporation or association, and as a non-agricultural corporation acquiring the land

for immediate use in non-farming purposes (facilitating the various activities of the members' private organization), and a non-agricultural corporation leasing land to a family farm unit or family farm corporation (the members who reside on the land who may engage in such activities).

21. **Severa[redacted]lity Clause:** In the event that any provision of this entire Operating Agreement, or the application thereof, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, the remainder of this Agreement will continue in full force and effect and the application of such provision to other Persons or circumstances will be interpreted so as reasonably to effect the intent of the parties hereto. The parties further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of such void or unenforceable provision.

### Article II: Member Interests

1. [redacted] LLC shall have three classes of interest: Class A, Class B, and Class C.

2. Class A and B members have rights to reside on their allocated land and other community benefits. Class C members do not have residency or access rights.
3. Class C members may purchase additional shares until the amount of land allocated to their membership interest reaches the Residency Threshold of 3 acres, at which point they become a Class B member and are permitted the land use afforded to Class B members as described in this Operating Agreement.
4. Class C has no voting rights, and no rights to profit or loss distribution. Class A and B have limited voting rights on certain items that are described in Article I and elsewhere in this Operating Agreement.
5. Anyone who is a member or a non-member can be assigned as a manager, in which case their voting rights take on those as described in Article 1, superceding the limitations described in this Article.
6. Class C members have no right to participate in official group decision making and discussion processes, unless they have been elected or assigned to the board of managers.
7. Other restrictions or benefits of different member interests are discussed elsewhere in this Operating Agreement.
8. A member who is found to have lied or misrepresented themselves in a way that would have otherwise made them ineligible to join the LLC under the criteria of the board of managers, may be expelled from the LLC with a forced buy-out, at the discretion of the board of managers.
9. A member who has misrepresented or failed to disclose previous employment, contract(s), or otherwise receiving monetary compensation from any

government, state, federal, or local, or any controversial organization such as the ACLU, SPLC, ADL, etc, or failed to disclose any representation of or affiliation with such entities, shall be expelled from the LLC via a forced buy-out and fined an amount equal to $5000 or 3 ounces of gold, at the discretion of the board of managers.

10. Colloquial class nomenclature: For internal LLC use, or as otherwise desired, classes of interest shall be colloquially referred to as "Nobleman Share," "Yeoman Share," and "Peasant Share," for Classes A, B, and C, respectively. For official purposes, the conventional nomenclature shall be used.
11. The Class A members shall have special considerations and obligations to sell part of their initial ownership interest.

10.1. **Desired Ending Interest:** The Class A members shall decide initially what their desired ending ownership interest shall be, and the percentage shall be expressed here in this Operating Agreement at the inception of the LLC. The desired ending interest must be divisible by the standard minimum land allotment share size which is tied to a specific area of land, so that surveying is practical and lot boundaries and sizes are relatively permanent. In addition, members who purchase additional percentages equal to or above that required to be a Class B member, regardless of their class, shall only have land alloted to their share up to the portion that is divisible by the minimum share size, and any amount after that may be held or sold but cannot be tied to a piece of land, due to the difficult and impracticality of constantly re-surveying and re-mapping boundaries for minute changes in land area. 10.2. **Funding Obligation for Common Elements:** The funding obligation for common elements by Class A members shall be based on their desired ending ownership interest, not their actual interest at the time that the obligation is decided upon or charged. Percentages shall be based on a revised total considering the total ownership interest to be charged.

10.3. **Partial Share Sale Obligation:** All Class A members are hereby obligated to sell all of their ownership interest to new members as approved by the board of managers, and this sale will be automatic, with percentage distribution and funds distribution calculated by the board of managers as determined elsewhere in this Operating Agreement. The board of managers may carry out these share sales without the express approval of the Class A members, as their approval has already been obtained via this clause.

10.4. **Funds Management:** All funds from the sale of interest above the desired ending interest shall be deposited to the LLC's bank account. If any adjustment needs to be made, or commission paid to Class A members, this will be done within 30 days after the funds are received by the LLC. Class A members reserve the exclusive right to receive distributions of commissions based on the sale of their ownership interest above the desired ending interest.

10.5. **Penalty:** A Class A member who attempts to refuse compliance

with the partial share sale obligation may receive monetary fines, forced buyout, legal action, or all of the above, at the discretion of the board of managers.

10.6. **Class C Seed Investors:** It is noted that Class C members may join the LLC from the beginning and be considered a "seed investor," however, they shall receive none of the benefits or considerations that Class A seed investors will receive.

12. **Alternative Capital Contributions:** Class A Seed investors shall have the opportunity to provide some or all of their capital contribution in the form of sweat equity, equipment, or other assets. The following restrictions shall apply:

11.1. **Approval:** The board must approve any requests to contribute capital in a form other than USD.

11.2. **Necessity:** The contribution must be a part of the approved budget for the LLC, specifically the initially passed PDB and/or IDB, as referenced elsewhere in this Operating Agreement.

11.3. **Classification:** The board must obtain all necessary information on the alternative capital contribution, including considerations such as liability and depreciation if it is physical equipment or materials, and specify this information in the list of members and capital contributions in this Operating Agreement.

11.4. **Likelihood of Compliance:** The LLC may accept alternative contributions in accordance with A.C.A. § 4-38-402. In the case of sweat equity, physical assets or promised future equipment rentals/leases, or other undelivered assets promised in the future, provided as a capital contribution, not only must the board assign a value to that labor or contribution and determine if it is included in the budget, but the board must also consider the likelihood that the individual will actually contribute such equity as promised, and in cases where the board perceives that there is a 25% or greater chance that they will not, the board must decline to allow that contribution. A time limit must be specified for future sweat equity and other forms of contribution that will be contributed in the future.

11.5 **Finality:** Capital contributions determined for Class A seed investors at the formation of the LLC are final, and after that point all new capital contributions must be in cash, unless the board sees sufficient justification to make a special exception, and said exception is part of the approved budget.

11.6 **Taxation:** If payroll or other tax obligations shall be incurred on sweat equity, it is the responsibility of the board to ensure the compliance of the LLC.

11.7 **Inability to Contribute:** If a member is unable to contribute a promised value of equity by the date specified, the Board may enact penalties, including forcing them to sell membership interest, even if that results in the member's share class changing from Class A to Class C. The board may also levy a fine on the member to cover the administrative burden.

**Article III: Share Transfer Restrictions**

1. **New member approval:** Any new members must be approved by the board of managers with a 2/3 vote, or they are prohibited from becoming a member. The board must use exclusive and specific criteria, and membership in [redacted] LLC is not open to the general public. Individuals or legal entities who become asignees due to matters of litigation, death, or dissolution, may not become members unless approved by the board of managers, and may be obligated to transfer their interest or assigneeship and withdraw from the LLC. Any new members must previously be members of the "Return To The Land: Ozarks Chapter" private membership association, or equivalent affiliated regional subgroup. All references to "PMA" in this Operating Agreement shall refer to the RTTL: Ozarks Chapter PMA unless otherwise noted.
2. **Right of first refusal:** Members may not transfer their shares without first offering them to the LLC or other shareholders with a right of first refusal. The LLC or other members shall have 30 days to accept or decline the offer.
3. **Forced transfer with mandated owner financing:** In the event a members's interest is subject to forced buy-out due to extreme circumstances requiring unanimity (minus 5% possible allowable dissent) among the board or members, or due to the interest being seized by a creditor or transferred to a heir or ex-spouse etc, the LLC may offer the shareholder an option of owner financing through a promissory note, and the shareholder must accept provided the offer is reasonable and follows the operating agreement.
4. **Value determination:** The forced buy-out value shall be the original investment adjusted for inflation, plus the appraised value of any improvements to the member's leased land, minus any liabilities or debts the owners has to the LLC or that are present on the leased land.
5. **Share dilution to pay debt:** Any debts owed by a member to the LLC must be paid in LLC ownership interest if the member fails to make payment, with value determined as already described in this Article.
6. **Class A transference of seed investor obligations:** A Class A interest, if it is sold, is transferred along with its existing forced sale obligations under Article VI. The Board of Managers must duly inform the buyer of this interest of such obligation.
7. A Class A member, for the sake of simplicity, may not sell ju[redacted] centage of his ownership that is considered as tied to the obligations under Article VI, unless authorized and approved by a 3/4 vote of the board of managers, with a written plan from the board regarding how to rectify the considerations of Article VI as applied to the interest being transferred.
8. A Class A member, if he sells his "Desired Ending Interest" that is considered as being tied to and therefore granting his land usage allocation

benefits, and retains his "excess interested" that is obligated for sale under Article VI, still has the sale obligation under Article VI and will not be compensated as it is sold to fund his required IDB contribution, except in such case where his contribution is already met and additional funds are then owed to the Class A member.

9. **Effect of death or incompetence of member, assignability of interest** - If a member who is an individual dies or a court of competent jurisdiction judges the member to be incompetent to manage his or her person or property, the member's executor, administrator, guardian, conservator, or other legal representative shall not have any power the member had to give his assignee the right to become a member, and shall have none of the rights of an assignee of the member's interest. Instead, the board of managers shall select a new assignee to take on those rights until such time as the ownership interest of the deceased or incompetent is transferred to a member whom the board of directors approve. The managers via a 3/4 vote may decide to obligate the sale of the interest of the deceased or incompetent individual, with a fair price determined as already specified in this Article. Any member may exempt the heir(s) of their estate from this clause if they provide a letter to the Secretary assigning a heir, in which case the board must approve this individual before the exemption shall be considered valid. If the board approves, the individual shall receive all aforementioned rights upon the death of the member, notwithholding that probate law may require the actual ownership interest be in the name of another individual, who might not be approved by the Board and therefore shall not receive any of the aforementioned rights and benefits.
10. **Business organization as member, dissolution and subsequent assignability of interest** - If a member is a corporation, partnership, limited liability company, trust or other entity and is dissolved or terminated, its legal representative or successor shall not have any power the member had to give his assignee the right to become a member and shall have none of the rights of an assignee of the member's interest. Instead, the board of managers shall select a new assignee to take on those rights until such time as the ownership interest of the former entity is transferred to a member whom the board of directors approve. The managers via a 3/4 vote may decide to obligate the sale of the interest of the former entity, with a fair price determined as already specified in this Article.

## Article IV: Buy/Sell Agreement

The following procedures shall be followed when transferring ownership interest of the LLC:

1. **New Member Ownership Transfer:** When a single or multiple LLC member(s) wish to voluntarily sell all or part of their interest to a non-member, the following procedure shall be followed:
   1.1 - The offering buyer shall fill out a standard application provided by

the board of managers.
1.2 - The application shall be sent to all members with Class A and B interests for review. As per the Share Transfer Restrictions, it is up to the board to approve with a 2/3 majority vote.
1.3 - If approval is reached, the board of managers will provide a standard Term Sheet and Purchase Agreement in coordination with the seller(s).
1.4 - The buyer will pay a fee of $200 to the LLC, to cover administration expenses regarding the transfer of ownership interest, and other overhead administration costs.
1.5 - Assuming payment is made, and the purchase agreement is signed, the board shall sign and issue a new Operating Agreement with the sole changes being the new ownership, and is hereby authorized to do so. The board shall issue and require the signing of any contribution document as required by this Operating Agreement and Arkansas state statutes.
1.6 - Class A and B members will be notified; sale and other information will be recorded appropriately. Any government reporting requirements due to the new ownership will be complied with by the board of managers.

2. **In-House Ownership Transfer:** When a single or multiple LLC member(s) wish to voluntarily sell their share to an existing LLC member, the following procedure shall be followed:
2.1 - If the purchasing member is in good standing with the LLC according to the board of managers, no approval is required. If the purchasing member is not in good standing, the transfer is prohibited.
2.2 - The buyer wil pay a fee of $150 to the LLC, to cover administration expenses regarding the transfer of ownership interest, and other overhead administration costs.
2.3 - The board of managers will provide a standard Term Sheet and Purchase Agreement in coordination with the seller(s).
2.4 - Assuming payment is made, and the purchase agreement is signed, the board shall sign and issue a new Operating Agreement with the sole changes being the new ownership, and is hereby authorized to do so. The board shall issue and require the signing of any contribution document as required by this Operating Agreement and Arkansas state statutes.
2.5 - Class A and B members will be notified; sale and other information will be recorded appropriately. Any government reporting requirements due to the new ownership will be complied with by the board of managers.

3. **Seed Investor Ownership Transfer:** When a non-member wishes to buy an ownership interest of the LLC as part of the pre-arranged Class A seed investor interest sales outlined in Article IX: Seed Investor Ownership Interests, the following procedure shall be followed:
3.1 - The offering buyer shall fill out a standard application provided by the board of managers.
3.2 - The application shall be sent to all members with Class A and B

interests for review. As per the Share Transfer Restrictions, it is up to the board to approve with a 2/3 majority vote.
3.3 - The board of managers will provide a standard Term Sheet and Purchase Agreement in coordination with the seller(s). 3.4 - The buyer will pay a fee of $250 to the LLC, to cover administration expenses regarding the transfer of ownership interest, and other overhead administration costs.
3.4 - The board of managers will determine the appropriate division of interest to be sold by each Class A member, which will be calculated according to the weighting of their original investment percentage.
3.4 - The board of managers will determine the appropriate division of funds. Class A members will receive some or all of the funds if the total required contribution of their required ending interest is less than their current total amount invested. Otherwise, funds will be applied to development as per the budget.
3.5 - Assuming payment is made, and the purchase agreement is signed, the board shall sign and issue a new Operating Agreement with the sole changes being the new ownership, and is hereby authorized to do so. The board shall issue and require the signing of any contribution document as required by this Operating Agreement and Arkansas state statutes.
3.6 - Class A and B members will be notified; sale and other information will be recorded appropriately. Any government reporting requirements due to the new ownership will be complied with by the board of managers.

4. **Involuntary Buy-out:** When a member is forced to sell all or part of their share due to a board or member vote following the relevant clauses in the Operating Agreement, the following procedure shall be followed:
4.1 - A buyer will be identified, whether it is a new member after having been approved by the board of managers and reviewed by Class A and B members, or some or all existing members.
4.2 - A buyer may be suggested by the member being forced to sell, in which case it shall be permitted if and only if the board of managers approves the buyer to be a member following the application / review / approval process described elsewherein this Operating Agreement.
4.3 - The board of managers will provide a standard Term Sheet and Purchase Agreement in coordination with the seller(s).
4.4 - The buyer will pay a fee of $100 to the LLC, to cover administration expenses regarding the transfer of ownership interest, and other overhead administration costs. The board of managers may waive this fee at their discretion if the circumstances warrant it.
4.5 - If the member being forced to sell refuses to sign the necessary paperwork to sell his share, the board of managers will take legal action against the member, forcing them to follow the Operating Agreement.
4.6 - Assuming payment is made, and the purchase agreement is signed, the board shall sign and issue a new Operating Agreement with the sole changes being the new ownership, and is hereby authorized to do so. The

board shall issue and require the signing of any contribution document as required by this Operating Agreement and Arkansas state statutes.
4.7 - Class A and B members will be notified; sale and other information will be recorded appropriately. Any government reporting requirements due to the new ownership will be complied with by the board of managers.

5. **Plat use compliance:** The LLC, due to not engaging in land sales, is not subject to any Arkansas state statute relating to such, however in order to ensure compliance with any technicalities or creative interpretations of relevant statues, shall not use any unapproved plat or map resembling a plat in its communication with current or potential LLC members, without including a disclaimer that such a map is not a recorded and approved plat nor is it being presented as a registered plat.

6. **Subvidision compliance:** In order to comply fully with Arkansas state statutes regarding subdivisions, the LLC is hereby forbidden from (1) subdividing land to sell individual lots via tenency-in-common or outright, and (2) Recording any interior features of the property on the recorded plat in the county land authority.

### Article V: Plan of Action

The LLC shall follow this Action Plan during its initial period of formation:

1. Complete legal research and draft documents to present to potential members

2. Gather a group together. Research and determine several possible land candidates. Make financial pledges and agree upon a general property size / price.

3. Finalize LLC articles of organization and operating agreement, vote on officer roles. Include vision, mission, and goals in the operating agreement.
4. Raise funds for initial administrative expenses, pass initial administrative budget.
5. Consult a business lawyer and a real estate lawyer in Arkansas, for a professional assessment of the legal situation of our planned project.

6. Pass a community budget, initial and yearly.

7. Register an LLC. Deposit the funds in the LLC's bank account. Any members who at this point cannot participate, are replaced, and this clause hereby authorizes a forced buy-out at a token price of $1.

8. Purchase the decided-upon land. Any references to land, access, residency, etc throughout this entire Operating Agreement, refer to this parcel of land that the LLC plans to purchase for the purposes of operation of a private

club organization of homesteaders, for their own benefit. Funds must be returned to the contributing members if the LLC is unable to complete the sale in the contracted period, with the option of agreeing on another property first, with a maximum period of 15 business days.

9. Rough survey and planning. Homestead areas are mapped and photographed. Common elements are planned. All members agree that there is a limit to the degree of accuracy we can achieve on their boundaries, and therefore shall treat their boundaries as a "blurry line" to prevent disputes over several feet of land. All members have the right to pay a professional surveyer for a more precise survey.
10. Members select their homestead areas. If two members want one area, they enter a bidding process. Proceeds go to community fund.
11. Permit application for septic systems, wells, anything else required.
12. Widespread residency and construction may begin, provided all relevant laws are complied with

## Article VI: Common Elements and Contributions

1. **Common elements:** The LLC shall establish common elements for the benefit of all members, including a community hub area with well, septic system, electric connection, workshop, RV hookup, driveways, perimeter fence, and administrative infrastructure.
2. **Development Budget:** The LLC hereby approves a budget of $68,000 total for development of the common areas of the property. This shall be divided appropriately and approximately between the following items: Well ($8k), community building and outfitting ($36,015), administration costs ($4,795), electric ($9,740), and road ($9,450). A line item breakdown will be maintained in a separate document by the Board of Managers. A community area shall be developed with a suitable building, well, septic, and electric, along with roads sufficient to access the lots, for use of the Class A and B members, and to be administered by the Board. Accounting shall be provided to class A and B members as required herein. The budget shall be funded by current and future members, with founding members funding the first $5520 in cash and $10,000 in tractor lease, and subsequent members who purchase remaining membership interest as outlined herein funding the remainder of the budget with their capital contributions. The total capital contribution planned shall be $305,000, with the land costing $237,000 and the development and other budgeted expenses using the remainder of the funds. Members may pass maintenance or additional development budgets in the future as described herein.
3. **Administration of common elements:** The Board of managers have the power to manage, control and restrict the use of the common elements of the community and the conduct of the members and their guests by adopting and publishing rules and regulations, and establishing monetary

penalties to enforce any lack of compliance. The board also has the right to suspend a member's right to use the common elements if a member is in default of any assessment payment due and owing to the LLC, or for lack of compliance with the board of manager's published rules and regulations, or those in the Operating Agreement.

4. **Deteriation of common elements caused by heavy usage:** Any member who uses roads or other common elements in a way that causes them to deteriorate significantly faster than normal, i.e. heavy dump truck use on internal roads, shall compensate the LLC for the increased maintenance. If they do not comply, they may be fined the value of the maintenance required, plus an additional $50 to $500, or 1-10 grams of gold.

5. **Consideration of LLC-administered private roads as for the common good:** Any internal roads in the LLC's property and administered by the LLC shall be considered for the good of the whole community and the LLC, since all members benefit from the other members being able to access their allocated or leased properties, develop, reside on the property, and thus help create a community environment. All members shall be guaranteed access to their lot via the internal roads created for this purpose, except in the case where the board of managers has removed access for a grave violation of this Operating Agreement. Members shall not use a specific road section's low number of beneficiaries to attempt to remove it from the budget or refuse payment for maintenance, nor shall they use the fact that the road does not serve themselves specifically.

6. **Other common expenses:** The LLC will be responsible for various common expenses such as property taxes, administration costs, and legal costs, as described in their operating budget.

7. **Contributions:** The common interests will be funded by contributions from members according to their percent of ownership interest, and these shall be considered obligatory if approved according to this Operating Agreement.

8. **Financial Obligation:** All members are financially responsible to contribute what is necessary, according to their ownership interest, to maintain the perfect operation of common elements, pay property taxes, meet all legal and administrative requirements of ongoing operations of the LLC and its assets, etc.

9. **Initial Budget and Seed Budget:** The founding members wil pass an initial development budget (IDB), and a tentative operating budget for the years after, which will be reviewed when necessary. Of the IDB, a small portion of initial costs will be identified as urgent, and referred to as the Seed Development Budget, or "SDB." So, the SDB is a part of the IDB. (For an example, we will use a land cost of $200k, IDB of $100k,

and SDB of $20k.)

10. **Total Projected Initial Investment:** The "total projected initial investment" (TPII) will be the cost of the land that is purchased as per Article V, plus the budget expenditures in the initial development budget. (e.g. Land cost + IDB = TPII. In our previous example, $200k land + $100k IDB = $300k Total Projected Initial Investment.)

11. **Total Seed Investment**: The "Total Seed Investment" is equal to the land cost plus the Seed Development Budget. *(e.g. Land cost + SDB = TSI. Following our examples, $200k + $20k = $220k Total Seed Investment, which is less than the $300k TPII.)*

12. **Founding Member Contribution:** The founding members (consisting of Class A and Class C interests) must contribute the total TSI amount. After the Class A members sell off the remaining shares to reach their Desired Ending Interest, the total amount invested in the LLC will be the TPII or Total Projected Initial Investment. *(e.g. the founding members in total must invest $220k to get the project off the ground, but after selling interest later on, the total amount raised will have been $300k.)*

13. **Founding Ownership Interest Calculation:** A founding member (Class A or C) will have an ownership interest percentage that is equal to the amount they contribute divided by the TSI. *(e.g. someone who invests $22k when the TSI is $220k, will have an ownership interest percentage of 10% initially.)*

14. **Gradual Sale of Class A Excess Interest:** As ownership interests are sold off, a small amount is shaved off of the ownership interest of each Class A member, until their ownership interest is equal to their Desired Ending Interest. At that point, they have no more obligation to sell any interest, per this Operating Agreement. *(e.g. The previous $22k investor has a Desired Ending Interest of 5%. Their 10% initial ownership is gradually sold off to new Class B members until it reaches 5%. $8k of that resale value is a contribution, but the remaining $7k is an interest transfer directly from the Class A member to the new Class B member and is paid to the seller, plus profit. This is because a member with a 5% interest is only obligated to contribute $15k of the TPII)*

15. **Allocation of Funds and Rationale:** Since the Class A's initial investment went entirely towards the land and the SDB, and later Class B investors' funds will go proportionally more towards the IDB, funds received from people buying Class B shares may go mostly or partially towards funding the IDB, with a preset profit being distributed directly to the Class A members as a benefit of having contributed early. *(explained in previous example; note that any amount excess of the contribution*

*corresponding to the Desired Ending Interest is returned to the Class A member in its entirety, plus profit.)*

16. **Normal Interest Transfer:** If a Class A member sells any of his Desired Ending Interest that he considers to be tied to his land usage benefits, it is considered a normal transfer of ownership interest, he can sell it at any price he desires (barring the invocation of a forced-buyout at a set value) and the entirety of the funds will be sent by the buyer directly to the Class A member who is selling. It would be the same as if a Class B or Class C member sold their interest.

17. **Total Class A Investment Amount:** In the end, the Class A member's total projected investment should end up being the following: (Land cost + IDB) * Desired Ending Interest %. *(eg. if a Class A member wants a 10% share of a $300k TPII, he should invest $30k. He will start off with roughly 13.63% ownership interest, and his share will be gradually reduced to 10%, and his contribution amount will be correct, and he will receive some profit.)*

18. **Desired Ending Interest Limitation:** A Class A Member's Desired Ending Interest cannot be greater than his initial contribution to the LLC divided by the sum of the land cost and the initial development budget. If for some reason this ends up being the case, the Class A member must contribute more to the LLC in order to fund the IDB appropriately per the size of his Desired Ending Interest. *(e.g. a Class A member contributes $20k to a $300k TPII but wants a 10% Desired Ending Share. He will start out with an 11% share, and will earn a wee bit of profit once that 1% is sold, but will have to contribute an additional $10k to meet his contribution obligation for the IDB.)*

19. **Limitation of Class A Contributions:** Class A Members will not be obliged to pay more than their desired ending interest's share of the TPII, in the case that not all shares are sold. In this case, the members must pass a budget allowing for contribution based on the current share size of Class B and C members, and the desired ending share size of Class A members.
20. **IDB Ratification:** The IDB must be passed unanimously by all founding members.

21. **Future Budget Ratification:** Any future operating budget, such as the one described in numeral 15, may be passed by a 2/3 majority of all Class A and B votes, and must be done on an annual basis. All members who are obligated to contribute funding based on that budget must sign a contribution agreement, either physically or electronically, and if they refuse, they can be found in breach of contract and forcibly expelled from the LLC.

22. **Contradiction:** Any clause in this article that appears to contradict another clause, or that seems mathematicaly impossible, shall not render the article nor its clauses invalid, but shall instead be substituted by all parties with a solution that is equitable and mathematically correct, and that is in line with the original intent of this article.

23. **Asignee contributions:** An assignee who has not become a member is still liable for any obligations of his assignor to make contributions, until such time as he transfers his share to another individual or entity, or is forced to transfer his share to another individual or entity as allowed in this Operating Agreement. Even if the asignee receives no other rights or benefits for his LLC interest, he is still obligated to contribute as per his interest.

24. **Contribution promises in writing:** All contributions listed above shall be detailed in this Article to be signed either physically or electronically by all founding members, and any future operating budgets requiring contributions from members, assuming they have been properly ratified as per this Operating Agreement, shall be codified into this Article, but shall also be presented to all affected members to be signed.
25. **Liability:** The board of managers shall ensure any personnel hired for the purposes of developing or maintaining common elements, shall be hired in a way that does not create liability on the LLC for potential injury or other claim, or if they do, that sufficient insurance be purchased. All LLC members hereby waive their right to compensation in case of injury or death anywhere on the LLC property for any reason. The board of managers shall require all residents of the property who are legal adults and who have not already signed the waiver herein to sign such a waiver form, and all minor residents must have a waiver signed by their parents.

### Article VII: Private Elements and Land Allocation

1. **Land Allocation to Members:** The LLC shall allocate land to each member, for their private use. This land and any developments on it shall be considered a private element.
2. **Land Selection and Allocation to Class A Members:** Class A members (founding members with an allocated land size greater than the "residency threshold" defined elsewhere in this Operating Agreement) shall have the right to select which land is allocated to them, with disputes being resolved via a bidding process.
3. **Land Allocation to Class B Members:** Class B members shall be given usage rights to the land that is already allocated to the share that they purchased, and must also have an allocated land size greater than the "residency threshold" defined elsewhere in this Operating Agreement.
4. **Residency Threshold and Class C Members:** The residency thresh-

old for using land allocated to a share is 3 acres. Any member whose membership interest is allocated an area of land that is less than 3 acres, shall not receive the rights to live on or occupy the land, and shall be considered a Class C member, with all associated benefits and obligations as described elsewhere in this Operating Agreement.

5. **Planning of Land Allocation:** The board of managers has the final say in the planning of common elements, before allowing the remaining land to be claimed as private elements, with any remaining land reserved for Class C investors who gain access and residency rights via a purchase of additional membership interest or as otherwise provided for in this Operating Agreement, or to be allocated to future members as per the partial share sale obligation and sale of excess ownership interest described elsewhere in this Operating Agreement.
6. **Members' Land Use:** Members may use this land, referred to as a "Homestead Area," for the following approved activities, in line with the goals of the members' private membership association: Hunting, fishing, all manner of farming including crops and livestock, recreational activities, construction of home and farm infrastructure, "off-grid living," raising a family, home education, or any other activity that is in line with the goals and values of the LLC and the members' private membership association.

7. **Restriction of Land Use:** Above activities and any other activities may be restricted as elaborated upon in the "Land Use Regulations" article of this Operating Agreement.

8. **Land Lease vs Allocation via Operating Agreement:** The LLC may formally lease the land to each member, or allocate the land solely by the terms of this Operating Agreement, at the discretion of the Board of Managers depending on which solution results in the highest degree of legal compliance, with the provision that it shall not create income tax liability for members, and it shall not cause the LLC to violate any state restrictions on corporate land ownership, subdivisions, or any relevant other state statute.
9. **Revocation of Land Usage Rights:** Land allocation or access to allocated land may be revoked as part of disciplinary actions taken against the member by the board of managers for serious violations of any part of this Operating Agreement.
10. **Waiver of Adverse Possession Rights:** All members of the LLC hereby waive their right to obtain or attempt to obtain a title deed or other ownership document for any portion of the LLC's land, including that leased to them or that for which they have usage or residency rights, via any legal means such as adverse possession, "squatter's law," etc. Violating this clause may result in a large fine, expulsion from the LLC, expulsion from the land, and civil penalties.
11. **Zoning Change Contingency:** In the case that the local or county au-

thorities change the zoning classification to include the LLC's property in a district that prohibits the construction of multiple residences on a single parcel, the LLC shall subdivide the land into parcels corresponding to each owner's lot, but shall continue to maintain ownership of all individually titled parcels, thus maintaining the smooth functioning of the community and of the LLC.

12. **Liability of Private Elements:** Members are fully liable for anything that happens on LLC-owned land that is allocated or leased to the member, and shall not hold the LLC liable. This includes injuries, theft, and any other event that may cause a financial or criminal liability.
13. **Ownership of Private Infrastructure:** Infrastructure or other physical assets funded by a member that is located on LLC-owned land that is leased or allocated to a member, is owned by that member, and not by the LLC nor its other members. The LLC encourages members to keep records of their private development expenditures in case the need should arise in the future for the member to use such records for his reference.

**Article VIII: Land Use Regulations**

1. The LLC shall implement and enforce a set of land use regulations, functioning as an HOA, to maintain an enjoyable and harmonious environment.

2. Members and their invitees shall adhere to the following regulations or face progressive consequences as defined below.

3. Members shall reimburse the LLC for any fines levied on the LLC due to their transgressions, including but not limited to fines from county zoning officials, state health department, EPA, etc.

4. **General Conduct:**
   - Members and residents shall conduct themselves in a manner that promotes a safe, peaceful, and harmonious living environment.

   - Respect for neighbors' privacy and property boundaries shall be maintained at all times.

5. **Noise and Nuisance:**
   - Excessive noise that disturbs the peace and quiet of the community, especially during nighttime hours, is prohibited, with the exception of occasional agricultural or recreational activities.
   - Regular burning of plastic trash and other materials that cause chemical burn smells is not allowed. Such burning can be organized on the last day of every month to coordinate and prevent multiple burnings. Other types of burnings can be carried out as is reasonable.
   - Anything that causes a "material and demonstrable" nuisance to



 

other members can be considered as such

- Generators must be installed inside a baffle box or similar structure that significantly reduces the noise, after no more than a 30 day period which included occasional operation

- Long-term heavy duty machinery use that will generate continuous noise could be considered a violation, please consult with LLC management before planning this type of operation. Normal agricultural and construction activities as part of land development and agricultural operations are not subject to this clause unless they create an extreme and unreasonable nuisance.
- Use of fireworks or firecrackers is prohibited, without special permission of the board of managers, in order to prevent disruption to livestock and pets.

6. **Agriculture and Farming:**
   - Members are allowed to engage in agriculture and farming activities on their property, provided they comply with local zoning and local/state/federal environmental regulations, and all other applicable local, state, and federal law

   - Large-scale concentrated agricultural operations that create excessive and unreasonable noise, smell, or groundwater pollution are not permitted. Large hog operations in particular are worth mentioning as a probable infactor. Normal ruminant and poultry grazing shall not be considered a violation of this clause.

7. **Pets and Animals:**
   - Owners are responsible for any property damage or bodily harm that their pets or farm animals may cause.

   - Dangerous or aggressive animals that pose a threat to the safety of residents are not allowed.
   - Dogs that are considered as "pit bulls," a colloquial and non-breed-specific classification that includes the American pit bull terrier, American Staffordshire terrier, Staffordshire bull terrier, American bulldog, and any other pure bred or mixed breed dog that is a combination of these dogs, shall be completely and forever banned from the LLC's property and all leased parcels within the LLC's property. The fine for bringing a pitbull shall be $500 and the dog shall be immediately removed. The fine for disguising the breed of a dog reasonably classified as a pit bull or pit bull mix shall be $1000 and the dog shall be immediately removed.
8. **General Aesthetics:**
   - This being a gentlemanly community, using your property as a junk-

yard, or letting your infrastructure collapse or rot away, is prohibited.

- Prepping and collecting useful items and equipment is permitted, but hoarding is prohibited.

9. **Trash and Recycling:**
   - Residents must dispose of trash and recyclables in a reasonable manner and timeframe.
   - Large items or hazardous materials must be properly disposed of at designated facilities.

10. **Parking:**

- Vehicles must be parked in designated parking areas and not obstruct shared driveways or common areas.

11. **Common Area Usage:**

- Common areas, such as parks or community facilities, are for the enjoyment of all members and must be respected and kept clean.
- Private events or gatherings in common areas must be coordinated with the HOA.
- Events open to the general public may NOT be held in common areas of the property
- Events open to the general public may only be held on privately allocated / leased land with prior permission of the board of managers

12. **Home Businesses:**

- Home-based businesses that do not require physical client access to the property are allowed, provided they comply with local laws and regulations
- Home-based businesses that require physical client access to the common elements of the property must receive prior permission from the board of managers, which may place limits or requirements on access, or prohibit access altogether
- Home-based businesses on allocated land that has direct public road front may allow client access without prior permission from the board of managers, provided that it does not create a material and demonstrable

nuisance to the other members, and provided that it does not disrupt the security protection of any community-funded perimeter fence

13. **Rental Policy:**

13.1 - **Purpose and Scope:**
This Rental Policy is established by the LLC to regulate and manage rental properties within the community. The policy aims to maintain the quality of living, preserve property values, and promote a safe and harmonious environment for all residents.

13.2 - **Rental Approval Process:**

- Prior to leasing a property within the community, the homeowner (Landlord) must obtain written approval from the LLC management. The Landlord shall submit a rental application on behalf of the prospective tenant to the LLC for review.

- The owner/lesee (LLC member) may not advertise or rent to the general public, only to PMA members or known individuals who meet the criteria to be approved for PMA membership

13.3 - **Rental Application Requirements:**
The member must submit a rental application provided by the board of managers, and it must include the following information about the prospective tenant(s): Full name, contact information (phone and email), proof of identification (e.g., driver's license or passport), indication of previous employment/income/rental/criminal history at the board's discretion

13.4 - **Tenant Screening and Approval:**

- The LLC management will conduct a tenant screening process to assess the prospective tenant's suitability for residency within the community.

- The LLC management shall approve or deny the rental application within a reasonable time frame.

13.5 - **Rental Term and Renewals:**

- Rental agreements shall be for a minimum term of three (3) months.

- If the tenant intends to renew the lease, the member must notify the LLC management in writing before the lease expiration date for reevaluation and approval.

13.6 - **Responsibility for Compliance:**

- The member is responsible for ensuring that the tenant complies with all LLC rules, regulations, and operating agreement.

- The member must provide a copy of the LLC's rules and regulations to the tenant at the beginning of the lease term.

- Tenants must adhere to all community rules and regulations and shall be held accountable for any violations.

- The member is responsible for addressing and resolving any tenant violations promptly.
  13.7 - **Right to Deny Rental:**

- The LLC management reserves the right to deny any rental application that does not meet their established criteria or poses a potential risk to the community.
  13.8 - **Enforcement and Penalties:**

- Violation of this Rental Policy may result in penalties, fines, or other enforcement actions, as outlined in the LLC's operating agreement.

14. **Septic and Graywater Compliance:**
    - Members must comply with all septic and graywater/blackwater regulations of the local county and of the Arkansas State Dept. of Public Health, as well as the EPA. Any fine levied on the LLC because of non-compliance of that member shall be levied upon the member by the board of managers, with possible additional fines or disciplinary action.

15. **Volatile Liquids Storage Compliance:**
    - In order to comply with EPA regulations regarding storage of such volatile and/or toxic liquids including but not limited to used motor oil, vegetable oil, gasoline, and diesel fuel, the LLC board of managers shall each year at the end of the year, solicit from each member an estimate of the maximum quantity of such liquids he plans to store on the LLC's property.

    - The board will use this information to determine if a self-certified spill prevention plan is required by the EPA, and if so, will create such a plan and engage in any administrative actions necessary to ensure full compliance with the law.
    - Members are required to furnish such information to the board of managers upon request.

16. **Water System Compliance:**
    - Any member, or the LLC as a whole, if they operate a water system that provides drinking water to more than 15 connections or more than 25 people, shall comply with all EPA monitoring and reporting requirements as well as any other legal requirements that may apply.

- Members operating a noncompliant system that receives a fine from the EPA or other governmental authority shall be required to pay the fine personally.

17. **Perimeter fence:**
    - All members who are allocated or leased land that is adjacent to a perimeter of the property, shall be required to, within 1 year of their purchase of the property, erect a fence along the perimeter.
    - The fence must function as a physical barrier against easy entry by a human, and must have barbed wire or equivalent at the top. Any openings must have a lockable gate.
    - The LLC shall be responsible for the installation of a gate at any public road entries.
    - The LLC may consider funding the fence portions along perimeter-adjacent lots that are not allocated at the time of the purchase of the property.
    - The LLC hereby adopts a fence-out policy for grazing animals, wherein each member must erect a fence if they wish to keep grazing ruminant animals and poultry out of their land.
18. **Guests:** Members shall be permitted to invite temporary guests to their allocated or leased land who are not members of the Private Membership Association, and they shall be allowed to access the private lot via the LLC's roads however necessary. Guests shall not have access to the community area unless they are a member of the RTTL: Ozarks Chapter PMA or otherwise approved by the LLC board of managers. Members who invite guests must make the sign a waiver, and whether or not this waiver is signed, the member is always liable for any claims brought against the LLC by the guest.
19. **School:** -In regards to the school of Plato planned by one of the LLC members, it shall be permitted to solicit donations from LLC members and from new and potential LLC members to support the school. Additionally, if the school shall engage in operations on the LLC's property, it shall be required that the member-organizer form a PMA that all attending students shall be members of, and that this PMA shall have a contractual agreement with the RTTL: Ozarks Chapter PMA, in order to facilitate the exchange of goods and services in the private domain. Furthermore, the LLC may enter into a contractual agreement with the school to exchange use of common facilities for rental income or some other form of equity as approved by the Board of Managers.
20. **Rental and Private Investment:** The LLC shall be permitted to arrange and organize rental investment agreements whereas a member or groups of members may invest funds to construct additional infrastructure in the community area, and receive returns when those facilities earn money from PMA members or members of another PMA. Such agreements must be fair and must benefit the LLC. Similar agreements may also be made regarding infrastructure built on private lots. Such agreements must

keep in mind the prohibition on doing business with the general public, and thus must rely on the PMA structure.

21. **Firearm Safety Rules:** Members must follow these rules to ensure the safety of others present on the property.

- The board of managers shall select an appropriate site to be used as the community shooting range.
- Members should use, but are not required to use, the community shooting range.
- Members must not shoot in the direction of another member's property.
- Members must always check for a safe backstop before shooting. The backstop must be solid enough to capture fired bullets, and must be constructed of a material that will not let the projectile ricochet.
- Members must remember that projectiles can travel for long distances. For example, a .22-caliber bullet can travel over 1½ miles. A centerfire bullet can travel several miles. Small shot can travel 200–350 yards. Larger shot can travel over 600 yards. Slugs can travel over 800 yards.
- Members must be sure of the target and what is in front of it and beyond it. Making sure you have a safe backstop helps ensure that the projectile cannot hit an unintended target. If you cannot see what lies beyond the target, do not take the shot.

22. **Enforcement and Mediation:**
    - The LLC shall use a mediation-first approach to resolve disputes among members.
    - Fines or penalties may be imposed for violations of the rules, with appropriate due process.
    - The board of managers shall administer these judgments, and may skip steps if the severity of the infraction warrants it:
      - Formal notification and mediation attempt, with a 30 day timeframe
      - Monetary fine imposed by the board of managers
      - Removal of access to common element benefits
      - Removal of access/residency rights to their leased / allocated land
      - Expulsion from the LLC per forced buy-out regulations elsewhere in the LLC Operating Agreement or Articles of Organization

### Article IX: Profit and Loss Distribution

1. **Profit Distribution:** All profits generated by the LLC shall be distributed to the Class A and Class B members in proportion to their respective ownership percentages as stated in the LLC's Operating Agreement or as subsequently amended by the members.
2. **Loss Distribution:** In the event of any losses incurred by the LLC, such losses shall be allocated to the Class A and Class B members in proportion to their respective ownership percentages as stated in the LLC's Articles of Organization or as subsequently amended by the members, always referring only to losses on the books, and not extending to create personal liability to the LLC by the members.
3. **Class C Membership Interests:** Class C members shall not be entitled to receive any profits or losses of the LLC. Their membership interests are non-participating and shall not have any rights to share in the financial results of the company.
4. **Timing of Distributions:** Profit distributions shall be made to the Class A and Class B members on a regular basis as determined by the LLC management. Loss distributions, if any, shall be accounted for and allocated in accordance with applicable tax regulations.
5. **Method of Distribution:** Profit and loss distributions shall be made in accordance with the LLC's operating procedures and the preferences of the members. Distributions may be made in cash, property, or other assets as deemed appropriate by the LLC management.
6. **Tax Compliance**
   - The Board of Managers, and specifically the Treasurer, with secondary responsibility to the Secretary, shall be responsible for the following: Annually filing an IRS form 1065, and annually issuing an IRS form K-1 to each member. Furthermore, they shall be responsible for complying with any state income tax obligations, any local and/or property tax obligations, and any other tax obligations that may arise.
   - It shall be noted that for the purposes of any tax regulation requiring such declaration; the LLC may consider any advertising, promotion, or related expenses to be tax-deductible.

### Article X: Code of Conduct

1. The LLC shall adhere to a Code of Conduct to maintain a harmonious and productive community. Disruptive behaviors, including concern controlling, compulsive lying, and purity spiraling, are strictly disallowed.

2. Any member found engaging in disruptive behaviors may be subject to disciplinary actions, including exclusion from LLC internal communications, suspension of decision-making activities or total expulsion from the LLC.
3. If a member or manager is making an accusation of financial impropriety or similar, the member or manager is forbidden from making general or vague accusations, accusations without actual evidence, or accusations via the "appeal to complexity" or "appeal to dumbness" routes commonly employed by those seeking, either intentionally or unintentionally, to disrupt the organization. "Appeal to complexity" in this context implies that because financial data is complex, therefore impropriety must be easy, therefore it must be happening. Appeal to dumbness implies the same, but via the route of claiming that the implied lack of intelligence of the member or manager making the complaint makes it easy for the accused to engage in impropriety, therefore it must be happening. Violation of this clause may result in a warning or mediation, fine of $20 to $500 or 0.5-10 grams of gold, and excommunication from the LLC if the behavior continues. This behavior may be also used as evidence to show an ongoing trait of disruptive behaviors that may be used to remove a member from the LLC.

**Article XI: Dispute Resolution and Mediation**

1. **Informal Resolution:** In the event of any dispute, controversy, or claim arising out of or relating to this operating agreement, the LLC's business activities, or the relationship between members, the parties involved shall first attempt to resolve the matter amicably through informal discussions and negotiations.

2. **Mediation:** If the parties are unable to reach a resolution through informal discussions within [specify timeframe, e.g., 30 days] from the date the dispute arose, the parties shall submit the dispute to mediation. Mediation shall be conducted by a neutral mediator mutually agreed upon by the parties.

3. **Mediation Process:** The mediation shall take place at a location and time agreed upon by the parties, and it shall be conducted in good faith with the aim of reaching a mutually acceptable resolution. The mediator's role is to facilitate communication and assist the parties in reaching a resolution, but the mediator shall not have the authority to impose a decision.

4. **Confidentiality:** All communications, negotiations, and proceedings related to the mediation shall be confidential and shall not be used as evidence in any subsequent legal proceedings, except as required by law, and only after consulting with LLC management to obtain a legal opinion on the legality of the request. ..

5. **Costs of Mediation:** The costs and expenses of the mediation, including

the mediator's fees, shall be shared equally between the parties, unless otherwise agreed upon.

6. **Binding Nature:** If the parties reach a resolution through mediation, the terms of the resolution shall be reduced to writing and signed by all parties. The resolution shall be binding on the parties and enforceable as a separate agreement.
7. **Litigation as Last Resort:** If mediation does not result in a resolution within 60 days from the initiation of the mediation process, any unresolved dispute shall be subject to litigation.
8. **Jurisdiction and Venue:** Any legal action or proceeding arising from or related to this operating agreement or the LLC's business activities shall be brought in the state or federal courts having jurisdiction over the location of the LLC's principal place of business.
9. **Attorneys' Fees:** In the event of litigation or arbitration, the prevailing party shall be entitled to recover its reasonable attorneys' fees and costs incurred in connection with the dispute.
10. **Waiver of Jury Trial:** To the fullest extent permitted by law, the parties hereby waive their right to a jury trial in any legal action or proceeding arising from or related to this operating agreement or the LLC's business activities. This reduces the time spent on dispute resolution and increases the chance that a solution will be reached without going to trial.
11. **Continuation of Business:** During the resolution process, the LLC's business activities shall continue unaffected to the extent possible, unless otherwise agreed upon by the parties or required by law, and only after consulting with LLC management to obtain a legal opinion on the legality of the request.
12. **Disruption of Official and Unofficial Communication:** If the parties in dispute insist on discussions of their dispute in public, and in formal or informal discussions of LLC business among all or most members or the board, the board may order the exclusion of either or both of the parties in dispute from such communications or take other punitive measures as is deemed reasonable, to ensure a healthy social atmosphere within the LLC. The previously discussed mediation processes should be sufficient for these members to solve their problems, without causing correspondence fatigue among all members.

### Article XII: Book Access and Audits

1. **Access to Records:** The LLC shall maintain accurate and complete records of all financial transactions, business activities, and decisions made by the LLC. These records shall be accessible to all members in good

standing for review and examination, unless the member is of a restricted share class as described elsewhere in this article.

2. **Electronic Access:** All LLC records, including financial statements, minutes of meetings, contracts, and other relevant documents, shall be stored electronically on a secure cloud server. Members in good standing shall receive access credentials to the cloud server, allowing them to view and download the records.

3. **Access Restrictions for "Peasant Share" Members:** Class C members shall have limited access to only those records required by state law. Such access may include annual financial reports, tax filings, and other documents necessary for legal compliance. Class C members shall not have access to other sensitive financial or operational records of the LLC.

4. **Member Responsibilities:** All members with access to the electronic records are responsible for maintaining the confidentiality and security of their access credentials. Members shall not share their access credentials with any third party or unauthorized individual. Members shall not share records with non-members unless required by state or federal law, and only after consulting with LLC management to obtain a legal opinion on the legality of the request.

5. **Audits and Examinations:** The LLC shall conduct periodic audits or examinations of its financial records to ensure accuracy and compliance with applicable laws. Audits may be performed by independent third-party auditors or by a committee of members designated by the managers.

6. **Audit Results and Reports:** The results of audits and examinations, including any recommendations for improvements or corrections, shall be documented in written reports. These reports shall be made available to all members in good standing upon completion of the audit.

7. **Frequency of Audits:** The frequency of audits or examinations shall be determined by the managers and may be conducted annually or at other intervals as deemed necessary for the proper financial management of the LLC.

8. **Confidentiality of Audit Reports:** Audit reports and any sensitive financial information obtained through audits shall be treated as confidential and shall not be disclosed to non-members or shared outside the LLC, except as required by law, and only after consulting with LLC management to obtain a legal opinion on the legality of the request. .

9. **Dispute Resolution:** Any disputes or disagreements regarding access to records, audits, or examinations shall be resolved in accordance with the dispute resolution provisions outlined in the LLC operating agreement.

10. **Record Retention:** The LLC shall maintain all records related to financial transactions, business activities, and decision-making for a period of

10 years, or as otherwise required by applicable state or federal laws.

11. **Document Conveyance:** If Arkansas state statute should require that any LLC-related documents must be delivered via mail to all members unless otherwise provided for in the Operating Agreement, then the LLC hereby makes clear that such documents must only be delivered electronically to Class A and B members, within a period of 30 days, and should not be sent to Class C members unless otherwise required by law.

### Article XIII: Force Majeure

This "Force Majeure" clause shall be applied to address unforeseen and catastrophic events, providing flexibility and adaptability to preserve the interests and well-being of the LLC and its members during challenging circumstances.

1. **Definition:** In the event of unforeseeable circumstances or events beyond the reasonable control of the LLC and its members, including but not limited to acts of God, natural disasters, economic collapses, hyperinflation, active war in the United States, terrorist attacks, solar flares, apocalyptic societal conditions, extreme social unrest and rioting, or any other catastrophic events (collectively referred to as "Force Majeure Events"), the provisions of this clause shall apply.

2. **Adjustment of Appraisals and Fines:** In the event of hyperinflation or severe currency devaluation, the LLC board may, at its sole discretion, adjust the appraisals, fines, and other monetary values mentioned in the operating agreement or articles of organization to account for the changed economic conditions. Such adjustments shall be made in good faith and with the aim of preserving the economic viability of the LLC and its members.

3. **Use of Alternative Currencies:** In case of a currency collapse or failure of the U.S. dollar, the LLC may, at its sole discretion, choose to accept and use alternative currencies or assets deemed suitable for conducting business and accounting, including but not limited to cryptocurrencies, precious metals (e.g., gold and silver), or any other medium of exchange considered appropriate under the circumstances.

4. **Alternative Currency and Cash Management:** In the event of a bank collapse or loss of confidence in the traditional or electronic banking system, the LLC may, at its sole discretion, implement cash-only, gold, silver, and/or barter-based cash management and accounting procedures to ensure the continuity of financial operations and transactions.

5. **Absence of Legal Framework** In the event that the United States Government or the Arkansas State Govenment are unable to maintain a functioning legal system in geopolitically challenging circumstances, this LLC and its member will continue to operate under the open-source standard "ULEX Law," which is a collection of Uniform Law Commission and

other generally accepted legal texts and case law, based on common law and uniform law standards. The LLC will also continue to operate under Arkansas's LLC statutes, since this document was written under their jurisdiction.

6. **Access and Residency Rights for Class C Members:** In the case of serious economic and geopolitical situations or any catastrophic events as described in the definition of Force Majeure Events, the board of managers may, by a unanimous vote, grant access and residency rights to Class C members. The board shall have the authority to determine the scope and duration of such access and residency rights based on the severity and nature of the Force Majeure Event.

7. **Mandatory Access and Residency Rights:** Notwithstanding any other provision in the operating agreement, the board of managers is mandated to grant access and residency rights to Class C members in the following very severe circumstances:

   a. Active war in the United States.
   b. Widespread and long-term societal disruption in Arkansas or southern Missouri due to natural disasters or catastrophic events.
   c. Solar flare or electromagnetic pulse (EMP) causing substantial damage to the planet's grid or critical infrastructure.

8. **Notification and Documentation:** In the event of the activation of this Force Majeure clause and the granting of access and residency rights to Class C members, the board shall provide written notification to all members, detailing the circumstances and the duration of the granted rights. Documentation of the board's decision shall be maintained in the LLC's records.

9. **Duration of Force Majeure:** The Force Majeure provisions shall remain in effect for the duration of the Force Majeure Event, as determined by the board of managers. Upon the cessation of the Force Majeure Event, the normal operating procedures shall resume, and any adjustments or modifications made during the Force Majeure period shall be reevaluated based on the prevailing circumstances.

### Article XIV: Dissolution

In the event of LLC dissolution, the assets shall be distributed in accordance with the Share Transfer Restrictions and the interests of the members as specified elsewhere in this Operating Agreement. The following procedures shall be followed:

1. **Voluntary Dissolution:** The LLC may be dissolved voluntarily with an affirmative or abstention vote from all Class A and Class B member interests minus a possible 5% of dissenting votes. Upon approval, the

members shall proceed with the winding-up process in accordance with applicable Arkansas state laws and this operating agreement.

2. **Involuntary Dissolution:** The LLC may be dissolved involuntarily under circumstances allowed by law, including but not limited to court order, bankruptcy, or loss of required licenses. In such cases, the dissolution shall be carried out in compliance with the applicable state laws governing LLC dissolution, and according to this operating agreement as is possible. Please note that a member withdrawing from the LLC shall not automatically trigger a dissolution.

3. **Winding-Up Process:** Upon dissolution, the LLC shall immediately cease all business activities except those necessary for the winding-up process. The managers shall be responsible for liquidating the LLC's assets, satisfying its liabilities, and distributing the remaining assets to the members as outlined in this operating agreement.

4. **Distribution of Assets:** After settling all debts and liabilities of the LLC, the remaining assets, except those covered in numeral 5, shall be distributed among the members in proportion to their ownership interests and other relevant considerations. The distribution shall be made in cash or in kind as determined by the managers, and it shall be documented and reported to all members.

5. **Distribution of Land:** Homestead land allocated to each member shall be parcelled and titled to them or to a party assigned by them, in full compliance with county zoning regulations. Common boundary and road elements shall be attached to the adjacent homestead land and included as a right-of-way easement in their map and title during the parcelation process. Other common elements such as community hub, water system, etc may be sold, added to a new LLC formed by the members for common element administration, or another solution determined most fair and feasible by the LLC management. If parcelation is not possible due to zoning regulation or other legal restriction, the land asset distribution or liquidation process will follow state and federal law.

6. **Final Tax Returns and Filings:** The managers shall be responsible for filing all necessary tax returns and final reports required by applicable state and federal authorities.

7. **Termination of Operating Agreement:** The dissolution of the LLC shall result in the termination of this operating agreement, except for provisions that, by their nature, survive termination, including but not limited to any confidentiality, non-compete, and indemnification clauses.

8. **Notice to State Authorities:** Upon completion of the winding-up process, the managers shall promptly file the appropriate dissolution documents with the Arkansas state authorities to formalize the dissolution of the LLC.

9. **Dispute Resolution:** Any disputes or disagreements arising from the dissolution process shall be resolved in accordance with the dispute resolution provisions outlined in this operating agreement.

10. **Recordkeeping:** The LLC shall maintain all necessary records related to the dissolution process for a period of 10 years unless otherwise required by state or federal law, during which time all members shall have access to such records upon request.

This dissolution clause shall govern the dissolution process of the LLC and shall be binding on all members. All members acknowledge and agree to abide by the terms and procedures set forth herein.

### Article XV: Amendments

This operating agreement may be amended with the consent or abstention vote of 3/4 of the Class A and B members.

### Article XVI: Governing Law

This operating agreement shall be governed by and construed in accordance with the laws of the State of Arkansas.

### Article XVII: Members

The following is a list of LLC members. Land allocations have a slight margin of error that depend on final survey after the property is purchased. The board of managers shall maintain a historical record of all past members and transfers of membership interests. The member list shall include capital contributions along with pertinent details of each item - form, description, value, date, depreciation, liabilities, etc.

☑ 1. **Nobleman Share (Founder):**
   - Name: [redacted]
   - Share Class: A
   - Address: [redacted]
   - Phone: [redacted]
   - Email: [redacted]
   - Current membership interest: 35.62%
   - Desired ending interest: 29.51%
   - Land allotment: 44.26 acres
   - Capital Contribution: $90,000 USD cash
   - Date of membership interest acquisition: September 20, 2023

☑ 2. **Nobleman Share (Founder):**
   - Name: [redacted]
   - Share Class: A
   - Address: [redacted]
   - Phone: [redacted]

- Email: [redacted]
- Current membership interest: 27.70%
- Desired ending interest: 22.95%
- Land allotment: 34.43 acres
- Capital Contribution: $70,000 USD cash
- Date of membership interest acquisition: September 20, 2023

☑ 3. **Nobleman Share (Founder):**
- Name: [redacted]
- Share Class: A
- Address: [redacted]
- Phone: [redacted]
- Email: [redacted]
- Current membership interest: 13.85%
- Desired ending interest: 11.48%
- Land allotment: 17.21 acres
- Capital Contribution: $35,000 USD cash
- Date of membership interest acquisition: September 20, 2023

☑ 4. **Nobleman Share (Founder):**
- Name: [redacted]
- Share Class: A
- Address: [redacted]
- Phone: [redacted]
- Email: [redacted]
- Current membership interest: 5.94%
- Desired ending interest: 4.92%
- Land allotment: 7.38 acres
- Capital Contribution: $15,000 USD cash
- Date of membership interest acquisition: September 20, 2023

☑ 5. **Nobleman Share (Founder):**
- Name: [redacted]
- Share Class: A
- Address: [redacted]
- Phone: [redacted]
- Email: [redacted]
- Current membership interest: 4.02%
- Desired ending interest: 3.33%
- Land allotment: 5.00 acres
- Capital Contribution: $10,160 USD cash
- Date of membership interest acquisition: September 20, 2023

☑ 6. **Nobleman Share (Founder):**
- Name: [redacted]
- Share Class: A
- Address: [redacted]
- Phone: [redacted]
- Email: [redacted]
- Current membership interest: 4.02%

- Desired ending interest: 3.33%
- Land allotment: 5.00 acres
- Capital Contribution: $10,160 USD cash
- Date of membership interest acquisition: September 20, 2023

☑ 7. **Nobleman Share (Founder):**
- [redacted] Name: [redacted]
- Share Class: A
- Address: [redacted]
- Phone: [redacted]
- Email: [redacted]
- Current membership interest: 4.83%
- Desired ending interest: 4.00%
- Land allotment: 6.00 acres
- Capital Contribution: $12,200 USD cash
- Date of membership interest acquisition: September 20, 2023

☑ 8. **Nobleman Share (Founder):**
- Name: [redacted]
- Share Class: A
- Address: [redacted]
- Phone: [redacted]
- Email: [redacted]
- Current membership interest: 4.02%
- Desired ending interest: 3.33%
- Land allotment: 5.00 acres
- Capital Contribution: [redacted] tractor shall be leased to the LLC for a period of 10 months for the total price of $10,000 USD which shall be considered the capital contribution for this membership interest. Failure to comply with the promissory note shall result in the member fulfilling the capital contribution in cash at the request of the board of managers, as described in the promissory note and lease agreement.
- Date of membership interest acquisition: September 20, 2023

**Article XVIII: Ratification**

***This LLC Operating Agreement shall forthwith govern the formation, operation, management, dissolution, and all other aspects of [redacted] LLC, and shall be binding on all members. All members acknowledge and agree to abide by the terms and procedures set forth herein.***

Name: [redacted]
Founding Member and Vice President

Signature: [redacted]

Name: [redacted]
Founding Member
Signature: [redacted]

Name: [redacted]
Founding Member
Signature: [redacted]

Name: [redacted]
Founding Member
Signature: [redacted]

Name: [redacted]
Founding Member and Treasurer
Signature: [redacted]

Name: [redacted]
Founding Member and Secretary
Signature: [redacted]

Name: [redacted]
Founding Member
Signature: [redacted]

Name: [redacted]
Founding Member and President
Signature: [redacted]

# Signature Certificate

Reference number: RPTUT-AEUHZ-QE8FB-I8AFA

| Signer | Timestamp | Signature |
|---|---|---|
| [redacted] | | [redacted] |
| Sent: | 28 Sep 2023 02:52:40 UTC | |
| Viewed: | 28 Sep 2023 02:53:25 UTC | |
| Signed: | 28 Sep 2023 02:57:03 UTC | |
| **Recipient Verification:** | | IP addres[redacted] |
| ✔Email verified | 28 Sep 2023 02:53:25 UTC | Location:[redacted] |
| [redacted] | | [redacted] |
| Sent: | 28 Sep 2023 02:52:40 UTC | |
| Viewed: | 28 Sep 2023 03:01:52 UTC | |
| Signed: | 28 Sep 2023 03:03:45 UTC | |
| **Recipient Verification:** | | IP addre[redacted] |
| ✔Email verified | 28 Sep 2023 03:01:52 UTC | Location[redacted] |
| [redacted] | | [redacted] |
| Sent: | 28 Sep 2023 02:52:40 UTC | |
| Viewed: | 28 Sep 2023 17:58:44 UTC | |
| Signed: | 28 Sep 2023 18:02:18 UTC | |
| **Recipient Verification:** | | IP addr[redacted] |
| ✔Email verified | 28 Sep 2023 17:58:44 UTC | Locatio[redacted] |

Document completed by all parties on:
30 Sep 2023 20:53:13 UTC



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature solution trusted by 40,000+ companies worldwide.

# Signature Certificate

Reference number: RPTUT-AEUHZ-QE8FB-I8AFA

| Signer | Timestamp | Signature |
|---|---|---|
| [redacted] | | [redacted] |
| Sent: | 28 Sep 2023 02:52:40 UTC | |
| Viewed: | 28 Sep 2023 23:25:29 UTC | |
| Signed: | 28 Sep 2023 23:27:14 UTC | |
| **Recipient Verification:** | | IP addre [redacted] |
| ✔Email verified | 28 Sep 2023 23:25:29 UTC | Location |
| [redacted] | | [redacted] |
| Sent: | 28 Sep 2023 02:52:40 UTC | |
| Viewed: | 28 Sep 2023 23:25:28 UTC | |
| Signed: | 28 Sep 2023 23:30:39 UTC | |
| **Recipient Verification:** | | IP addre [redacted] |
| ✔Email verified | 28 Sep 2023 23:25:28 UTC | Location |
| [redacted] | | [redacted] |
| Sent: | 28 Sep 2023 02:52:40 UTC | |
| Viewed: | 29 Sep 2023 11:30:23 UTC | |
| Signed: | 29 Sep 2023 11:32:02 UTC | |
| **Recipient Verification:** | | IP add [redacted] |
| ✔Email verified | 29 Sep 2023 11:30:23 UTC | Locatio |

Document completed by all parties on:
30 Sep 2023 20:53:13 UTC



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature solution trusted by 40,000+ companies worldwide.

# Signature Certificate

Reference number: RPTUT-AEUHZ-QE8FB-I8AFA

| Signer | Timestamp | Signature |
|---|---|---|
| [redacted] | | [redacted] |
| Sent: | 28 Sep 2023 02:52:40 UTC | |
| Viewed: | 28 Sep 2023 07:08:03 UTC | |
| Signed: | 29 Sep 2023 13:45:57 UTC | |
| **Recipient Verification:** | | IP addres[redacted] |
| ✔Email verified | 28 Sep 2023 07:08:03 UTC | Location: [redacted] |
| [redacted] | | [redacted] |
| Sent: | 28 Sep 2023 02:52:40 UTC | |
| Viewed: | 29 Sep 2023 20:42:42 UTC | |
| Signed: | 30 Sep 2023 20:53:13 UTC | |
| **Recipient Verification:** | | IP addre[redacted] |
| ✔Email verified | 29 Sep 2023 20:42:42 UTC | Location: [redacted] |

Document completed by all parties on:

30 Sep 2023 20:53:13 UTC



**Signed with PandaDoc**

PandaDoc is a document workflow and certified eSignature solution trusted by 40,000+ companies worldwide.