**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**NORTHERN DIVISION**

**MICHELLE WALKER,**
Plaintiff,

v.

**RETURN TO THE LAND, et al.,**
Defendants.

Case No. 3:26-cv-00151-DPM

# BRIEF OF AMICUS CURIAE BRANDON MICHAEL HAYES CONCERNING THE CONSTITUTIONAL CLASSIFICATION OF ASSOCIATION, PROPERTY, STATUTORY INJURY, AND COMPULSORY PROCESS

## I. INTEREST, AUTHORSHIP, AND PURPOSE OF AMICUS

Amicus Brandon Michael Hayes serves as President of the Natural Law Institute and conducts research concerning constitutional governance, reciprocal legal obligations, institutional classification, and the lawful exercise of compulsory authority.

Amicus appears individually.

Following the commencement of this litigation, Amicus developed and communicated analytical material to persons associated with Return to the Land concerning the distinction between private association and regulated property transactions, defendant-specific statutory predicates, constitutional avoidance, and the preservation of constitutional questions.

That prior communication is affirmatively disclosed.

### Authorship and Financial Disclosure

No party or counsel for a party authored this submission, in whole or in part. No party or counsel for a party contributed money intended to fund its preparation or submission. No other person or entity contributed money specifically intended to fund its preparation or submission.

Amicus retains responsibility for the analysis and representations contained herein. His prior communications concerning the litigation are disclosed above.

The present submission addresses the constitutional and procedural architecture within which the competing claims and defenses arise.

The accompanying Appendix A, entitled *The Constitutional Limits of Process: Classification, Compulsion, and Reviewability Before a Determination of Liability*, develops a comparative jurisprudential framework with reference to this proceeding and the separate proceeding in *Orwoll et al. v. United States Department of Justice et al.*, No. 3:26-cv-00239-BSM.

The Appendix is submitted as supplemental legal analysis, independently of the evidentiary records of the respective proceedings.

Amicus takes no position concerning the resolution of contested facts or the ultimate liability of any Defendant.

The principles advanced herein apply irrespective of the ancestry, religion, political position, ideological commitments, or popularity of the parties.

---

## II. QUESTIONS PRESENTED

1. Whether the constitutional protection of voluntary association necessarily encompasses a corresponding protection against compelled association, subject to the lawful regulation of independently actionable conduct.
2. Whether application of the Fair Housing Act to a membership determination requires identification of the operative relationship connecting that determination to a statutorily regulated housing practice.
3. Whether the legal distinction between separate entities must be examined through their governing instruments, actual functions, delegated authority, and operative relationships rather than presumed from either organizational affiliation or formal separateness.
4. Whether Article III standing must be established through injury, traceability, and redressability independently of the ultimate determination of statutory liability.
5. Whether the absence of direct contact with a particular defendant is independently dispositive of standing where the plaintiff alleges an operative agency relationship or discriminatory deterrence.
6. Whether the authority of a court to determine its own jurisdiction independently establishes the permissible scope of merits discovery while material jurisdictional predicates remain contested.
7. Whether discovery affecting confidential associational relationships requires particularized examination of relevance, necessity, proportionality, constitutional burden, and available alternatives before disclosure occurs.

8. Whether the irreversible consequences of certain compulsory disclosures warrant protection independently of the anticipated disposition of the underlying litigation.
9. Whether any eventual remedy must distinguish unlawfully restricted housing opportunities and other independently actionable conduct from constitutionally protected associational relationships.

---

## III. INTRODUCTION AND SUMMARY OF ARGUMENT

The present controversy requires the Court to distinguish several relationships that the parties characterize differently:

- Association membership;
- Property ownership;
- Residential occupancy;
- Commercial exchange;
- Contractual participation;
- Representative authority;
- And legally actionable injury.

The Plaintiff alleges that rejection from a private membership association operated to deny her access to residential property.

The Defendants contest the existence and legal significance of that relationship.

Both positions depend upon an antecedent question:

**What relationship actually existed between the membership determination and the alleged housing opportunity?**

That question cannot be resolved merely through the identification of ideological commitments, organizational labels, overlapping participants, or separately constituted legal entities.

It requires examination of the operative relationships.

The constitutional significance of this controversy extends beyond the classification of the underlying conduct.

Several Defendants contest the existence of Article III jurisdiction over the claims asserted against them. Discovery has nevertheless been permitted to proceed under the Court's administration while that challenge remains unresolved.

The authority to examine contested jurisdictional predicates is established.

The permissible scope of compulsory process during that examination remains a separate inquiry.

Disclosure, once accomplished, may produce consequences beyond the capacity of a subsequent dismissal to reverse.

Accordingly, the Court must distinguish:

- **The authority to entertain a controversy;**
- **The authority to investigate its jurisdictional predicates;**
- **The authority to compel particular disclosures;**
- **The authority to adjudicate liability;**
- **And the authority to impose corrective relief.**

Each performs distinct constitutional and legal work.

The lawful invocation of one does not independently establish the permissible exercise of the others.

The central question concerns both the underlying relationships alleged to produce statutory injury and the compulsory relationships established through the judicial examination of that allegation.

The authority to investigate a disputed relationship must remain distinguishable from the authority to alter that relationship.

The constitutional protections of the respective parties remain operative throughout that examination.

**The existence of lawful process and the lawfulness of every act performed through that process are separate determinations.**

---

## IV. THE FREEDOM OF ASSOCIATION NECESSARILY INCLUDES PROTECTION AGAINST COMPELLED ASSOCIATION

### A. Association derives its function from voluntary selection.

Human beings associate to accomplish shared purposes that they cannot accomplish as effectively in isolation.

Through association, individuals acquire opportunities for cooperation, mutual assistance, shared responsibility, cultural preservation, religious practice, political expression, collective enterprise, and the transmission of knowledge.

The value of these relationships depends substantially upon the capacity of participants to determine their commitments, responsibilities, purposes, and fellow participants.

Association produces benefits through the particular relationships established among its participants.

The capacity to decline or discontinue particular relationships preserves the voluntary character of those commitments.

The freedom to establish an association therefore necessarily entails a corresponding freedom to decline certain associations.

Absent that capacity, participants lose an essential mechanism through which the purposes and reciprocal obligations of their association are maintained.

The Supreme Court recognized this relationship in *Roberts v. United States Jaycees*, 468 U.S. 609, 617–23 (1984), distinguishing constitutionally protected intimate relationships from association undertaken in furtherance of protected expression.

In *Boy Scouts of America v. Dale*, 530 U.S. 640, 648–59 (2000), the Court further recognized that compelled inclusion may significantly impair an association's ability to communicate its chosen message.

The legal significance of membership consequently extends beyond physical presence or contractual participation.

Membership may alter the expressive, organizational, reciprocal, and governing relationships among existing participants.

Where compulsory inclusion materially burdens constitutionally protected association, that burden must receive examination under the applicable constitutional standard.

**B. The tension between civil-rights enforcement and associational liberty requires express constitutional resolution.**

The existing jurisprudence establishes substantially different approaches to the relationship between civil-rights enforcement and voluntary association.

In *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968), and *Runyon v. McCrary*, 427 U.S. 160, 175–79 (1976), the Supreme Court recognized congressional authority to prohibit racial discrimination within private property and contractual relationships.

In *Roberts v. United States Jaycees*, 468 U.S. 609, 623–29 (1984), the Court sustained the application of antidiscrimination legislation notwithstanding an asserted burden upon associational freedom.

In *Boy Scouts of America v. Dale*, 530 U.S. 640, 648–59 (2000), the Court recognized constitutional limitations upon the application of antidiscrimination legislation where compulsory inclusion materially altered protected expressive association.

In *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 68–70 (2006), the Court distinguished compelled interaction with persons outside an expressive association from compelled admission into the association itself.

In *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023), the Court recognized that participation in commercial activity does not extinguish constitutional protection against compelled expression.

These decisions establish different classifications through which the constitutional permissibility of compulsory participation is determined.

Their application nevertheless presents a continuing jurisprudential difficulty where those classifications overlap within a single relationship.

An association may involve property, contractual commitments, collective investment, shared expenses, residential proximity, cultural preservation, religious observance, and expressive participation simultaneously.

The existence of a contractual or property component cannot independently resolve the constitutional character of the relationship in its entirety.

The difficulty arises where legislation protecting equal access to a regulated opportunity operates to require the establishment of an independently protected private relationship.

**At that point, the legal obligation asserted and the constitutional liberty invoked may become operationally incompatible.**

The Court must determine the boundaries of the respective propositions before determining the permissible scope of their enforcement.

**C. Constitutional liberties and governmental interests are not inherently commensurable.**

A constitutional liberty establishes a limitation upon the exercise of governmental authority.

A governmental interest identifies an objective government seeks to accomplish.

These propositions perform different legal functions.

The desirability of a governmental objective cannot independently establish the constitutional permissibility of the means employed to accomplish it.

Nevertheless, prevailing jurisprudence frequently resolves constitutional controversies through the comparative weighing of governmental interests and individual liberties.

Amicus submits that such balancing is insufficient as an antecedent method of constitutional classification.

Before the respective interests can receive examination under an applicable standard of scrutiny, the Court must determine:

1. The particular liberty protected;
2. The person possessing that liberty;
3. The particular entitlement asserted against that person;
4. The corresponding obligation necessary to satisfy that entitlement;
5. The constitutional and statutory source of that obligation;
6. The relationship altered through its enforcement; and
7. The constitutional permissibility of the compulsory act.

The proposed sequence is:

**LIBERTY → ENTITLEMENT → CORRESPONDING DUTY → LAWFUL AUTHORITY → COMPULSORY ACT → CONSTITUTIONAL DETERMINATION**

The Supreme Court has recognized the constitutional limitations of judicial interest balancing in other contexts. See *District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008).

Although *Heller* addressed the Second Amendment, the methodological question warrants consideration wherever an expressly protected liberty becomes contingent upon a subsequent judicial assessment of its comparative social utility.

Amicus advances this distinction as a proposed development of associational jurisprudence.

The applicable standards established by controlling precedent remain operative. Where those standards produce unresolved constitutional tensions, their express identification facilitates examination by the courts possessing authority to resolve them.

**The classification of a constitutional liberty must precede the evaluation of governmental interests advanced to restrict it.**

**D. Equal civil liberty must remain distinguishable from compulsory access to private relationships.**

The equal possession of a liberty does not independently establish an entitlement to the relationships formed through another person's exercise of that liberty.

Every person may possess the liberty to establish a religious association.

That liberty does not independently establish an entitlement to membership in every existing religious association.

Every person may possess the liberty to establish a household.

That liberty does not independently establish an entitlement to participate in every existing household.

Every person may possess the liberty to acquire property and enter legally protected transactions.

The constitutional and statutory character of a particular demand for participation nevertheless depends upon the actual relationship sought.

This distinction possesses particular significance where access to property and participation in private association cannot readily be separated.

In *Fair Housing Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1220–23 (9th Cir. 2012), the court construed the Fair Housing Act to exclude roommate selection within shared living units, recognizing the substantial constitutional problems arising from a broader construction.

The decision establishes a distinction between access to an independent dwelling and selection of persons with whom one establishes an intimate living relationship.

In 42 U.S.C. § 3607(a), Congress additionally established particular exemptions concerning noncommercial housing operated by qualifying religious organizations and incidental noncommercial lodgings provided by qualifying private clubs.

Those exemptions possess specific statutory limitations, including the distinction between religious preference and racial exclusion and the distinction between rental or occupancy and sale.

See *United States v. Columbus Country Club*, 915 F.2d 877 (3d Cir. 1990).

The existence of these distinctions establishes that the relationship between voluntary association and residential occupancy cannot be resolved through a universal classification of every housing-related activity.

The constitutional question concerns the principled boundary of those distinctions.

Amicus submits that the law ought to distinguish among:

- Participation in public institutions;
- Access to statutorily regulated commercial opportunities;
- Acquisition and enjoyment of private property;
- Shared residential and intimate relationships;
- Membership in expressive, cultural, or religious associations;
- And participation in the internal governance of those associations.

Each relationship creates different obligations.

Where a relationship combines several of these functions, the Court must identify which function establishes statutory liability and which constitutional protections remain operative notwithstanding that liability.

Equal civil rights cannot be rendered precise through an undifferentiated entitlement to participation in relationships established and maintained by others.

**E. Constitutional classification must remain invariant across racial, religious, cultural, and ideological identities.**

Throughout the United States, individuals establish associations around common religious beliefs, ancestry, cultural traditions, political commitments, historical experiences, and collective interests.

Such associations include African-American cultural organizations, Jewish congregations and communal institutions, Muslim religious communities, European heritage organizations, and numerous other forms of collective participation.

Their respective purposes, membership conditions, property arrangements, and commercial activities differ.

The constitutional standard governing their liberties must nevertheless remain capable of reciprocal application under materially comparable circumstances.

Religious autonomy, for example, receives constitutional protection in matters of ecclesiastical governance. See *Serbian Eastern Orthodox Diocese v. Milivojevich*, 426 U.S. 696 (1976).

The statutory treatment of ancestry and religion may additionally overlap. See *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615 (1987).

Accordingly, the classification of an organization as religious, racial, ethnic, cultural, commercial, or expressive may materially affect the legal treatment of its membership and property relationships.

The Court ought to examine whether the distinctions employed possess constitutionally sufficient foundations and can be applied consistently when the identities of the respective participants change.

The constitutional inquiry cannot be satisfied through the substitution of favorable or unfavorable assessments of an organization's purposes for examination of its actual legal relationships.

Where the applicable authorities produce competing constitutional obligations, the Court ought to identify the particular distinction through which those obligations are reconciled.

Where such reconciliation cannot be achieved under controlling precedent, the unresolved constitutional question ought to remain identifiable for appellate examination.

**The constitutional protection of voluntary association must be determined through a rule capable of reciprocal application, rather than through discretionary approval of the association seeking its protection.**

---

## V. FAIR-HOUSING LIABILITY MUST BE ANCHORED TO A STATUTORILY REGULATED RELATIONSHIP

### A. Congress expressly situated fair-housing policy within constitutional limitations.

The Fair Housing Act begins with the declaration that federal fair-housing policy operates "within constitutional limitations." 42 U.S.C. § 3601.

That qualification preserves the constitutional inquiry accompanying application of the statute.

The existence of a disagreement concerning membership, belief, association, cultural identity, or social participation does not independently establish that a discriminatory housing practice occurred.

Conversely, an organization performing a housing-related function cannot avoid the applicable statutory requirements merely by describing that function as private association.

The Court must examine the actual conduct under the particular statutory provision invoked.

The statutory classification must correspond to the operative facts.

**B. The statutory predicates differ according to the asserted violation.**

The Fair Housing Act establishes several independently actionable practices.

Under 42 U.S.C. § 3604(a), the relevant inquiry concerns discriminatory refusals, negotiation, denial, or other conduct making a dwelling unavailable.

Section 3604(b) concerns discriminatory terms, conditions, privileges, services, or facilities associated with the sale or rental of a dwelling.

Section 3604(c) concerns discriminatory notices, statements, and advertisements relating to the sale or rental of a dwelling.

These provisions possess different elements.

The absence of a completed sale does not defeat every statutory claim.

The absence of a formal purchase application does not necessarily eliminate discriminatory deterrence.

The absence of a direct property transaction between two persons does not necessarily eliminate legally relevant agency.

Each statutory theory must nevertheless maintain correspondence between the regulated object, the challenged conduct, the responsible actor, and the alleged injury.

Under § 3602(b), a dwelling includes qualifying vacant land offered for residential construction or placement.

The statutory classification therefore depends upon the property's actual character, use, and availability within the relationship challenged.

The use of a membership share rather than a deed likewise does not independently resolve the question.

In *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 236–37 (1969), the Supreme Court examined the functional relationship between a membership share and the enjoyment of leased property in determining liability under 42 U.S.C. § 1982.

The Court must accordingly determine the nature and function of the property relationship rather than rely exclusively upon its formal instrument.

Applicable statutory exemptions must likewise receive examination according to their particular scope and requirements. See 42 U.S.C. § 3607.

**C. Contractual rights, property rights, and conspiracy require independent examination.**

The additional civil-rights provisions invoked by the Plaintiff establish distinct substantive requirements.

Section 1981 protects the equal right to make and enforce contracts.

A claimant invoking that provision must identify an existing or proposed contractual relationship under which the claimant possesses or would possess rights.

*Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476–80 (2006).

The claimant must additionally establish the applicable requirement of but-for racial causation.

*Comcast Corp. v. National Association of African American-Owned Media*, 589 U.S. 327 (2020).

Accordingly, the absence of a housing transaction does not independently dispose of a § 1981 claim concerning a separately cognizable contractual relationship.

Section 1982 protects equal rights concerning real and personal property.

Its applicability requires examination of the property right or opportunity alleged to have been impaired.

A valid claim under § 1985(3) additionally requires satisfaction of the applicable conspiracy elements, including the requisite agreement, discriminatory purpose, conduct in furtherance of the conspiracy, and injury.

See *Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971).

The existence of related entities, overlapping personnel, or common organizational objectives does not independently establish those elements.

The state-law claims likewise require examination according to their own statutory predicates.

Each asserted cause of action must perform its own legal work.

**D. The governing sequence.**

The appropriate sequence of statutory adjudication is:

**REGULATED OBJECT → REGULATED CONDUCT → RESPONSIBLE ACTOR → OPERATIVE RELATIONSHIP → PROHIBITED CAUSATION → COGNIZABLE INJURY → AUTHORIZED REMEDY**

Each element must perform its own work.

Evidence of ideological commitments may bear upon motive, purpose, causation, and the interpretation of conduct.

It cannot independently supply an otherwise absent statutory relationship.

Evidence of a disputed membership decision may establish an exclusion from association.

Whether that decision additionally constituted interference with housing availability must be determined according to the actual relationship between membership and the relevant housing opportunity.

The statutory term "otherwise make unavailable" encompasses conduct extending beyond a completed refusal to sell.

Its application must nevertheless remain anchored to the housing practice Congress authorized the courts to regulate.

A statutory designation must correspond to the factual relationship through which the statute becomes applicable.

**The statutory predicate must establish the regulated relationship; the existence of the statute cannot independently establish that relationship.**

---

## VI. THE OPERATIVE RELATIONSHIP BETWEEN RETURN TO THE LAND AND WISDOM WOODS MUST BE DETERMINED

### A. Formal separation and functional integration require distinct examination.

The Defendants maintain that Return to the Land operates as a membership association and that Wisdom Woods LLC independently owns and administers property.

See ECF Nos. 18 and 20.

The Plaintiff maintains that the association administers the preliminary admission mechanism through which Wisdom Woods restricts access to residential property.

See ECF No. 23 at 17–24.

The parties' positions present a dispute concerning functional authority.

Separate legal existence is relevant.

Overlapping management and organizational affiliation are relevant.

Public representations, internal governing instruments, actual practices, and delegated decision-making authority are relevant.

None independently determines the controversy.

An association and a landholding entity may remain legally distinct while performing interconnected functions.

They may likewise share participants while maintaining genuinely independent functions.

The Court must distinguish these possibilities through the operative record.

**B. Necessary conditions must be distinguished from sufficient conditions.**

The Defendants emphasize that Wisdom Woods membership does not automatically follow from membership in Return to the Land.

They identify additional requirements concerning invitation, application, personal interaction, and approval by the LLC's governing authorities.

The Plaintiff advances the proposition that admission to Return to the Land constitutes a necessary preliminary condition for obtaining certain property interests.

These propositions are logically compatible.

**A condition may be necessary without being sufficient.**

The existence of additional admission requirements does not independently establish that an earlier requirement is immaterial.

Conversely, affiliation with an organization does not independently establish that membership constitutes a legally operative prerequisite for acquiring property.

The Court must distinguish among:

1. Association membership that itself confers a property entitlement;
2. Association membership that constitutes a necessary condition for pursuing a property interest;
3. Association membership that affects access or eligibility without constituting an exclusive prerequisite;
4. Association membership that is independent of property acquisition.

Each relationship presents different factual, statutory, and constitutional consequences.

The distinction must follow the actual conditions governing the property opportunity rather than the number of association members who ultimately obtain property interests.

A low rate of participation in a landholding entity may establish that association membership is insufficient to obtain a particular property interest.

It does not independently establish that association membership is unnecessary to obtain that interest.

**C. The governing instruments must be classified temporally.**

The parties have supplied materially different versions of the Wisdom Woods LLC Operating Agreement.

The historical instrument submitted by the Plaintiff contains an express reference to prior membership in Return to the Land or an equivalent affiliated regional organization as a condition of obtaining new LLC membership.

See ECF No. 23-8, Article III.

The instrument submitted by the Defendants identifies separate invitation, application, approval, and eligibility procedures.

See ECF No. 20-4, Articles III–IV.

The latter instrument also contains references to an affiliated fraternal organization.

The legal inquiry must therefore establish, to the extent material to the claims:

- Which governing instrument was operative at the time of the challenged conduct;
- What amendments were adopted and when they became effective;
- What eligibility requirements governed the particular property relationship;
- How those requirements operated in practice;
- And whether any relevant authority was delegated between the organizations.

The publication of an instrument supplies evidence of its existence and possible public representation.

Its operative legal effect at a particular time presents an additional question.

The same distinction applies to subsequent instruments, amendments, and changes in organizational practices.

Historical evidence may remain relevant to the existence, development, or interpretation of a particular policy.

Its relevance must remain distinguishable from proof that the historical policy governed the challenged conduct.

**Classification must correspond to the relationship as it existed at the time legally relevant to the particular claim.**

**D. Agency and attribution must follow actual authority and conduct.**

The Plaintiff invokes actual authority, apparent authority, and ratification as mechanisms for attributing conduct among the Defendants.

The Supreme Court recognizes the applicability of traditional agency principles to Fair Housing Act liability.

*Meyer v. Holley*, 537 U.S. 280, 285–86 (2003).

Those principles require identification of the legally relevant relationship between principal and agent.

Actual authority concerns the authority conferred upon the agent.

Apparent authority concerns manifestations attributable to the principal and the reasonable understanding arising from those manifestations.

Ratification concerns legally sufficient adoption of an act performed or purportedly performed on another's behalf.

See Restatement (Third) of Agency §§ 2.01, 2.03, 4.01.

The existence of common membership, shared ideology, overlapping leadership, or a common organizational purpose may furnish evidence relevant to these inquiries.

Such circumstances cannot independently replace the required showing.

The Court must identify the authority exercised, the actor exercising it, the function performed, and the conduct to which liability is attributed.

The Court must likewise distinguish the permissible development of legal arguments based upon existing factual allegations from an attempt to supply missing claims or material allegations through responsive briefing.

See *Morgan Distributing Co. v. Unidynamic Corp.*, 868 F.2d 992, 995 (8th Cir. 1989).

Where the operative pleading adequately identifies the relevant conduct and relationships, their legal characterization may require examination.

Where material factual allegations remain absent, the applicable pleading and amendment procedures govern.

**Affiliation may furnish evidence of attribution. It cannot independently substitute for attribution.**

---

## VII. ARTICLE III STANDING AND STATUTORY LIABILITY MUST REMAIN DISTINCT

### A. Constitutional jurisdiction requires an independently cognizable controversy.

Article III standing requires injury in fact, traceability, and redressability.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

Those requirements must be satisfied for each claim and form of relief for which federal judicial power is invoked.

*TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021).

The constitutional inquiry must identify the particular injury asserted and its relationship to the conduct of the defendant against whom relief is sought.

The existence of a substantive statutory prohibition does not independently establish that every person invoking it possesses standing.

Conversely, the failure ultimately to establish every element of statutory liability does not necessarily establish an absence of Article III jurisdiction.

See *Bell v. Hood*, 327 U.S. 678, 682–83 (1946); *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 511–16 (2006).

The distinction matters here because the moving Defendants contest both the existence of a constitutionally cognizable injury attributable to them and the sufficiency of the relationships upon which the underlying statutory claims depend.

These questions must be separately classified.

The Court must apply the evidentiary requirements corresponding to the procedural stage at which the jurisdictional challenge arises.

**B. Direct contact is evidence of attribution rather than a universal substitute for it.**

The moving Defendants principally maintain that the Plaintiff lacks standing because she never directly contacted Wisdom Woods or the individual Defendants concerning property acquisition.

See ECF Nos. 20 and 26.

That absence of direct contact is materially relevant.

In *McClain v. American Economy Insurance Co.*, 424 F.3d 728, 733–34 (8th Cir. 2005), the Eighth Circuit examined direct contact and reliable information in the context of alleged discriminatory insurance practices.

In *Saunders v. Farmers Insurance Exchange*, 440 F.3d 940 (8th Cir. 2006), the court likewise required adequate evidence connecting the asserted injury to the challenged conduct.

The governing constitutional requirement remains traceability.

Contact through an authorized agent may establish a legally relevant relationship with a principal.

In appropriate circumstances, an established discriminatory policy may deter a person from completing an otherwise available application.

See *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 365–67 (1977); *Pinchback v. Armistead Homes Corp.*, 907 F.2d 1447, 1451–52 (4th Cir. 1990).

The absence of direct personal contact must therefore be examined alongside the alleged authority, agency, reliability of information, actual availability of the opportunity, and asserted deterrence.

The Plaintiff must establish the causal connection applicable to each invoked theory.

The relevant inquiry is whether an independently cognizable injury is fairly traceable to the particular Defendant under the applicable Article III standard.

The more demanding requirements of substantive statutory liability remain distinct.

**C. Different injuries require different legal predicates.**

The Plaintiff alleges injury arising from denial of a residential property opportunity, exclusion from membership, discriminatory representations, and resulting emotional harm.

These asserted injuries require separate examination.

The Supreme Court recognized in *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373–74 (1982), that a person may suffer injury through a discriminatory misrepresentation prohibited by § 3604(d), irrespective of an intention to acquire the property.

That decision concerns the particular statutory right and injury established in that controversy.

It does not render every asserted informational, economic, dignitary, or associational injury interchangeable.

The Court must distinguish:

- Loss of an actual housing opportunity;
- Discriminatory interference with access to information or negotiations;
- Injury arising from an independently prohibited housing statement or advertisement;
- Exclusion from a protected contractual or property relationship;
- Personal emotional or dignitary injury attributable to actionable conduct;
- And injury sufficient to support prospective relief.

Where the asserted injury concerns exclusion from a transaction, its examination may require consideration of the actual availability of the opportunity, the claimant's relationship to it, and the conduct alleged to have prevented access.

Where the injury concerns an independently protected statutory interest, the inquiry must follow the elements of that interest.

The prospective remedy requires particular attention because past injury does not automatically establish a real and immediate threat of future injury.

See *City of Los Angeles v. Lyons*, 461 U.S. 95, 105–11 (1983).

The statutory elements and available remedies must correspond to the injury actually pleaded and established.

**D. Protected expression may constitute evidence without independently constituting the violation.**

The parties rely extensively upon public communications, interviews, statements of organizational purpose, and descriptions of the Defendants' beliefs.

Such evidence may be relevant to discriminatory purpose, the existence of an organizational practice, and the relationship between membership and property availability.

The First Amendment does not categorically prevent the evidentiary use of protected expression to establish an element of independently actionable conduct.

See *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993).

Section 3604(c) also independently regulates specified housing-related statements.

Nevertheless, judicial attribution of liability must maintain the distinction between expression concerning political or cultural commitments and conduct constituting a statutory violation.

The Court must determine the function, context, and legally relevant subject of the communication.

A statement establishing discriminatory purpose cannot independently establish an unrelated transaction, agency relationship, conspiracy, or injury.

Each element remains subject to its own evidentiary requirements.

The existence of protected expression cannot furnish an exemption from liability for independently actionable conduct.

Equally, the existence of controversial expression cannot independently furnish the missing elements of that liability.

---

## VIII. THE AUTHORITY TO DETERMINE JURISDICTION DOES NOT INDEPENDENTLY ESTABLISH THE SCOPE OF COMPULSORY DISCOVERY

**A. Jurisdiction ordinarily precedes adjudication of substantive liability.**

The Supreme Court reaffirmed the constitutional importance of resolving jurisdiction before adjudicating substantive claims in *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94–95 (1998).

A court nevertheless possesses authority to examine its own jurisdiction.

That examination may require factual development.

In *Osborn v. United States*, 918 F.2d 724, 729–30 (8th Cir. 1990), the Eighth Circuit recognized the authority of a district court to examine evidence concerning contested jurisdictional facts.

Where those facts are sufficiently intertwined with the merits, their resolution may require further evidentiary development or adjudication under the appropriate procedural standard.

See *Buckler v. United States*, 919 F.3d 1038, 1044 (8th Cir. 2019).

Accordingly, a pending jurisdictional motion does not categorically prohibit discovery.

The constitutional and procedural inquiry concerns the scope, purpose, and sequence of the particular discovery undertaken.

The Court's authority to examine the existence of jurisdiction does not independently determine the necessity of every compulsory disclosure requested during that examination.

**B. The present scheduling controversy identifies the operative problem.**

The Defendants requested that discovery be deferred pending resolution of the jurisdictional motion.

They identified the possibility of compelled production of property records, financial information, private communications, and confidential associational information.

Their filing expressly recognized the irreversible character of disclosure:

"Discovery produced on that frame cannot be undone by a later ruling."

ECF No. 34 at 2.

The Plaintiff responded that discovery concerning the relationship between Return to the Land and Wisdom Woods would remain relevant to claims against the answering association irrespective of the disposition of the pending motion.

ECF No. 35 at 2–4.

The Court permitted discovery to proceed and subsequently entered its initial scheduling order. ECF No. 37.

The parties therefore identify competing procedural necessities.

The Plaintiff requires access to evidence capable of establishing the relationship upon which her statutory theories depend.

The Defendants possess an interest in avoiding compulsory disclosures exceeding the legally relevant scope of the controversy.

These interests must receive reconciliation through the applicable procedural and constitutional standards.

The requirement to preserve one interest does not independently eliminate the other.

The possibility that information may remain relevant after dismissal of particular Defendants does not independently establish the necessity of acquiring every category of that information at the same procedural stage.

**C. The scope of discovery must correspond to its authorized function.**

Federal Rule of Civil Procedure 26(b)(1) limits discovery according to relevance and proportionality.

The Rule requires consideration of the importance of the issues, the parties' relative access to information, their resources, the significance of discovery in resolving the issues, and the relationship between anticipated benefit and burden.

Rule 26(b)(2)(C) requires limitation of discovery under specified circumstances, including where information may be obtained from a more convenient, less burdensome, or less expensive source.

Rule 26(c) authorizes protective measures upon an appropriate showing.

Rule 26(d)(3) permits judicial control over the sequence of discovery where warranted.

Rule 26(f)(3)(B) expressly contemplates discovery conducted in phases or focused upon particular issues.

Rule 45 establishes corresponding protections for nonparties subjected to compulsory production.

These mechanisms provide the Court with authority to reconcile legitimate evidentiary needs with the interests implicated by compulsory production.

Where the pending jurisdictional dispute concerns the relationship between identified organizations, the initial inquiry may be substantially advanced through governing instruments, their amendment history, the operative allocation of authority, relevant application procedures, and evidence concerning the particular relationship challenged.

The necessity of examining these materials does not independently establish the necessity of obtaining every record associated with every participant.

The scope of compulsory discovery must remain connected to the question it serves to resolve.

**D. Compulsory process must remain responsive to the developing record.**

The scope of discovery ought to become more precise as the material relationships and disputed facts become ascertainable.

Evidence may establish the relevance of additional inquiry.

Evidence may also eliminate the justification for particular demands.

Where the available record resolves a threshold relationship, the necessity of further compulsory production must be assessed in light of that development.

This principle preserves legitimate discovery while maintaining correspondence between its continuing scope and the legal controversy from which its authority arises.

---

## IX. CONFIDENTIAL ASSOCIATIONAL RELATIONSHIPS REQUIRE DISTINCT CONSTITUTIONAL EXAMINATION

**A. Compulsory disclosure can impair the relationship before liability is determined.**

In *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462–63 (1958), the Supreme Court recognized the constitutional relationship between confidential affiliation and freedom of association.

The compelled disclosure of organizational membership can expose individuals to economic reprisal, hostility, interference with personal relationships, and other consequences capable of impairing protected association.

In *Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021), the Court reaffirmed the requirement of a sufficiently tailored relationship between compulsory associational disclosure and the governmental interest asserted to justify it.

The constitutional injury may arise through the existence and operation of a disclosure demand rather than exclusively through completed enforcement.

In *First Choice Women's Resource Centers, Inc. v. Davenport*, No. 24-781 (U.S. Apr. 29, 2026), the Supreme Court held that an outstanding governmental subpoena seeking confidential donor information could establish present injury sufficient for Article III standing before judicial enforcement.

The decision concerns constitutional standing in relation to an investigatory subpoena.

It does not establish a categorical privilege against civil discovery.

Its recognition of injury arising during compulsory process nevertheless bears directly upon the temporal character of associational harm.

The constitutional significance of disclosure must receive examination while protection remains capable of enforcement.

**B. Civil discovery remains subject to protections against substantial associational burdens.**

The Supreme Court has recognized the potentially serious consequences of civil discovery for the privacy interests of parties and third persons.

*Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34–36 (1984).

This constitutional distinction possesses particular significance within the Eastern District of Arkansas.

In *Pollard v. Roberts*, 283 F. Supp. 248, 256–57 (E.D. Ark. 1968), aff'd, *Roberts v. Pollard*, 393 U.S. 14 (1968), this District recognized constitutional limitations upon compulsory investigative efforts to obtain confidential information identifying contributors to a political organization.

The Eighth Circuit subsequently applied those principles in *United States v. Citizens State Bank*, 612 F.2d 1091, 1094–95 (8th Cir. 1980), distinguishing the initial showing of an infringement upon associational liberty from the governmental justification necessary to sustain compulsory disclosure.

The Eighth Circuit expressly contemplated sequential production through which investigators could initially obtain financial information without acquiring the identities of members and contributors, with subsequent expansion of compulsory production dependent upon the evidentiary necessity established.

Although these decisions concern governmental investigations, their reasoning supports the particularized examination and sequencing of compulsory judicial discovery affecting constitutionally protected association.

Other federal appellate courts have recognized qualified First Amendment protections concerning demands for confidential associational information.

See *Grandbouche v. Clancy*, 825 F.2d 1463, 1466–67 (10th Cir. 1987); *Perry v. Schwarzenegger*, 591 F.3d 1126, 1139–41 (9th Cir. 2010).

These authorities contemplate an initial showing of an objectively supportable burden upon protected expression or association, followed by examination of the requesting party's need for the information and the availability of less intrusive means.

The party asserting protection must substantiate its application.

The requesting party's evidentiary justification must then receive examination under the governing standard.

The constitutional inquiry is particularly significant where demands concern persons who are neither parties to the litigation nor alleged participants in the particular conduct challenged.

Membership in an organization does not independently render every member's identity relevant to every dispute involving that organization.

The Court must preserve the distinction between evidence necessary to determine actionable conduct and information concerning persons whose relationships to the controversy remain unestablished.

An association's confidentiality interests do not establish an unrestricted privilege against the production of relevant evidence.

The existence of a legitimate evidentiary need likewise does not independently establish that the production of personally identifiable information is necessary to satisfy that need.

**C. The timing of protection is constitutionally consequential.**

Disclosure alters custody.

A subsequent ruling may exclude disclosed information from evidence.

It may restrict additional dissemination.

It may terminate the proceedings through which disclosure was obtained.

It cannot necessarily restore the informational relationship existing before disclosure.

The constitutional question concerning the compelled transfer of sensitive information therefore arises before that transfer occurs.

Where a sufficiently supported constitutional objection has been presented, its resolution must account for the consequences of production itself.

Protection limited to restricting subsequent use may be inadequate where acquisition constitutes part of the alleged injury.

The Court ought to distinguish among:

- Acquisition of confidential information;
- Disclosure among litigants;
- Disclosure to counsel;
- Custody and retention;
- Public dissemination;
- Subsequent use for unrelated purposes.

Each produces different consequences and may require different protections.

The constitutional and procedural sequence is therefore:

**ACQUISITION → CUSTODY → RETENTION → DISSEMINATION → SUBSEQUENT USE**

Authority to acquire information for one lawful purpose does not independently establish authority to retain, disseminate, or use that information for every other purpose.

The availability of protection must correspond to the relationship being altered and the consequences produced.

**D. Protective measures must correspond to the duration and character of the interest protected.**

The draft Final Scheduling Order accompanying ECF No. 37 identifies an ordinary preference for protective orders remaining effective for no longer than one year following the conclusion of litigation.

See ECF No. 37, draft Final Scheduling Order.

That proposed limitation warrants particular consideration where information concerns confidential associational affiliations.

The conclusion of litigation does not necessarily terminate the constitutional or privacy interests implicated by subsequent disclosure of those affiliations.

Where an applicable protective interest continues, the Court ought to consider additional protections corresponding to the character and duration of the particular information.

Such protections may include narrowly defined continuing restrictions, redaction, return or destruction of sensitive materials, and procedures permitting modification upon an appropriate showing.

The legitimate public interest in access to judicial records remains relevant where information becomes part of the adjudicative record.

The applicable standard must therefore distinguish ordinary discovery materials from materials submitted to the Court and relied upon in adjudication.

The duration of protection ought to correspond to the duration of the interest established rather than operate exclusively according to the duration of the proceeding.

**E. Constitutional protection must remain applicable to persons outside the underlying controversy.**

The exercise of judicial discovery may affect persons whose information appears within organizational records without those persons having participated in the challenged conduct.

Such persons may possess independent constitutional and privacy interests.

Their status as members, former members, applicants, donors, employees, contractors, or other affiliates must remain distinguishable from the status of a Defendant alleged to have participated in an actionable violation.

The authority to examine organizational practices does not independently establish that every affiliated person must surrender the confidentiality of unrelated personal relationships.

Where individual identities are necessary to adjudication, the corresponding evidentiary justification must receive examination.

Where the relevant information can be established without identifying its individual subjects, less intrusive mechanisms ought to receive consideration.

**The constitutional protection must follow the person and relationship affected by compulsory process, including where that person is not a party to the underlying controversy.**

## X. THE PROPOSED SEQUENCE OF COMPULSORY DISCOVERY

The Court possesses mechanisms capable of preserving legitimate evidentiary development while avoiding unnecessary or constitutionally disproportionate disclosure.

Amicus proposes that discovery concerning disputed jurisdictional and associational relationships proceed through the following sequence.

**Stage One — Identification of material predicates**

The relevant parties, claims, asserted injuries, disputed relationships, and jurisdictional predicates must be identified.

The inquiry must distinguish evidence necessary to resolve those predicates from evidence concerning liability, broader organizational practices, damages, and remedies.

Where those subjects overlap, their common evidentiary requirements ought to be identified expressly.

**Stage Two — Production of directly relevant structural evidence**

The initial inquiry ought to prioritize evidence materially bearing upon the challenged relationships, including:

- Operative governing instruments and their amendment history;
- The allocation of decision-making authority;
- The relationship between association membership and property eligibility;
- The application and response concerning the Plaintiff;
- Relevant property availability and transfer procedures;
- Evidence concerning communications legally attributable to the particular Defendants.

These materials may substantially develop the jurisdictional and statutory classification questions without requiring immediate production of unrelated confidential affiliations.

**Stage Three — Examination of additional evidentiary necessity**

Following appropriate development of the structural record, the parties ought to identify what material questions remain unresolved and what additional discovery is warranted under Rule 26.

Where jurisdictional questions can be determined independently of the remaining merits, the Court ought to resolve them before unnecessary expansion of compulsory process.

Where the questions are sufficiently intertwined, further discovery may proceed according to the governing procedural standard.

**Stage Four — Resolution of particularized constitutional objections**

A party asserting an associational privilege or other protection must identify the information and substantiate the applicable burden.

The Court must evaluate the objection under the relevant legal standard.

Where comparable evidentiary value may be obtained through less intrusive means, those alternatives ought to receive consideration.

Such mechanisms include:

- Redacted documents;
- Anonymized records;
- Limited samples;
- Restricted disclosure;
- In-camera examination;
- Narrowly defined protective orders.

The objective is sufficient evidence for adjudication with appropriately limited interference in protected relationships.

**Stage Five — Expansion and adjudication**

Compulsory process may expand where the developed record and applicable standards justify additional inquiry.

The scope of discovery must remain proportionate to the legally relevant controversy.

The ultimate determination must correspond to the claims, injuries, actors, and relationships established through the record.

This sequence preserves the availability of legitimate discovery.

It distinguishes the necessity of obtaining evidence from the assumption that all potentially obtainable evidence must be acquired at the same procedural stage.

The Rule 26(f) conference and discovery plan provide an appropriate mechanism through which the parties may identify the relevant discovery phases, disputed confidentiality interests, and procedures governing the resolution of particular objections.

**The authority to discover must remain attributable to the question for which discovery is authorized.**

---

## XI. THE CORRESPONDING CONSTITUTIONAL CONTROVERSY IN ORWOLL v. DOJ

### A. The two proceedings expose corresponding questions of compulsory authority.

A separate proceeding before this District presents a corresponding question concerning compulsory administrative process.

In *Orwoll et al. v. United States Department of Justice et al.*, No. 3:26-cv-00239-BSM, the plaintiffs contest the initiation, scope, administration, and continuation of governmental investigations concerning their activities.

The federal defendants invoke administrative nonfinality as a material limitation upon judicial review.

See *Orwoll*, ECF Nos. 18 and 21.

The two proceedings employ distinct legal mechanisms.

The present proceeding concerns private civil enforcement under judicial administration.

The separate controversy concerns administrative investigation and the availability of judicial examination of alleged governmental injury.

The common constitutional question concerns the exercise of compulsory authority while material predicates for that exercise remain contested.

In this proceeding, discovery may produce effects before jurisdiction and liability are resolved.

In the administrative controversy, investigation may produce effects before an agency renders a final determination.

In both contexts, later disposition may be incapable of reversing particular consequences already produced.

This relationship identifies the need to determine what authority exists at each procedural stage and whether the available mechanisms of protection correspond to the injury alleged.

### B. The completed act must be distinguished from the unfinished proceeding.

A judicial proceeding consists of individually identifiable acts.

Documents may be produced.

Confidential affiliations may be disclosed.

Persons may be subjected to compulsory testimony.

Information may pass into the possession of opposing parties and their representatives.

These events occur before the ultimate adjudication of liability.

Likewise, governmental investigations may involve information demands and disclosures whose practical consequences precede administrative finality.

The constitutional consequences of particular acts must receive examination according to their own character and applicable legal standards.

The procedural status of the larger controversy does not independently determine the propriety of every constituent act.

The continued existence of litigation does not independently establish necessity for a particular disclosure.

The subsequent termination of litigation cannot necessarily reverse the consequences of disclosures already accomplished.

**The finality of a proceeding and the occurrence of an injury are independent events.**

**C. Congress has established a statutory relationship between concurrent housing proceedings.**

The Fair Housing Act expressly contemplates circumstances in which private civil litigation and administrative proceedings may coexist.

Under 42 U.S.C. § 3613(a), an aggrieved person may generally commence a civil action independently of the existence or procedural status of an administrative complaint, subject to the statutory limitations.

Section 3610(g)(4) restricts the issuance of an administrative charge after the commencement of trial in a qualifying civil action concerning the same alleged discriminatory housing practice.

Congress therefore contemplated concurrent proceedings while establishing particular conditions governing their interaction.

The existence of administrative investigations does not independently establish the merits of the Plaintiff's allegations.

The existence of the present litigation does not independently establish that concurrent governmental investigations are unauthorized.

Each proceeding must satisfy its own jurisdictional, statutory, constitutional, and procedural requirements.

Their factual correspondence may nevertheless produce overlapping demands and cumulative burdens upon the persons and organizations involved.

**D. The availability of information through one proceeding does not independently establish authority for its use through another.**

Where multiple proceedings concern related persons, organizations, and activities, confidential information obtained through one mechanism may become relevant to another.

The existence of such information does not independently establish entitlement to obtain it.

Its lawful acquisition for a particular purpose does not independently authorize its dissemination or subsequent use for a different purpose.

The constitutional and procedural examination must distinguish the authorities, purposes, restrictions, and legal relationships governing each transfer.

Applicable protective orders, privileges, statutory confidentiality provisions, and other restrictions must receive independent effect.

The cumulative consequences of concurrent proceedings may warrant examination where those consequences bear upon properly presented claims of undue burden, constitutional injury, or the necessity of particular compulsory demands.

**E. The common constitutional standard.**

The broader comparative analysis is developed in Appendix A.

Its proposed standard consists of eight elements:

**AUTHORITY → CLASSIFICATION → ATTRIBUTION → PREDICATE → PROPORTIONALITY → CONTINUITY → REVIEWABILITY → CORRECTION**

Applied to this proceeding, that framework requires examination of:

- The authority invoked by the Plaintiff;
- The relationships connecting the Defendants to the alleged conduct;
- The factual and legal predicates governing particular compulsory acts;
- The scope and continuing necessity of discovery;
- The constitutional consequences of particular disclosures;
- And the availability of appropriately tailored protection and relief.

The correspondence between the two proceedings exists at the level of constitutional operation.

Each controversy remains subject to its own evidentiary record and governing legal requirements.

The governing law must remain capable of protecting the legitimate interests of each party throughout the proceeding.

---

## XII. RELIEF MUST CORRESPOND TO THE VIOLATION ESTABLISHED

### A. Statutory liability and the permissible scope of relief require distinct examination.

The eventual disposition of this controversy may distinguish among several independently cognizable relationships and forms of conduct.

If the evidence establishes unlawful discrimination in a regulated housing relationship, appropriate statutory relief may be available.

If the evidence establishes interference with an independently protected contractual or property right, the applicable remedial provisions govern.

If the evidence establishes legally relevant participation or agency, responsibility may attach according to the applicable substantive standards.

If particular claims lack jurisdictional or statutory predicates, their disposition must correspond to those deficiencies.

The identification of an actionable violation establishes the basis upon which relief may be rendered.

The scope of that relief must remain connected to the violation established.

### B. The constitutional consequences of corrective relief must receive independent examination.

Where requested relief implicates independently protected expressive or intimate association, the constitutional justification and scope of that relief require examination.

The correction of an unlawful housing practice does not independently establish the necessity of reorganizing every internal relationship within an affiliated association.

Equally, protection of independent expressive association does not extinguish otherwise valid legal obligations concerning regulated conduct.

The scope of relief must follow the violation established.

The Court ought to maintain the availability of appropriately tailored alternative remedies where broader relief exceeds statutory or constitutional limitations.

This principle governs prospective injunctions, compelled participation, organizational restructuring, disclosure requirements, and continuing supervision.

Where prospective relief is sought, the applicable Article III and equitable requirements must be satisfied.

**C. Corrective authority must remain distinguishable from additional compulsory authority.**

An order correcting a particular unlawful relationship may alter the obligations of the persons responsible for that relationship.

The necessity of such correction does not independently establish authority over every affiliated individual, organization, activity, or internal relationship.

The resulting remedy must remain attributable to the legal violation and the lawful corrective authority through which it operates.

The Court must preserve the distinction between obligations necessary to remedy the established violation and additional restrictions requiring independent justification.

**A remedy must correct the violation without independently acquiring authority over relationships beyond the lawful scope of that correction.**

---

## XIII. QUESTIONS FOR EXPRESS JUDICIAL RESOLUTION AND APPELLATE REVIEW

The following questions are submitted to facilitate analytically distinct adjudication of the matters presented by the pending motion, subsequent discovery disputes, preserved defenses, and eventual requests for relief.

**Question One — Constitutional association**

What standard governs the constitutional protection against compelled membership where the challenged membership decision is alleged to affect a separately regulated property relationship?

**Question Two — Constitutional commensurability**

Can the protection of voluntary association and an asserted statutory entitlement to participation operate over the same relationship without producing incompatible legal obligations?

**Question Three — Jurisprudential reconciliation**

What constitutional distinction reconciles the respective approaches established in *Roberts*, *Dale*, *Runyon*, *Jones*, and subsequent decisions?

**Question Four — Classification antecedent to balancing**

Must the constitutional classification of the respective liberties, entitlements, and obligations precede judicial balancing of governmental interests against associational liberty?

**Question Five — Constitutional invariance**

Can the resulting decisional standard be applied reciprocally to materially comparable associations irrespective of their racial, religious, cultural, or ideological identity?

**Question Six — Jurisprudential reconsideration**

Where controlling precedent requires a disposition that leaves these constitutional propositions unresolved, what question remains available for examination by a reviewing court?

**Question Seven — Fair-housing classification**

What operative relationship must exist between association membership and residential property availability before the particular provisions of the Fair Housing Act invoked by the Plaintiff become applicable?

**Question Eight — Independent statutory predicates**

How must the statutory predicates of the separate contractual, property, and conspiracy claims remain distinguishable from the predicates of fair-housing liability?

**Question Nine — Functional integration**

What evidence establishes whether membership in Return to the Land constituted an entitlement, prerequisite, access mechanism, or independently maintained relationship with respect to Wisdom Woods?

**Question Ten — Temporal classification**

Which governing instruments and operative practices control the assessment of the conduct challenged?

**Question Eleven — Documentary significance**

What legal and evidentiary significance attaches to historical and subsequent versions of the governing instruments?

**Question Twelve — Attribution**

What principal-agent relationship, delegated authority, personal participation, ratification, or other legally sufficient mechanism connects each Defendant to the asserted conduct and injury?

**Question Thirteen — Constitutional standing**

Does the Plaintiff possess an independently cognizable injury fairly traceable to each Defendant against whom relief is sought and redressable through the particular remedy requested?

**Question Fourteen — Jurisdiction and merits**

What distinction must be maintained between the deficiencies asserted concerning Article III jurisdiction and those concerning the elements or legal sufficiency of the substantive claims?

**Question Fifteen — Scope of compulsory process**

What distinction must govern the permissible scope of discovery directed toward contested jurisdictional and statutory predicates as compared with broader merits discovery?

**Question Sixteen — Cumulative compulsory burdens**

Where multiple proceedings impose overlapping compulsory burdens, what relevance do those cumulative burdens possess under the applicable constitutional and procedural standards?

**Question Seventeen — Associational privilege**

What showing establishes an applicable First Amendment protection against compulsory disclosure of confidential associational information?

**Question Eighteen — Justification for compulsory disclosure**

What evidentiary justification and tailoring are required to overcome an established constitutional protection against compulsory disclosure?

**Question Nineteen — Irreversible injury**

What procedural protections are necessary where the production of information may independently impair protected relationships before jurisdiction or liability is determined?

**Question Twenty — Continuing confidentiality**

What protections remain appropriate after the conclusion of litigation where the constitutional or privacy interest implicated by disclosure continues?

**Question Twenty-One — Information custody**

What distinctions must govern the acquisition, custody, retention, dissemination, and subsequent use of constitutionally protected information?

**Question Twenty-Two — Remedial correspondence**

What limitations govern relief directed toward correcting an established housing, contractual, or property violation where the requested remedy additionally affects independently protected associational relationships?

The questions are individually enumerated because each performs distinct constitutional or legal work. Where their resolution becomes material to disposition, the determination rendered upon each ought to remain independently ascertainable. This preserves the distinction between propositions resolved through adjudication, propositions governed by controlling precedent, and unresolved propositions remaining susceptible to subsequent judicial examination and jurisprudential reconsideration.

These questions are submitted for resolution as they become material to the disposition of properly presented claims, defenses, and procedural disputes.

The Court's resolution of one inquiry ought to remain distinguishable from its resolution of another.

A dismissal for lack of jurisdiction does not constitute an adjudication of statutory liability.

A determination of statutory liability does not independently authorize every proposed remedy.

The existence of legitimate discovery does not conclusively establish the propriety of every disclosure demand.

The denial of a general discovery stay does not independently resolve every subsequent and particularized constitutional objection to compulsory disclosure.

The termination of litigation does not independently terminate every constitutional interest affected during litigation.

An analytically discrete disposition preserves the intelligibility of the resulting judgment and the availability of meaningful appellate review.

Such precision permits subsequent reviewing courts to identify the particular determination under examination without attributing to the original disposition conclusions that were never rendered.

---

## XIV. THE PROPOSED DECISIONAL STANDARD

Amicus respectfully submits the following synthesis of the governing constitutional and procedural principles.

**First**, the application of civil-rights legislation to an associational determination must correspond to the particular regulated relationship and prohibited conduct established under the statute invoked.

**Second**, the legal responsibility of each Defendant must follow the legally relevant authority, participation, causation, or attribution established through the operative record.

**Third**, Article III jurisdiction must remain distinguishable from the ultimate determination of statutory liability.

**Fourth**, the authority to conduct jurisdictional or merits discovery must remain subject to the relevance, proportionality, privilege, and constitutional protections applicable to particular compulsory demands.

**Fifth**, a sufficiently supported objection concerning irreversible associational disclosure must receive examination at a stage when meaningful protection remains available, through the applicable procedures.

**Sixth**, the scope and continuation of compulsory discovery must remain responsive to the material facts and relationships established through the developing record.

**Seventh**, the acquisition, custody, retention, dissemination, and subsequent use of confidential information must remain subject to the legal protections governing each operation.

**Eighth**, any relief rendered must address the established violation while accounting for independently protected relationships affected by its operation.

These principles preserve both the lawful enforcement of civil rights and the constitutional limitations governing the exercise of the judicial power through which those rights are enforced.

The authority to administer a proceeding and the authority to impose its particular compulsory burdens must remain distinguishable throughout its operation.

---

## XV. CONCLUSION

The law must distinguish association from property, affiliation from attribution, injury from allegation, jurisdiction from liability, and the authority to administer process from the permissible scope of its exercise.

The freedom to associate retains constitutional significance because association entails voluntary participation.

The capacity to decline or discontinue particular associations preserves the voluntary character of the relationships through which associational benefits arise.

The enforcement of civil rights retains legal significance because liability follows conduct satisfying identifiable statutory predicates.

The exercise of judicial authority retains constitutional legitimacy through correspondence between its delegated function, the controversy presented, the compulsory acts undertaken, and the relief ultimately rendered.

The Court must maintain these distinctions throughout the proceeding.

The existence of a legitimate statutory controversy does not extinguish the constitutional protections of the persons subjected to its process.

A person may be a proper defendant and nevertheless be subjected to an impermissible disclosure demand.

An organization may participate in regulated conduct while retaining constitutional protection for independently protected association.

A court may possess authority to develop contested jurisdictional facts while particular demands remain disproportionate to the purposes warranting their production.

A subsequent determination may terminate litigation without reversing every consequence produced during its administration.

The constitutional examination must therefore account for the particular acts occurring throughout the process rather than depend exclusively upon its ultimate disposition.

Amicus respectfully requests that the Court consider the constitutional and statutory classification questions identified herein when resolving the pending jurisdictional motion, administering discovery, adjudicating properly presented constitutional objections, and determining the permissible scope of eventual relief.

Where appropriate, Amicus further requests consideration of phased discovery and particularized protective measures addressing confidential associational information before irreversible disclosure occurs.

The accompanying Appendix A supplies the broader constitutional framework within which these questions may be examined.

The principles advanced herein preserve legitimate civil enforcement while maintaining constitutional limitations upon the compulsory authority through which that enforcement operates.

**The freedom secured by the Constitution remains operative during the process through which the law determines whether that freedom has been lawfully exercised.**

**The authority precedes the act.**

**The remedy follows the violation.**

**The Constitution governs both.**

Respectfully submitted,

Brandon Michael Hayes
Proposed Amicus Curiae, individually
President, Natural Law Institute
159 Indian Hill St.
West Newbury, MA 01985

brandon@hayeshaus.com
617-438-2049

Dated: Nov 19, 2026

---

**APPENDIX A**

**THE CONSTITUTIONAL LIMITS OF PROCESS**

*Classification, Compulsion, and Reviewability Before a Determination of Liability*

A Comparative Jurisprudential Analysis

Submitted separately as accompanying supplemental legal analysis, subject to the Court's authorization.

---

**CERTIFICATE OF SERVICE**

I certify that on November 19, 2026, I transmitted by electronic mail a copy of the foregoing Motion for Leave, proposed Brief of Amicus Curiae, and accompanying Appendix A to counsel of record.

Respectfully certified,

Brandon Michael Hayes
November 19, 2026

# THE CONSTITUTIONAL LIMITS OF PROCESS

**Classification, Compulsion, and Reviewability Before a Determination of Liability**

**A Comparative Jurisprudential Analysis**

Brandon Michael Hayes
President, Natural Law Institute
November 2026

**Prepared for consideration in relation to:**

*Walker v. Return to the Land et al.*
No. 3:26-cv-00151-DPM

*Orwoll et al. v. United States Department of Justice et al.*
No. 3:26-cv-00239-BSM

United States District Court
Eastern District of Arkansas

---

## I. THE CONSTITUTIONAL PROBLEM

The exercise of compulsory process produces consequences before the proceeding through which that process is administered reaches its conclusion.

An investigation consumes resources. A demand for information reorganizes the activities of its recipient. An official declaration alters the relationships between an identified person and the public. A discovery order transfers information from private custody into the possession of others. An unresolved enforcement proceeding introduces continuing uncertainty into otherwise voluntary commercial and associational relationships.

**Each constitutes an operative event.**

**Each may produce consequences independently of the ultimate determination of liability.**

The constitutional problem arises when the law recognizes the authority to produce these consequences while postponing examination of their lawfulness until the conclusion of the process producing them.

Where the process itself is alleged to constitute the instrument of injury, the completion of that process cannot furnish a universally sufficient condition for reviewing its exercise.

**The finality of a proceeding and the occurrence of an injury are independent events.**

Two separate proceedings presently before the United States District Court for the Eastern District of Arkansas illustrate this distinction.

In *Walker v. Return to the Land*, a private claimant invokes judicial authority against several individuals and organizations. Some defendants contest the existence of jurisdiction over the claims against them, while discovery has been permitted to proceed notwithstanding the pending jurisdictional challenge.

In *Orwoll v. United States Department of Justice*, several of those same individuals and organizations invoke judicial authority against governmental actors whose investigative conduct they contest. The federal defendants seek dismissal, relying in material part upon the nonfinality of their administrative proceedings.

In the first controversy, process advances while its jurisdictional predicates remain contested.

In the second, the unfinished character of administrative process is advanced as a ground for withholding judicial review.

These proceedings involve different legal mechanisms, different jurisdictional requirements, and different burdens of proof. Their relationship nevertheless exposes a common constitutional question:

**What must be established before compulsory authority may be exercised, and when must its exercise become susceptible to meaningful review?**

A constitutional system must account for the acts occurring within its proceedings as well as the determinations those proceedings eventually produce.

The authority to commence a process and the authority to impose each successive burden within that process require distinct examination.

---

## II. FIRST PRINCIPLES: THE CLASSIFICATION OF AUTHORITY

Private liberty begins with a broad field of permissible action, subject to lawful restrictions.

Public authority begins with a defined delegation of power, subject to the limitations accompanying that delegation.

The individual entering public service assumes a more specifically defined capacity. The office confers particular powers for particular purposes and attaches corresponding duties to their exercise.

The classification of public authority must therefore proceed through the following sequence:

**ACTOR → OFFICE → CAPACITY → DELEGATION → JURISDICTION → OBJECT → FACTUAL PREDICATE → DUTY → AUTHORIZED ACT → REVIEW**

Each element performs distinct work.

- **Actor:** The person exercising authority.
- **Office:** The institutional position through which authority is exercised.
- **Capacity:** The function in which the actor is presently operating.
- **Delegation:** The constitutional, statutory, or other lawful source of power.
- **Jurisdiction:** The legally defined reach of that power.
- **Object:** The person, property, relationship, transaction, or conduct toward which the power is directed.
- **Factual predicate:** The circumstances activating the particular authority.
- **Duty:** The governmental obligation governing its exercise.
- **Authorized act:** The specific intervention permitted under those conditions.
- **Review:** The mechanism through which the exercise may be contested and corrected.

The possession of governmental office establishes the possibility of exercising particular powers. The correspondence between the delegation, the operative facts, and the particular governmental act establishes whether those powers are properly exercised.

The absence of an express prohibition upon an official act does not independently establish the affirmative delegation authorizing that act.

The greater the compulsory consequence, the greater the need for precision in identifying the authority producing it.

This principle applies to administrative agencies, executive officers, municipal authorities, courts, and private parties seeking to invoke public enforcement mechanisms.

A private party invoking judicial power must establish the predicates necessary to obtain the particular exercise of that power.

A public officer exercising delegated power must remain within the authority and duties accompanying the particular office and capacity.

**The more coercive the power, the more exact the classification required to justify its exercise.**

---

## III. THE CONSTITUTIONAL BINARIES

Several distinctions must remain intact throughout any examination of compulsory process.

### A. Authority and exercise

The existence of a delegated power and the lawful exercise of that power are separate questions.

An agency may possess authority to investigate housing discrimination while exceeding the lawful scope of a particular information demand.

A court may possess authority to administer discovery while imposing a particular disclosure requirement that is disproportionate or constitutionally infirm.

A public official may possess authority to communicate government policy while using that capacity to communicate an impermissible threat.

The existence of authority establishes the mechanism. Its lawful exercise requires correspondence between the mechanism, its purpose, its scope, and the facts activating it.

### B. Suspicion and determination

Suspicion may justify inquiry.

Inquiry may establish facts.

Facts may justify further action.

A determination of liability requires satisfaction of the applicable legal and evidentiary standards.

These are successive conditions. The authority available at one stage does not automatically include the authority reserved for another.

The legitimacy of preliminary investigation depends substantially upon maintaining that distinction.

### C. Association and regulated conduct

An association is a relationship among persons.

Property ownership, commercial exchange, employment, tenancy, investment, and contractual agency are additional relationships that may coexist with association.

The existence of one does not independently establish the existence of another.

Conversely, the use of a particular organizational label does not prevent examination of the relationships actually operating beneath it.

The law must identify the function being performed before determining which legal requirements attach.

**D. Affiliation and attribution**

Persons may share beliefs, organizational memberships, business interests, management responsibilities, or personal relationships.

Liability follows legally relevant participation, authority, causation, or attribution.

Affiliation may furnish evidence relevant to those inquiries. It cannot replace them.

The same standard governs private parties and public officers.

Common institutional employment does not independently establish governmental conspiracy. Common membership in a private association does not independently establish participation in every transaction undertaken by other members.

**E. Process and punishment**

Lawful process necessarily imposes some burdens.

Those burdens may be justified by the legitimate functions of investigation, evidence preservation, adjudication, and enforcement.

The constitutional question arises when procedural burdens become excessive, retaliatory, discriminatory, unrelated to the authorized objective, or independently destructive of protected rights.

At that point, the process requires examination according to its operative consequences.

Its administrative or procedural designation cannot conclusively establish its constitutional character.

Where procedural burdens are employed to achieve punitive or coercive effects independently of the standards governing punishment or enforcement, the particular conduct requires examination under the applicable constitutional and statutory limitations.

**F. Finality and injury**

**Finality** concerns the procedural status of a governmental determination.

**Injury** concerns the impairment of an identifiable interest.

An administrative proceeding may remain unfinished while a particular disclosure demand, official communication, seizure, restriction, or retaliatory act produces an existing injury.

A subsequent favorable determination may terminate the proceeding without reversing the consequences already produced.

The two inquiries must remain distinct.

**G. Immunity and lawfulness**

Immunity limits the availability of particular proceedings or remedies against particular defendants.

It does not independently establish that the underlying conduct was lawful.

The recognition of immunity must therefore remain distinct from the recognition of substantive authority.

A limitation upon the available remedy cannot be converted into an enlargement of the power against which the remedy was sought.

**H. Aggregate process and constituent acts**

A proceeding consists of identifiable acts occurring in sequence.

An investigation may remain open long after particular information demands have been issued, documents acquired, classifications communicated, or settlement conditions proposed.

A judicial proceeding may remain unresolved long after particular disclosures have occurred.

The act may be complete while the proceeding remains unfinished.

The constitutional consequences of the act must receive examination according to their own character and applicable legal standards.

**The unfinished character of the aggregate process does not independently determine the lawfulness of its constituent acts.**

---

## IV. THE SEQUENCE OF LAWFUL PROCESS

The legitimate exercise of compulsory process may be understood through six successive stages.

### 1. Identification

An identifiable legal object must exist.

The governmental actor must be capable of identifying the general subject of inquiry and the lawful function being performed.

The initiating facts may be incomplete. Their incompleteness is frequently the reason an investigation is authorized.

What must remain identifiable is the relationship between the inquiry and the law under which it proceeds.

An investigation into housing practices must concern conduct potentially regulated as housing activity.

An investigation into securities practices must concern conduct potentially regulated as securities activity.

A civil action must present an actual controversy within the jurisdiction of the adjudicating court.

### 2. Initiation

The applicable threshold for commencement must be satisfied.

Different forms of process employ different thresholds. An administrative inquiry may commence on substantially less information than would be required to impose a sanction or establish civil liability.

The Supreme Court recognized the breadth of legitimate preliminary investigative authority in *Oklahoma Press Publishing Co. v. Walling*, 327 U.S. 186 (1946), and *United States v. Morton Salt Co.*, 338 U.S. 632, 652 (1950).

Administrative inquiry may occur before a violation has been established. Compulsory demands remain subject to lawful authority, reasonable relevance, and adequate definiteness.

Where a statute or regulation prescribes a particular authorization for commencement, that authorization must retain its operative significance.

The authority to investigate uncertainty is essential to enforcement.

**Uncertainty identifies what needs investigation. It does not eliminate the requirement that the investigation possess an authorized object.**

### 3. Development

Information is sought to resolve the uncertainties justifying commencement.

During this stage, the investigating or adjudicating actor acquires additional facts. Those facts may substantiate the initial classification, require its modification, narrow the inquiry, identify additional appropriate subjects, or establish that further intervention is unnecessary.

The classification ought to become more precise as the record develops.

The authority to expand the process must correspond to the information obtained and the applicable procedural standards.

The initial classification must remain capable of correction through the evidence subsequently acquired.

### 4. Confrontation

Responsive information requires distinction between the original allegation and the developed record when evaluating the justification for further compulsory intervention.

A party identifies separate entities. The government or claimant examines the asserted separateness.

A party identifies an incorrect classification. The decision-maker examines its accuracy.

A party disputes the scope of a demand. The responsible actor considers its relevance and necessity.

A party identifies a protected constitutional interest. The applicable constitutional standard becomes part of the inquiry.

The determination need not favor the responding party. Its justification must remain capable of examination through the facts and law governing the proceeding.

Compliance with a governmental demand does not independently establish consent to the government's classifications, jurisdictional assertions, allegations, or requested remedies.

The evidentiary response and the legal relationship under which that response was obtained must remain distinguishable.

**5. Disposition**

The process produces an appropriate determination according to the applicable legal framework.

Depending upon the proceeding, this may consist of further authorized investigation, amendment, settlement, dismissal, a charge, adjudication, or termination.

The responsibility to render a disposition is particularly significant where Congress or an applicable rule has prescribed a definite duty or timeframe.

Where discretion remains, its exercise continues to be subject to constitutional limitations.

The availability of continued process must remain distinguishable from the justification for continuing it.

**6. Review and correction**

The exercise of authority remains subject to the available mechanisms of objection and review.

The timing of review must account for the character of the alleged injury.

Some errors can be adequately corrected following final disposition.

Other consequences, including certain disclosures of confidential associational information or continuing impairments of constitutional liberty, may require examination before they become irreversible.

The proposed constitutional standard is therefore:

**Review must correspond to the injury being alleged, rather than depend exclusively upon the procedural maturity of the larger controversy.**

---

## V. THE CLASSIFICATION PREDICATES OF PRIVATE CIVIL ENFORCEMENT

The Fair Housing Act establishes a statutory framework for regulating discriminatory housing practices. Congress expressly situated federal fair-housing policy within constitutional limitations. 42 U.S.C. § 3601.

The application of that framework requires identification of the particular conduct regulated.

Sections 3602 and 3604 distinguish qualifying housing objects and various prohibited practices, including discriminatory refusals, conditions, advertisements, statements, and other acts affecting housing availability.

The Civil Rights Act of 1866 separately protects contractual and property rights under 42 U.S.C. §§ 1981 and 1982.

These provisions have different elements.

Accordingly, the judicial inquiry must distinguish:

1. The **regulated object**;
2. The **regulated conduct**;
3. The **responsible actor**;
4. The **operative relationship** connecting the actor to the conduct;
5. The **prohibited causal condition**;
6. The **legally cognizable injury**; and
7. The **available remedy**.

A completed purchase is not universally required. Discriminatory advertising, interference with negotiations, exclusion from a qualifying opportunity, and other statutorily prohibited conduct may establish independently cognizable claims.

Likewise, the use of a membership interest instead of a deed does not independently remove a property relationship from regulation.

In *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 236–37 (1969), the Supreme Court examined the functional relationship between a membership share and the enjoyment of leased property in applying § 1982.

In *Meyer v. Holley*, 537 U.S. 280, 285–86 (2003), the Court recognized the ordinary principles of agency and vicarious liability applicable to the Fair Housing Act.

The relevant inquiry is consequently functional.

- What does the association actually do?
- What does the landholding entity actually control?

- What authority has been delegated between them?
- What legal or practical relationship exists between membership and property availability?
- What action prevented the claimant from obtaining a statutorily protected opportunity?

Where a membership requirement constitutes an operative means of controlling access to housing, the relationship may fall within the applicable statutory framework.

Where the challenged conduct concerns independently protected association, the constitutional inquiry is different.

The distinction requires evidence rather than inference from organizational labels alone.

## A. The constitutional incompatibility of compulsory participation and voluntary association

The freedom to associate necessarily encompasses a corresponding freedom to decline certain associations.

Voluntary association derives its function from the capacity of participants to establish and maintain relationships according to identifiable purposes, commitments, responsibilities, and expectations.

The constitutional protection of those relationships preserves the capacity of individuals to cooperate through voluntary participation.

The difficulty arises where statutory entitlements to participation extend into relationships governed by constitutional protections against compulsory participation.

At that point, the law may simultaneously recognize the liberty to decline a particular relationship and the authority to compel its establishment.

These propositions cannot operate without qualification upon the same relationship under identical circumstances.

The boundary between them must be rendered precise.

### 1. Equal liberty and corresponding obligations

The equal possession of a liberty does not independently establish an entitlement to the cooperation of another person.

The liberty to establish a household does not establish an entitlement to participation in another person's household.

The liberty to establish a religious congregation does not establish an entitlement to membership in every existing congregation.

The liberty to acquire property does not independently establish an entitlement to every property relationship another person has formed.

Where an enforceable entitlement exists, the law must identify its corresponding obligation, the source of that obligation, and the permissible means of its enforcement.

The constitutional sequence is:

**PERSON → LIBERTY → ASSERTED ENTITLEMENT → CORRESPONDING DUTY → SOURCE OF AUTHORITY → PERMISSIBLE COMPULSION**

Without this sequence, the existence of an asserted entitlement may become its own justification for compulsory intervention.

**2. The classification of the commons**

The commons, as employed in this analysis, comprises those resources, institutions, and relationships in which legally identifiable obligations of reciprocal access have been established.

This classification extends beyond public ownership.

Private persons may assume obligations through contract, participation in regulated commerce, dedication of property to particular uses, or the operation of valid statutory requirements.

Those obligations must nevertheless remain distinguishable from private relationships whose formation and continuation depend upon voluntary participation.

The constitutional inquiry must identify the relationship through which an obligation of access arises.

The possession of property, the establishment of an organization, or the existence of contractual relations does not independently establish that every activity conducted through that arrangement possesses the same legal character.

The law must distinguish the actual obligations attaching to public institutions, commercial transactions, private property, intimate relationships, expressive association, religious congregation, and internal organizational governance.

The existence of overlap requires greater classificatory precision.

It cannot justify the abandonment of classification.

**3. The unresolved tension within existing jurisprudence**

The Supreme Court has sustained prohibitions against racial discrimination in private property and contractual relationships. *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968); *Runyon v. McCrary*, 427 U.S. 160, 175–79 (1976).

The Court has additionally sustained compulsory inclusion within an association upon application of the governing constitutional standard. *Roberts v. United States Jaycees*, 468 U.S. 609, 623–29 (1984).

Conversely, the Court has recognized constitutional limitations upon compulsory inclusion where such inclusion materially burdens protected expressive association. *Boy Scouts of America v. Dale*, 530 U.S. 640, 648–59 (2000).

The Court has distinguished compulsory interaction from compulsory membership. *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 68–70 (2006).

It has likewise recognized that commercial activity does not independently extinguish constitutional protection against compelled expression. *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023).

In the residential context, the Ninth Circuit has construed the Fair Housing Act to exclude roommate selection within shared living units, recognizing the serious constitutional concerns accompanying governmental intrusion into intimate residential relationships. *Fair Housing Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1220–23 (9th Cir. 2012).

Congress has itself established differentiated exemptions concerning religious organizations and private clubs under 42 U.S.C. § 3607(a).

These exemptions carry different conditions and limitations. Their operation depends upon the character of the organization, the nature of its property relationship, and the function being performed. See *United States v. Columbus Country Club*, 915 F.2d 877 (3d Cir. 1990).

The resulting jurisprudence recognizes several categories of protected and regulated activity whose boundaries become uncertain when the activities coexist within the same institution.

The authorities may be distinguished according to their particular facts and holdings.

The underlying constitutional tension nevertheless remains:

**What principle determines when the protection of equal civil rights authorizes compulsory alteration of a relationship otherwise protected through the freedom of association?**

**4. The insufficiency of interest balancing as an antecedent decisional method**

Constitutional liberties and governmental interests perform different legal functions.

A liberty establishes an area of protected human agency.

A governmental interest identifies an objective whose pursuit remains subject to constitutional limitations.

The importance attributed to the governmental objective does not independently establish the lawful character of the means employed to accomplish it.

The Supreme Court has expressly recognized limitations upon judicial interest balancing in determining the scope of constitutional protection. See *District of Columbia v. Heller*, 554 U.S. 570, 634–35 (2008).

The broader jurisprudential significance of that concern warrants examination in the context of associational liberty.

Balancing competing interests before classifying the respective rights and obligations permits the decisional result to influence the definition of the liberty subjected to evaluation.

Where the weight attributed to an interest determines the existence or extent of the competing liberty, constitutional protection becomes contingent upon the evaluative preferences of the decision-maker.

The proposed constitutional alternative begins with the classification of the respective liberties, entitlements, and obligations.

The existence, scope, and constitutional validity of the asserted obligation must receive examination before compulsory enforcement can be justified.

Applicable standards of constitutional scrutiny remain operative. Their function must remain connected to the particular liberty and intervention previously identified.

The proposed jurisprudential development seeks to render constitutional dispositions through identifiable legal predicates rather than through an antecedent comparison of the perceived social value of the respective participants or their objectives.

**5. The constitutional consequences of unresolved contradictions**

Where two legal propositions authorize incompatible dispositions under materially identical conditions, their simultaneous availability introduces discretion into the administration of the controversy.

An official may select the classification furnishing authority for intervention.

Another official may select the classification preserving private liberty.

The resulting difference may arise through the classification selected rather than any material difference in the underlying conduct.

Where the law fails to establish the conditions governing that selection, the opportunity for inconsistent and discriminatory administration increases.

The uncertainty becomes particularly consequential where government can impose investigatory burdens, compulsory production, continuing supervision, or restrictive contractual conditions before the underlying constitutional question receives judicial examination.

An unresolved contradiction in the applicable legal standard creates a recurring opportunity for intrusion upon liberty.

The constitutional response ought to consist of rendering the competing classifications precise, establishing their respective boundaries, and preserving mechanisms through which their consistency may be challenged and corrected.

**6. The proposed standard**

The constitutional examination must proceed through the following sequence:

**CLASSIFY THE RELATIONSHIP → IDENTIFY THE PROTECTED LIBERTY → ESTABLISH THE ASSERTED ENTITLEMENT → IDENTIFY THE CORRESPONDING OBLIGATION → DETERMINE CONSTITUTIONAL AUTHORITY → RENDER THE LAWFUL DISPOSITION**

Where existing precedent resolves the controversy, its application must remain identifiable.

Where existing precedent leaves the underlying constitutional tension unresolved, the question ought to remain susceptible to examination by the appropriate reviewing authority.

Where existing jurisprudence requires alteration to establish a constitutionally coherent standard, that alteration must proceed through the lawful mechanisms of judicial reconsideration, appellate review, or legislative correction.

**The legitimacy of a constitutional disposition must follow the lawful classification of the relationship and the authority established to intervene within it.**

**B. Necessary and sufficient conditions**

A membership condition may be necessary for obtaining a property interest without being sufficient to obtain that interest.

Additional requirements concerning invitation, approval, contractual agreement, or eligibility do not independently establish that an antecedent membership requirement is immaterial.

Likewise, overlapping organizational memberships do not independently establish that membership in one entity constitutes a prerequisite for transactions with another.

The legal inquiry must identify the actual conditions governing the particular opportunity.

The relevant governing instruments must also be classified according to their operative dates.

Historical representations, superseded agreements, subsequent amendments, and current practices perform different evidentiary functions.

**The relationship must be classified as it existed at the time legally relevant to the challenged conduct.**

### C. The classification of injury

The existence of a statutory prohibition and the existence of a legally cognizable injury attributable to its violation must remain distinct.

A claimant may allege loss of a housing opportunity, interference with negotiation, discriminatory misinformation, exclusion from a contractual relationship, or another injury recognized by applicable law.

The elements necessary to establish each injury differ.

Article III standing, statutory liability, and entitlement to a particular remedy accordingly require separate examination.

The existence of a grievance cannot independently supply the legal predicates necessary to invoke compulsory judicial authority.

The possession of an applicable statutory right cannot independently establish that every disputed relationship falls within that right.

---

## VI. COMPULSORY JUDICIAL DISCOVERY

Judicial discovery exists to obtain information necessary to resolve actual legal controversies.

Its legitimacy derives from its relationship to those controversies.

Article III requires a concrete and particularized injury, traceability to the challenged conduct, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

These requirements must be satisfied for the relevant claims and requested forms of relief. See *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021).

Jurisdiction ordinarily precedes adjudication of the merits. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94–95 (1998).

A court nevertheless possesses authority to examine its own jurisdiction, including through appropriate factual inquiry.

In *Osborn v. United States*, 918 F.2d 724, 729–30 (8th Cir. 1990), the Eighth Circuit recognized factual examination of disputed jurisdictional predicates and the importance of distinguishing jurisdictional questions from the merits.

Those principles permit appropriately directed jurisdictional discovery. They do not resolve the proper scope of every discovery demand while jurisdiction remains contested.

**A. The distinction between jurisdictional inquiry and unrestricted merits discovery**

Where jurisdiction depends upon the relationship between two organizations, production of governing instruments, relevant amendments, records of authority, and particular transactional information may assist the court in resolving that relationship.

The necessity of those materials does not independently establish the necessity of obtaining every membership record, private communication, financial record, or unrelated personal detail associated with either organization.

Federal Rule of Civil Procedure 26(b)(1) expressly limits discovery through relevance and proportionality.

Rule 26(b)(2)(C) requires limitation of discovery under specified circumstances.

Rule 26(c) authorizes protection against undue burden, expense, oppression, and other specified harms.

Rule 26(d)(3) permits judicial control over the sequence of discovery.

Rule 26(f)(3)(B) expressly contemplates discovery conducted in phases or focused upon particular issues.

Rule 45 establishes additional protections for nonparties subjected to compulsory production.

The Supreme Court has recognized that discovery can seriously affect the privacy interests of litigants and third parties. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34–36 (1984).

Where disputed information implicates constitutionally protected association, further analysis becomes necessary.

In *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462–63 (1958), the Court recognized the connection between confidential membership information and the effective exercise of associational freedom.

*Americans for Prosperity Foundation v. Bonta*, 594 U.S. 595 (2021), reaffirmed the requirement of appropriately tailored justification for compulsory disclosures burdening protected association.

Other federal appellate courts have applied qualified First Amendment protections within civil discovery. See *Grandbouche v. Clancy*, 825 F.2d 1463, 1466–67 (10th Cir. 1987); *Perry v. Schwarzenegger*, 591 F.3d 1126, 1139–41 (9th Cir. 2010).

These authorities support examination of the particular information sought, the nature of the asserted burden, the requesting party's evidentiary need, and available alternatives.

The corresponding principle possesses established jurisprudential foundations within the Eastern District of Arkansas and the Eighth Circuit.

In *Pollard v. Roberts*, 283 F. Supp. 248, 256–57 (E.D. Ark. 1968), aff'd, *Roberts v. Pollard*, 393 U.S. 14 (1968), the court recognized constitutional limitations upon investigative demands seeking confidential associational information.

In *United States v. Citizens State Bank*, 612 F.2d 1091, 1094–95 (8th Cir. 1980), the Eighth Circuit distinguished legitimate investigatory authority from the justification necessary to compel disclosures impairing constitutionally protected association.

The court contemplated sequential production through which information necessary to advance an investigation could initially be obtained without disclosing the identities of members and contributors.

Further compulsory disclosure could follow where the developing record established the requisite justification.

The significance of this approach extends beyond the particular statutory investigative mechanism involved.

It identifies an operational principle governing compulsory process:

**The precision and scope of compulsory intervention ought to develop in correspondence with the evidentiary necessity established through preceding stages of inquiry.**

**B. The proposed sequence for disputed discovery**

Where material jurisdictional questions and associational privacy interests coexist, courts ought to consider the following sequence:

1. Identification of the contested jurisdictional predicates;
2. Initial production of governing, transactional, and other directly relevant records;
3. Determination of whether additional evidence is necessary;
4. Examination of any sufficiently supported claim of constitutional privilege;
5. Consideration of redaction, anonymization, representative samples, in-camera review, and appropriate protective orders;
6. Expansion of compulsory disclosure where the applicable evidentiary and legal standards justify it.

This sequence preserves the claimant's ability to establish a legitimate cause of action while limiting unnecessary interference with the rights of defendants and third parties.

The purpose is to align the scope of compulsory process with the question presently requiring resolution.

**C. The acquisition and custody of protected information**

Disclosure alters custody.

A subsequent ruling may exclude information from evidence, restrict additional dissemination, or terminate the proceeding through which disclosure occurred.

Such a ruling cannot necessarily restore the informational relationship existing before disclosure.

The constitutional and procedural examination must therefore distinguish:

**ACQUISITION → CUSTODY → RETENTION → DISSEMINATION → SUBSEQUENT USE**

Each operation may produce different consequences.

Where acquisition itself implicates a protected interest, restrictions upon subsequent publication may be insufficient.

Where the protected interest continues beyond the conclusion of litigation, the duration of an appropriate protective measure ought to correspond to the character and duration of that interest.

The applicable standards governing public access to judicial records remain independently operative.

Protection of materials exchanged in discovery and protection of materials submitted for adjudication may require different treatment.

The law must account for the particular informational relationship being altered and the consequences of altering it.

---

## VII. ADMINISTRATIVE NONFINALITY AND CONSTITUTIONAL REVIEW

The Administrative Procedure Act ordinarily requires final agency action for judicial review under 5 U.S.C. § 704, except where agency action is otherwise made reviewable by statute.

In *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997), the Supreme Court identified the principal conditions of agency finality: completion of the relevant administrative decision-making process and an action producing legal consequences or determining rights or obligations.

The initiation of an administrative complaint generally does not satisfy those conditions. *FTC v. Standard Oil Co. of California*, 449 U.S. 232, 239–45 (1980).

The Eighth Circuit applied the finality analysis in *Minnesota Bankers Association v. FDIC*, 152 F.4th 893 (8th Cir. 2025).

These authorities protect legitimate administrative functions from premature judicial interruption.

They do not independently establish that constitutional injuries produced during administrative proceedings are categorically unreviewable.

The waiver of sovereign immunity, the existence of an independent constitutional claim, the finality of agency action, and the availability of prospective relief remain separate inquiries.

### A. The independent constitutional controversy

In *Webster v. Doe*, 486 U.S. 592, 603–05 (1988), the Supreme Court recognized the serious constitutional question arising from an interpretation that would foreclose every judicial forum for a colorable constitutional claim.

In *Axon Enterprise, Inc. v. FTC*, 598 U.S. 175 (2023), the Court held that particular structural constitutional challenges could proceed in district court notwithstanding ongoing administrative proceedings.

Although *Axon* concerned challenges to the constitutional structure and authority of administrative adjudicators, its reasoning demonstrates why the character of the alleged injury matters when determining the adequacy of later review.

Where an injury arises from subjection to an allegedly unlawful process, review following completion of that process may be incapable of providing meaningful prevention.

The appropriate inquiry must identify:

1. The specific constitutional claim;
2. The injury allegedly produced by the process;
3. The applicable jurisdictional and remedial vehicle;
4. Any statutory displacement of that vehicle; and
5. The adequacy of the remaining mechanism of review.

Administrative finality must be applied according to the statutory function it performs.

**B. The Eighth Circuit distinction**

The Eighth Circuit has expressly distinguished federal sovereign-immunity waiver from the procedural requirements of ordinary APA review.

*Red Lake Band of Chippewa Indians v. Barlow*, 846 F.2d 474, 476 (8th Cir. 1988), explains that the waiver under 5 U.S.C. § 702 does not depend upon application of the APA's ordinary review procedures and standards.

In *Raz v. Lee*, 343 F.3d 936, 937–38 (8th Cir. 2003), the court applied § 702 when reversing the dismissal on sovereign-immunity grounds of a constitutional action seeking injunctive relief concerning alleged retaliatory governmental surveillance.

Section 702 does not itself establish an independent cause of action. Other statutory and equitable limitations remain applicable.

Nevertheless, the distinction recognized by the Eighth Circuit must be maintained:

**Failure to establish final agency action for ordinary APA review does not independently establish sovereign immunity from an otherwise cognizable constitutional action seeking prospective equitable relief.**

### C. The corresponding controversy involving state officials

Constitutional claims against state officials present different sovereign-immunity questions.

*Ex parte Young*, 209 U.S. 123 (1908), recognizes prospective relief against appropriate state officials maintaining ongoing violations of federal law.

The inquiry must identify the responsible official, the ongoing violation, the official's connection to the challenged conduct, and the prospective character of the requested remedy.

In each context, immunity and substantive lawfulness must receive separate treatment.

### D. Administrative control over the availability of review

Where an agency controls the duration of an administrative proceeding, it may also substantially influence the time at which ordinary final-agency-action review becomes available.

That arrangement serves legitimate administrative purposes where investigation must precede determination.

It produces a different constitutional concern where the alleged injury arises from the investigation itself.

If the agency's control over administrative completion also operates to foreclose every meaningful avenue of review of its continuing conduct, the agency may obtain practical insulation from accountability by maintaining the procedural condition upon which that insulation depends.

The adequacy of alternative review must be examined in relation to the particular injury asserted.

**The governmental authority to control the completion of an administrative proceeding cannot, by itself, establish authority to preclude judicial examination of an independently cognizable constitutional injury occurring within that proceeding.**

---

## VIII. CONSTITUTIONAL INJURY DURING THE EXERCISE OF PROCESS

In *First Choice Women's Resource Centers, Inc. v. Davenport*, No. 24-781 (U.S. Apr. 29, 2026), the Supreme Court examined an outstanding governmental subpoena seeking confidential donor information.

The absence of a judicial enforcement order did not eliminate the present consequences of the subpoena.

The Court held that the organization had established an existing associational injury sufficient to satisfy Article III standing.

The decision addressed standing rather than rendering an ultimate determination of constitutional liability.

Its significance nevertheless reaches the operation of compulsory process.

A governmental demand may impair protected relationships when communicated and while outstanding. Its consequences need not await enforcement.

The distinction may be expressed through the following sequence:

**DEMAND → ALTERED EXPECTATIONS → ALTERED CONDUCT → PRESENT BURDEN → POSSIBLE ENFORCEMENT**

The government may obtain practical effects during the intermediate stages.

A member may withdraw.

A donor may cease contributing.

A prospective business counterparty may reconsider a relationship.

An organization may restrain its otherwise protected expression.

Information may be produced to avoid the possibility of escalating enforcement.

The constitutional significance of these consequences depends upon the nature of the demand, the rights implicated, the causal relationship, and the governing substantive standards.

The absence of an adjudicated violation does not independently eliminate those questions.

**A. Process as functional punishment**

Ordinary expense, uncertainty, and inconvenience accompanying lawful investigation or litigation do not automatically constitute unconstitutional punishment.

The constitutional controversy arises where procedural power is used to produce burdens for impermissible purposes or beyond the lawful scope of the authority invoked.

The Supreme Court recognized the possibility of improper investigative purpose in *United States v. Powell*, 379 U.S. 48, 58 (1964), addressing judicial enforcement of administrative tax summonses.

The possibility that process may be employed to harass or pressure a person into resolving an unrelated controversy was material to the legitimacy of enforcement.

The principle deserves particular attention where governmental actors control both the duration of the proceeding and the conditions under which its burdens may cease.

A governmental actor may lawfully pursue a determination through which corrective authority becomes available.

The administration of independently unjustified burdens in advance of that determination presents a separate controversy.

**A procedure intended to establish whether compulsory correction is justified must remain distinguishable from the premature administration of that correction.**

### B. Resistance, compliance, and consent

Governmental investigation may produce responses ranging from voluntary cooperation to compliance under the prospect of compulsory enforcement.

These responses require separate classification.

The production of requested information establishes that information was produced.

It does not independently establish agreement with the investigative classification, acknowledgment of liability, or consent to further governmental intervention.

Likewise, objections to the scope or authority of a demand do not independently establish an intention to obstruct a legitimate investigation.

The law must distinguish the act of responding from the legal character of the relationship in which the response occurs.

---

## IX. GOVERNMENTAL COMMUNICATION AS OPERATIVE CONDUCT

Governmental authority may be exercised through communication as well as through orders.

A public statement identifying a person as the subject of official opposition may alter that person's relationships with employers, investors, customers, neighbors, regulators, or other institutions.

The act of communicating the statement is complete when the statement is issued.

Its constitutional character depends upon the accompanying authority, purpose, context, and consequences.

The government retains substantial latitude to express its policies and opinions.

The distinction concerns the use of that expressive capacity as an instrument of coercion or retaliation.

In *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67–72 (1963), the Supreme Court recognized unconstitutional suppression accomplished through informal governmental pressure.

In *National Rifle Association of America v. Vullo*, 602 U.S. 175 (2024), the Court reaffirmed that regulatory authority cannot be employed to coerce private parties into suppressing disfavored protected expression.

The Eighth Circuit has likewise recognized that comparatively minor governmental enforcement actions can satisfy the adverse-action component of a First Amendment retaliation claim. *Garcia v. City of Trenton*, 348 F.3d 726, 728–29 (8th Cir. 2003).

The relevant examination includes:

- The authority possessed by the communicating official;
- The capacity in which the communication was issued;
- The person or activity identified;
- The adverse consequences communicated or reasonably understood;
- The relationship between those consequences and protected conduct;
- The injury attributable to the communication.

An official announcement of prospective governmental opposition to an identifiable religious, political, cultural, or commercial organization may therefore warrant examination independently of whether a permit has already been denied, a fine imposed, or a formal enforcement proceeding commenced.

The constitutional threshold remains the existence of an actionable governmental burden, threat, or other legally cognizable injury.

**The distinction between private opposition and official opposition**

A private individual expressing opposition to an organization ordinarily exercises private expressive liberty.

A public officer communicating official opposition may additionally invoke the institutional authority, regulatory capacity, and enforcement mechanisms accompanying the office.

The constitutional examination must account for the material consequences of that additional capacity.

The absence of a formal enforcement instrument does not conclusively establish the absence of coercion.

The possession of governmental authority does not independently establish that every communication issued through that authority constitutes coercion.

The operative relationship between the communication, the power accompanying it, and the consequences produced must determine the constitutional inquiry.

---

## X. INVESTIGATORY AUTHORITY AND CONTRACTUAL ACQUISITION

Investigatory relationships and contractual relationships arise through different mechanisms.

**Investigatory authority** derives from lawful governmental delegation.

**Contractual authority** derives from enforceable agreement, subject to the limitations governing the parties and the agreement.

A negotiated settlement may lawfully resolve disputed claims without a prior adjudication of liability.

Settlement may establish obligations that differ from the relief immediately available through ordinary adjudication.

Nevertheless, governmental participation in settlement remains subject to constitutional and statutory limitations.

The consequential question is whether an agency employs the burdens of a contested investigative relationship to obtain concessions beyond its lawful regulatory objective or through independently unconstitutional means.

The sequence is:

**INVESTIGATORY CLASSIFICATION → INFORMATION DEMANDS → CONTINUING EXPOSURE → SETTLEMENT PROPOSAL → CONTRACTUAL OBLIGATIONS → CONTRACTUAL ENFORCEMENT**

At the moment of agreement, the governmental relationship changes materially.

The agency may acquire independently enforceable rights. The responding party may assume continuing obligations, surrender particular claims, accept monitoring, or make commitments concerning future conduct.

The government must therefore remain accountable for both the authority under which the original inquiry proceeds and the manner in which the contractual relationship is obtained.

**A. Classification of administrative conciliation**

The Fair Housing Act expressly distinguishes preliminary inquiry, complaint, investigation, conciliation, determination, and enforcement.

Section 3610(a)(1)(A)(iii) authorizes preliminary investigation for the purpose of determining whether the filing of a complaint is warranted.

Section 3610(b)(1) establishes the statutory period for conciliation following the filing of a complaint.

Section 3602(l) defines conciliation in relation to issues raised by a complaint or its investigation.

Section 3610(b)(2) establishes requirements governing the participants and approval of statutory conciliation agreements.

Sections 3610(c) and 3614 establish mechanisms for enforcing the resulting agreements.

The implementing regulation, 24 C.F.R. § 103.300(a), likewise establishes the statutory conciliation period by reference to the filing and disposition of a complaint.

These distinctions are material where an agency seeks to employ statutory conciliation mechanisms before the occurrence of the procedural event identified by Congress.

An agency may possess additional authority to pursue informal voluntary settlements. The source and legal consequences of such authority must be separately identified where its applicability is materially contested.

The existence of general investigative authority cannot independently establish that every form of settlement, supervision, payment, or waiver is available at every procedural stage.

Where threatened consequences, burdens, or restrictions are alleged to exceed the legitimate regulatory objective, the constitutional principles governing coercion and unconstitutional conditions become relevant. See *Bantam Books*; *Vullo*; *Perry v. Sindermann*, 408 U.S. 593, 597 (1972).

The proposed standard concerns the lawful use of governmental leverage.

**B. The acquisition of continuing supervisory authority**

A settlement may terminate an existing investigation while establishing a new relationship carrying continuing governmental authority over the settling parties.

The resulting obligations may concern financial commitments, organizational practices, information production, monitoring, access to records, and the surrender of claims concerning previous governmental conduct.

The legal significance of the proposed agreement therefore extends beyond its immediate financial cost.

Its terms may establish independently enforceable obligations capable of producing further governmental intervention upon breach.

The constitutional examination must distinguish the authority exercised under the original investigatory relationship from the authority acquired through the resulting agreement.

Where a proposed condition reaches independently protected relationships, the constitutional justification for that condition requires examination.

Where the proposed obligations include financial penalties, the statutory authority governing adjudicated penalties must remain distinguishable from the authority governing negotiated financial commitments.

See 42 U.S.C. § 3612(g)(3).

An unaccepted settlement proposal does not itself establish the obligations it proposes.

Its issuance and the governmental conduct accompanying it may nevertheless have independent constitutional significance.

**C. The preservation of legal objections**

An agreement resolving an underlying regulatory controversy may additionally contain releases concerning the government's previous conduct.

Where such releases are sought, the lawfulness of the governmental means employed to obtain them remains a distinct question.

The ability to resolve disputed claims through agreement does not independently establish that every proposed waiver of constitutional or statutory claims has been lawfully obtained.

The scope of the release, the character of the preceding governmental conduct, and the circumstances governing consent require examination under the applicable law.

Communications arising during statutory conciliation remain subject to the confidentiality and evidentiary restrictions established by 42 U.S.C. § 3610(d)(1), where applicable.

The constitutional standard advanced herein does not depend upon unrestricted publication or evidentiary use of protected negotiation communications.

---

## XI. THE TEMPORAL DIMENSION OF PUBLIC AUTHORITY

The duration of an exercise of authority forms part of its operation.

An investigation may be justified when commenced and improperly administered thereafter.

An initially appropriate demand may become unnecessary after responsive information has been produced.

A legitimate inquiry may develop into an unauthorized or excessively broad examination of unrelated persons and activities.

The constitutional and statutory assessment must therefore distinguish:

**INITIATION → DEVELOPMENT → EXPANSION OR NARROWING → CONTINUATION → DISPOSITION**

Each stage presents a different question.

### Initiation

What statutory function and factual circumstances justified commencement?

What procedural authorization was required?

In the context of preliminary HUD investigations, 24 C.F.R. § 103.200(b) identifies written direction from the Assistant Secretary as the authorization for initiating an investigation into housing practices for the purpose of determining whether a complaint is warranted.

The general existence of investigatory authority must remain distinguishable from the occurrence of the particular authorization required to exercise it.

### Development

What information has been obtained, and what effect does that information have upon the original administrative classification?

The developing record ought to distinguish the allegations prompting commencement from the evidence subsequently acquired.

**Expansion or narrowing**

What newly identified facts justify additional demands, subjects, or classifications?

What information eliminates or materially alters the justification for existing demands, subjects, or classifications?

The scope of the inquiry ought to develop in correspondence with its authorized purpose and the operative record.

**Continuation**

What legitimate governmental function remains to be performed?

What consequences result from maintaining the investigation or its accompanying demands?

The justification for commencement and the justification for continued intervention must remain distinguishable.

**Disposition**

What decision, notification, report, referral, or other legally prescribed act is required?

These questions do not imply that every agency must publicly disclose its internal investigative reasoning or that every investigation is subject to an identical deadline.

Legitimate confidentiality, investigative necessity, and statutory discretion remain applicable.

The governing distinction concerns whether those limitations themselves have an identifiable legal basis and whether an appropriate reviewing authority can examine their proper invocation.

**Statutory duties during unfinished proceedings**

Congress has expressly imposed temporal and procedural requirements upon certain administrative functions.

Under 42 U.S.C. § 3610(a)(1)(B)(iv), (a)(1)(C), and (g)(1), HUD ordinarily must complete the relevant complaint investigation and render a reasonable-cause determination within 100 days, subject to the applicable statutory qualifications.

Where timely completion or determination becomes impracticable, written explanations are required.

Sections 3610(a)(1) and (a)(2) establish notification duties, including requirements applicable to the addition of respondents.

Section 3610(g)(3) establishes duties following a determination that reasonable cause does not exist.

Similarly, 5 U.S.C. § 555 establishes administrative obligations concerning the reasonable conclusion of matters and notice of certain denials.

Under 5 U.S.C. § 706(1), an available judicial remedy may include compelling a discrete action that the agency is legally required to perform. *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 63–65 (2004).

The law may preserve discretion over the substance of a determination while imposing a duty to render it.

Different agencies exercising authority under different statutory provisions may possess different procedural obligations.

Those obligations must be identified according to the particular delegation and governmental act.

**Discretion concerning the result and discretion concerning whether a required governmental act will occur are distinct.**

---

## XII. EQUALITY AND RECIPROCITY IN ENFORCEMENT

Constitutional standards governing the exercise of public authority must remain invariant with respect to the identity of those subjected to it.

The Fifth Amendment imposes equal-protection limitations upon federal governmental action. *Bolling v. Sharpe*, 347 U.S. 497 (1954); *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200 (1995).

The Fourteenth Amendment imposes corresponding requirements upon state and municipal action.

The existence of enforcement discretion does not place its exercise beyond those constitutional standards.

The selection of persons for investigation, the scope of information demanded, the procedural mechanisms employed, and the conditions producing disposition may furnish evidence relevant to discriminatory or retaliatory administration.

Selective-enforcement claims require satisfaction of the applicable standards concerning discriminatory purpose and effect. See *Wayte v. United States*, 470 U.S. 598, 608 (1985).

Procedural departures may be relevant evidence when examined alongside other circumstances. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266–68 (1977).

A comparison must identify materially comparable conduct and procedural circumstances.

Where different procedures have been selected, the examination may properly extend to the legally relevant circumstances explaining that selection.

The fact that different procedural obligations attach to different administrative classifications may explain differences occurring after classification.

It does not independently establish why the respective classifications were selected.

**The administrative classification cannot conclusively justify itself.**

**A. Institutional convergence and conspiracy**

Multiple governmental actors may respond independently to common information, publicity, allegations, incentives, or political pressures.

Their conduct may converge without an agreement among them.

An allegation of coordinated misconduct must satisfy the applicable legal requirements governing conspiracy.

The absence of a legally established conspiracy does not independently establish the lawfulness of the constituent governmental acts.

Each actor's conduct must remain attributable to the authority exercised, the facts relied upon, the duties assumed, and the consequences produced.

Where multiple interventions operate simultaneously, their cumulative consequences may become relevant to independently asserted injuries.

The legal responsibility for those consequences must nevertheless follow the applicable standards of attribution.

## B. Invariance of the constitutional standard

Constitutional protection must remain capable of reciprocal application across changes in the identity of the persons invoking it.

Throughout the United States, individuals establish religious congregations, racial and ethnic affinity organizations, cultural associations, political organizations, intentional communities, and collectively governed property arrangements.

These institutions differ in their purposes and operation.

Some establish relationships of private congregation and internal governance. Others administer commercial opportunities or residential property. Many combine several such functions.

The constitutional significance of those functions must remain distinguishable from the identity of their participants.

An African-American cultural association, a Jewish religious congregation, a Muslim intentional community, and a European heritage association may each possess constitutionally protected interests.

Their particular legal obligations must follow the actual relationships established and activities performed.

The statutory and constitutional classifications applicable to those relationships cannot be rendered interchangeable merely because the organizations possess a common demographic, religious, or ancestral orientation.

Conversely, materially comparable conduct cannot receive constitutionally different treatment merely because the identities of its participants change.

The proposed examination therefore requires a reciprocal substitution test:

1. Identify the conduct subjected to governmental intervention.
2. Identify the legal classification through which intervention is authorized.
3. Substitute materially different racial, religious, cultural, or ideological identities while maintaining the legally relevant conduct and circumstances.
4. Determine whether the same constitutional and statutory rule remains applicable.
5. Identify the lawful justification for any material difference in governmental treatment.

This test is proposed as a method of examining constitutional consistency. Particular claims of discriminatory enforcement remain subject to their applicable evidentiary and legal requirements.

Where differing dispositions arise from legally material distinctions, those distinctions furnish the appropriate basis for examination.

Where differing dispositions arise from discretionary selection among overlapping or unresolved legal classifications, the adequacy of the underlying jurisprudence requires examination.

The constitutional standard ought to be capable of application without requiring approval of the identities, beliefs, or purposes of the persons invoking its protection.

**Equality before the law requires consistency in the legal classification of materially equivalent conduct and in the constitutional limitations governing compulsory intervention.**

---

## XIII. COMPARATIVE APPLICATION TO THE TWO PROCEEDINGS

### A. Walker v. Return to the Land

In *Walker*, the plaintiff alleges that an association's membership determination prevented her from obtaining a residential property opportunity.

The defendants contest that classification.

The record identifies distinct entities, overlapping participants, disputed historical representations, and competing governing documents.

The association has answered. Other defendants have moved to dismiss for lack of subject-matter jurisdiction.

The competing submissions therefore present questions concerning:

- The functional relationship between association membership and property availability;
- The governing instruments operative at the relevant time;
- The attribution of conduct among the respective defendants;
- The existence and nature of a cognizable injury;
- The constitutional character of the association's activities;
- The appropriate scope of discovery while these questions remain contested.

See *Walker*, ECF Nos. 17, 18, 20, 23 and 26.

The parties have supplied materially different versions of the Wisdom Woods LLC Operating Agreement.

One contains an express membership prerequisite involving the affiliated association. The other identifies separate invitation, application, approval, and eligibility procedures.

See *Walker*, ECF Nos. 20-4 and 23-8.

The respective instruments require examination according to their operative dates, actual legal effect, and correspondence with organizational practices.

The distinction between a necessary condition and a sufficient condition becomes material to that examination.

The defendants subsequently requested that discovery be deferred until resolution of their jurisdictional motion, identifying the irreversible consequences of disclosure under an improperly expanded litigation framework. ECF No. 34.

The plaintiff responded that discovery would assist in resolving the disputed relationships and would substantially overlap with discovery against the answering association regardless of the motion's disposition. ECF No. 35.

The court permitted discovery to proceed and issued an initial scheduling order on October 16, 2026. ECF No. 37.

The scheduling order establishes a December 2, 2026 conference-report deadline and proposes a litigation schedule extending through December 2028.

The order does not itself determine the propriety of every future discovery demand.

The accompanying draft scheduling provisions also identify an ordinary preference for protective orders of limited post-litigation duration.

The continuing constitutional significance of confidential associational information requires separate consideration where the protected interest extends beyond the proceeding.

The constitutional opportunity in *Walker* is to distinguish the legitimate production of evidence necessary to establish statutory liability from compulsory disclosures exceeding the necessity and scope of the controversy.

**B. Orwoll v. United States Department of Justice**

In *Orwoll*, the plaintiffs allege that governmental actors have improperly initiated, expanded, administered, and continued investigations concerning their activities.

The challenged governmental acts include information requests, organizational classifications, official communications, and the maintenance of administrative proceedings.

The plaintiffs additionally dispute the relationship between preliminary investigation and statutory conciliation.

The governmental defendants contest the reviewability and legal sufficiency of those claims.

The federal dismissal memoranda invoke administrative finality as a material limitation upon the requested judicial review. See *Orwoll*, ECF Nos. 18 and 21.

The plaintiffs' First Amended Complaint attempts to distinguish independently cognizable constitutional injuries from ordinary review of final agency action. ECF No. 20.

The controversy additionally presents questions concerning the authorization of preliminary investigation, the scope of demands directed toward separately organized entities, the statutory sequencing of conciliation, and the availability of judicial relief from continuing governmental conduct.

The constitutional opportunity in *Orwoll* is to examine whether particular governmental acts remain susceptible to meaningful judicial review independently of the disposition of the investigations during which they occur.

**C. The statutory relationship between concurrent proceedings**

Congress expressly contemplated the potential coexistence of private civil litigation and administrative enforcement under the Fair Housing Act.

Under 42 U.S.C. § 3613(a), an aggrieved person may generally commence a private civil action independently of the existence or procedural status of an administrative complaint, subject to the specified statutory limitations.

Section 3610(g)(4) restricts issuance of an administrative charge after commencement of trial in a civil action brought by the aggrieved party concerning the same alleged discriminatory housing practice.

The statutory architecture therefore permits concurrent proceedings in designated circumstances while identifying particular events that alter their permissible continuation or interaction.

The existence of private litigation does not independently establish that governmental investigation has become unauthorized.

The existence of governmental investigation does not independently establish the merits of private litigation.

The relationship between the proceedings must follow the particular conduct, statutory authority, procedural posture, and alleged injury.

Where multiple proceedings impose overlapping burdens or seek overlapping information, their cumulative consequences may warrant examination under the applicable procedural and constitutional standards.

The availability of relevant information through one proceeding does not independently establish an entitlement to obtain or use that information through another.

**D. The common question**

Both proceedings concern the lawful exercise of procedural mechanisms while material predicates for further intervention remain contested.

The judicial proceeding operates through the authority of the court.

The administrative proceeding operates through the delegated authority of executive agencies and public officers.

The procedural standards differ.

The common jurisprudential question is whether compulsory authority remains sufficiently identified, appropriately limited, and meaningfully reviewable throughout its operation.

In both proceedings, information may be obtained before ultimate liability is determined.

In both, the persons subjected to process may experience consequences that later disposition cannot reverse.

In both, the relationship connecting particular persons and entities to the regulated conduct remains contested.

The comparison does not require consolidation of the proceedings, acceptance of either party's factual characterization, or importation of disputed evidence from one record into the other.

It identifies a constitutional principle capable of application independently within each proceeding.

---

## XIV. THE PROPOSED CONSTITUTIONAL STANDARD

The foregoing authorities support the development of a unified standard governing compulsory process.

The following formulation is proposed as a jurisprudential synthesis grounded in established constitutional, statutory, and procedural principles.

### 1. Authority

Every compulsory act must remain attributable to an identifiable lawful source of authority.

The power to commence a proceeding must be distinguished from powers available during its development, adjudication, and enforcement.

Where the exercise of authority requires a particular procedural authorization, that authorization must retain its operative significance.

### 2. Classification

The object of the particular compulsory act must bear a legally relevant relationship to the authorized function.

Persons, entities, capacities, property interests, transactions, and protected associations must be classified according to their operative relationships.

The classification ought to become more precise as the relevant record develops.

### 3. Attribution

Responsibility must follow the legally relevant authority, participation, causation, or agency established by the record.

Organizational affiliation and ideological sympathy cannot independently supply missing elements of attribution.

The conduct of each actor must remain independently examinable notwithstanding the existence or failure of broader allegations concerning collective conduct.

### 4. Predicate

The factual and legal conditions applicable to the particular stage of process must be satisfied.

The degree of proof necessary to investigate a possible violation may differ from the degree necessary to compel protected disclosures, establish liability, impose a remedy, or enforce a sanction.

The satisfaction of a preliminary threshold does not independently establish satisfaction of every subsequent threshold.

**5. Proportionality**

The scope and burden of compulsory intervention must remain reasonably related to its lawful function and satisfy any heightened constitutional standard arising from the rights implicated.

Less intrusive mechanisms ought to receive consideration where applicable.

Where governing law requires tailoring or limitation of compulsory process, those requirements must receive effect before the particular intervention occurs.

**6. Continuity**

The exercise of authority must remain lawful throughout its operation.

The legitimacy of commencement does not conclusively establish the legitimacy of expansion, continuation, or disposition.

The continued exercise of compulsory authority must remain attributable to the lawful function through which it operates.

**7. Reviewability**

An independently cognizable injury must receive examination according to its own character, the applicable jurisdictional requirements, and available remedial mechanisms.

The unfinished character of a larger proceeding cannot independently establish that every constituent governmental act is constitutionally unreviewable.

Where later review cannot meaningfully correct a particular injury, the availability of earlier protection requires independent examination.

**8. Correction**

The remedy must correspond to the violation established.

Where a particular demand, condition, classification, or governmental act is unlawful, correction ought to remain available at the appropriate level without unnecessarily preventing the continued performance of otherwise lawful functions.

The correction of one unlawful relationship does not independently authorize intervention in every relationship associated with it.

The complete sequence is therefore:

**AUTHORITY → CLASSIFICATION → ATTRIBUTION → PREDICATE → PROPORTIONALITY → CONTINUITY → REVIEWABILITY → CORRECTION**

This standard preserves legitimate investigation and adjudication while maintaining constitutional limitations throughout their operation.

---

## XV. QUESTIONS FOR JUDICIAL RESOLUTION AND APPELLATE REVIEW

The following questions are independently significant. Their express consideration, where material to the disposition of an actual controversy, facilitates meaningful review and prevents distinct constitutional and procedural inquiries from collapsing into one another.

### Question One — Classification

What operative relationship between the actor, conduct, and regulated object establishes the applicability of the authority invoked?

### Question Two — Attribution

What factual and legal relationship connects each person, entity, or public officer to the particular conduct or injury alleged?

### Question Three — Procedural predicates

What must be established before compulsory process may commence, expand, or impose the particular burden in controversy?

### Question Four — Scope of compulsion

Where the existence or extent of jurisdiction remains contested, what limits govern the production of evidence extending beyond the resolution of those threshold questions?

### Question Five — Associational liberty

When compulsory inclusion, disclosure, or regulation burdens constitutionally protected association, what justification, proportionality, and tailoring are required?

**Question Six — Constitutional commensurability**

What principle resolves the potential incompatibility arising where a statutory entitlement to participation and constitutional protection against compulsory participation operate upon the same relationship?

**Question Seven — Classification antecedent to balancing**

Must the legal classification of the respective liberties, entitlements, and obligations precede the balancing of governmental interests?

**Question Eight — Constitutional invariance**

Can the resulting constitutional standard be applied reciprocally across materially comparable associations without its operation becoming contingent upon their racial, religious, cultural, or ideological identity?

**Question Nine — Jurisprudential reconsideration**

Where controlling jurisprudence fails to render those constitutional boundaries sufficiently precise, what mechanisms remain available for constitutional clarification and correction?

**Question Ten — Independent injury**

Can governmental or judicial process produce a presently cognizable constitutional injury before the conclusion of the proceeding through which the process operates?

**Question Eleven — Administrative finality**

May the nonfinality of administrative proceedings defeat an otherwise cognizable constitutional action seeking prospective relief?

**Question Twelve — Sovereign immunity**

What effect do applicable sovereign-immunity waivers have upon the availability of independent constitutional review during unfinished administrative proceedings?

**Question Thirteen — Governmental coercion**

Under what circumstances does the use of official communications, continuing investigation, or threatened escalation constitute an independently actionable exercise of governmental coercion?

**Question Fourteen — Contractual acquisition**

What limitations govern the use of investigatory authority to obtain contractual concessions, continuing supervisory powers, or waivers of claims?

**Question Fifteen — Statutory conciliation**

What authority governs the employment of statutory conciliation mechanisms before the procedural conditions establishing their applicability have arisen?

**Question Sixteen — Continuing duties**

What discrete obligations imposed by statute remain enforceable while the ultimate substantive determination remains discretionary or unresolved?

**Question Seventeen — Equality in enforcement**

What constitutional standards govern the selection, classification, expansion, and continuation of governmental interventions among materially comparable persons and activities?

**Question Eighteen — Availability of review**

Where review is postponed, what mechanism remains available to address the particular alleged constitutional injury?

**Question Nineteen — Meaningful remedy**

Can the available mechanism of review meaningfully prevent or correct the consequences of the particular alleged constitutional injury?

The questions are individually enumerated because each performs distinct constitutional or legal work. Where their resolution becomes material to disposition, the determination rendered upon each ought to remain independently ascertainable. This preserves the distinction between propositions resolved through adjudication, propositions governed by controlling precedent, and unresolved propositions remaining susceptible to subsequent judicial examination and jurisprudential reconsideration.

These questions are proposed for resolution to the extent presented by properly cognizable claims, defenses, and disputes.

A determination concerning one ought to remain distinguishable from a determination concerning another.

Dismissal for want of jurisdiction differs from dismissal for insufficient allegations.

Dismissal on immunity grounds differs from adjudication of constitutional lawfulness.

Dismissal for administrative nonfinality differs from a determination that no present constitutional injury exists.

The rejection of a particular remedy differs from the rejection of the substantive right invoked.

The disposition of an aggregate proceeding differs from examination of the particular governmental acts occurring within it.

Judicial precision concerning those distinctions preserves the intelligibility of constitutional adjudication.

It additionally permits subsequent reviewing courts to identify the particular determination under examination without attributing to the original disposition conclusions that were never rendered.

---

## XVI. THE CORE PROPOSED HOLDING

**The authority to initiate an investigative, administrative, or judicial proceeding does not independently establish the lawful scope of every compulsory act undertaken within that proceeding.**

Each challenged exercise of compulsory authority must be evaluated according to its applicable delegation, jurisdictional and factual predicates, operative consequences, and constitutional limitations.

Where process implicates protected rights, its scope and administration must satisfy the substantive standards governing those rights.

Where a particular act produces an independently cognizable constitutional injury, the availability of meaningful review must be examined separately from the finality of the larger proceeding, subject to the governing jurisdictional, statutory, and equitable requirements.

The authority to control the duration of a proceeding does not independently establish authority to foreclose judicial examination of otherwise cognizable injuries produced during that proceeding.

A limitation upon a particular remedy does not enlarge substantive governmental authority.

The existence of a legitimate underlying regulatory or judicial controversy does not extinguish the constitutional protections of the persons subjected to its process.

Where statutory enforcement implicates constitutionally protected voluntary relationships, the legal classification of the respective liberties, entitlements, and corresponding obligations must precede the determination of permissible compulsion.

The constitutional standard ought to remain capable of reciprocal application across materially comparable persons, associations, activities, and circumstances.

Where overlapping legal classifications produce incompatible obligations or unresolved constitutional boundaries, the resulting questions must remain susceptible to examination and correction through the applicable judicial mechanisms.

The existence of a governmental interest cannot independently establish the constitutional validity of the compulsory means employed to advance it.

**Constitutional limitations remain operative throughout the exercise of compulsory authority, including the process through which government determines whether further authority may lawfully be exercised.**

---

## XVII. CONCLUSION

Constitutional governance requires more than the lawful creation of governmental institutions.

It requires the lawful operation of those institutions.

- A person may be investigated for a legitimate purpose and subjected to an illegitimate demand.
- A person may be a proper defendant and subjected to disproportionate discovery.
- An association may participate in regulated transactions while retaining constitutional protection for its expressive activities.
- An agency may possess discretion over enforcement while remaining bound by statutory duties and constitutional limitations.
- An official may possess immunity against a particular remedy while having exercised authority unlawfully.

These distinctions remain operative throughout the exercise of public power.

The mature constitutional system must preserve both the agency of the citizen and the legitimate functions of government.

That requires precision in classification, correspondence between authority and action, and review capable of addressing the injury actually produced.

The government must remain accountable for the consequences of the authority it exercises.

Its authority ought to become more precisely defined as its interventions become more compulsory.

Its procedures must remain instruments for discovering and correcting violations, rather than mechanisms through which punishment can be administered independently of the standards governing punishment.

The constitutional significance of process lies in what it actually does, the authority through which it operates, and the consequences it produces.

The legitimacy of the proceeding depends upon the continued correspondence between those elements.

**The Constitution governs the process by which government determines whether it may act, the act itself, and the consequences produced through its exercise.**

**The remedy follows the violation.**

**The authority precedes the act.**

**The Constitution governs both.**

BMH

Brandon Michael Hayes
Natural Law Institute

Nov. 19, 2026